# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ROMELL BROOM** | ) | |
| Inmate No. 187-343 | ) | Case Number: 2:04-CV-1156 |
| Ohio State Penitentiary | ) | |
| 878 Coitsville-Hubbard Road | ) | |
| Youngstown, Ohio   44505 | ) | Judge Gregory L. Frost |
| | ) | |
| Plaintiff, | ) | Magistrate Judge Abel |
| | ) | |
| vs. | ) | |
| | ) | |
| **TED STRICKLAND** | ) | |
| Governor | ) | |
| State of Ohio | ) | |
| 77 South High Street, 30th Floor | ) | |
| Columbus, Ohio   43215, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TERRY J. COLLINS**, Director | ) | |
| Ohio Dept. of Rehabilitation & Correction | ) | |
| 1050 Freeway Drive North | ) | |
| Columbus, Ohio   43229, | ) | **INTERVENOR-PLAINTIFF'S** |
| | ) | **PROPOSED COMPLAINT FOR** |
| and | ) | **INJUNCTIVE AND DECLARATORY** |
| | ) | **RELIEF, ATTORNEY FEES, AND** |
| **EDWIN C. VOORHIES, JR.**, Warden | ) | **COSTS OF SUIT PURSUANT TO** |
| Southern Ohio Correctional Facility | ) | **42 U.S.C. § 1983** |
| 1724 State Route 728 | ) | |
| Lucasville, Ohio   45699, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MARK C. HOUK**, Warden, | ) | |
| Ohio State Penitentiary | ) | |
| 878 Coitsville-Hubbard Road | ) | |
| Youngstown, Ohio   44505, | ) | |
| | ) | |
| Defendants. | ) | |

-1-

Intervenor-Plaintiff, Romell Broom, for his Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 against Defendants Ted Strickland, Terry J. Collins, Edwin C. Voorhies, Jr., and Mark C. Houk, alleges and avers as follows:

### Nature of Action

1.      This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations of Plaintiff's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, and Plaintiff's rights to be free from violations of his substantive and procedural due process rights under the Fourteenth Amendment to the United States Constitution. Plaintiff seeks equitable, injunctive, and declaratory relief.

2.      Plaintiff is a death row inmate awaiting execution of his death sentence. His Petition for a Writ of Certiorari from the denial of his habeas petition was denied by the U.S. Supreme Court on February 26, 2007. Broom v. Mitchell, 127 S. Ct. 1376 (2007). An application for rehearing was denied on April 16, 2007. Broom v. Mitchell, 2007 U.S. LEXIS 4330 (April 16, 2007). An execution date has not yet been set as of the date Plaintiff sought intervention in this action.

3.      In this action, Plaintiff claims that Defendants' current method of lethal injection can and will, in effect, cause him to be tortured to death. No government within the United States can intentionally or negligently use an arbitrary, cruel, and/or unreliable method of execution.

4.      Defendants intend to violate Plaintiff's constitutional rights by executing him with drugs that include a paralyzing agent veterinarians will not use for the euthanasia of cats and dogs. This paralyzing drug can and will cast a chemical veil over, but will not numb the pain the Plaintiff will feel from, the excruciatingly painful effects of death by suffocation and heart attack. Defendants' lethal injection protocol includes an unreliable ultrashort-acting anesthetic that can and

will leave Plaintiff conscious but trapped in a paralyzed body wracked with the pain of suffocation and a heart attack. Defendants intend to execute Plaintiff with unreliable and arbitrary drugs, administered by inadequately trained personnel, who use inappropriate equipment and methods to cause death by lethal injection.

5.     The claims in this complaint are cognizable under 42 U.S.C. § 1983; they need not be brought in a habeas action. This lawsuit is not and should not be treated as being a successor habeas corpus petition. See, e.g., Hill v. McDonough, ___ U.S. ___, 126 S. Ct. 2096 (2006); Nelson v. Campbell, 541 U.S. 637 (2004). Plaintiff is not challenging his underlying capital conviction or death sentence in this present action; nor is he alleging that Defendants could never execute him. Plaintiff could be executed if: (1) no separate legal challenge overturns his capital conviction or death sentence; (2) he is not granted executive clemency; and (3) Defendants design a constitutionally acceptable method for executing him.

6.     Plaintiff seeks, among other relief, a temporary, preliminary and permanent injunction preventing Defendants from executing him by the means currently employed for carrying out an execution by lethal injection in the State of Ohio. Plaintiff also seeks an Order declaring that Defendants' current methods for conducting an execution by lethal injection violates the Eighth and Fourteenth Amendments to the United States Constitution.

## PARTIES, JURISDICTION AND VENUE

7.     Plaintiff Romell Broom is a United States citizen and a resident of the State of Ohio. He is currently a death-sentenced inmate in the custody of Defendants, and under the control and supervision of the State of Ohio Department of Rehabilitation and Correction, who have him incarcerated in the Ohio State Penitentiary in Youngstown, Ohio, under Inmate No. A 187-343. If

Plaintiff's capital conviction and/or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will execute him. Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use the lethal injection methods described herein to execute Romell Broom in the death house located on the grounds of the Southern Ohio Correctional Facility in Lucasville, Ohio, which is operated and controlled by the Defendants.

8.      Defendant Ted Strickland is the Governor of the State of Ohio. He is the final executive authority in the state, statutorily and constitutionally responsible for the execution of all sentences of death in Ohio and the manner in which those sentences are executed.

9.      Defendant Terry J. Collins is, and at all times relevant was, the Director of the State of Ohio Department of Rehabilitation and Correction ("DRC"), a department of the State of Ohio that was created and is maintained pursuant to Ohio Revised Code Section 5120. As such, Defendant was charged and authorized under Ohio Revised Code Section 5120.01 to prescribe and direct the promulgation of rules and regulations for the DRC, including the rules and regulations for the conduct of prison operations and execution procedures. He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

10.     Defendant Edwin C. Voorhies, Jr. is, and at all times relevant was, Warden of the Southern Ohio Correctional Facility at Lucasville ("SOCF"), a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code Section 5120.05, and which is the prison at which sentences of death are executed in the State of Ohio. Pursuant to Ohio Revised Code Section 5120.38, Defendant Voorhies, as the Warden of SOCF, is charged with management of SOCF and the oversight and conduct of operations there, including the oversight and conduct of

executions carried out there. He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

11.     Defendant Mark C. Houk is, and at all times relevant was, Warden of the Ohio State Penitentiary ("OSP"), a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code Section 5120.05. OSP is the prison at which most of the inmates sentenced to death in Ohio, including Broom, are currently housed for the purpose of serving their sentences until a death warrant is issued, at which time the practice is that the inmate subject to the death warrant will be moved to SOCF where the actual execution of that inmate will be carried out. Pursuant to Ohio Revised Code Section 5120.38, Defendant Houk, as the Warden of OSP, is charged with management of OSP and the oversight and conduct of operations there, including the oversight and conduct of preparing death sentenced inmates for the inmate's execution that will be conducted at SOCF. He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

12.     Defendants, and each of them at all times relevant hereto, were acting in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of state law. Upon information and belief, unless preliminarily and permanently enjoined, the Defendants, and each of them, intend to act in their respective official capacities and under the authority of state law by executing Plaintiff by utilizing lethal injection methods that will violate his constitutional rights.

13.     Plaintiff brings this action to enforce and protect rights conferred by the Eighth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment to the United States Constitution, and to enforce and protect rights conferred by the Fourteenth

Amendment to the United States Constitution.

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that it arises under the Constitution of the United States; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to secure equitable relief under an act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 28 U.S.C. § 2201(a), in that one purpose of this action is to secure declaratory relief; and under 28 U.S.C. § 2202, in that one purpose of this action is to secure preliminary and permanent injunctive relief.

15.     This Court has supplemental jurisdiction over any state statutory claim asserted by Plaintiff pursuant 28 U.S.C. § 1367, in that the state and federal claims are derived from a common nucleus of operative facts.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) in that all of the Defendants are situated within the State of Ohio and at least three of them reside within the Southern District of Ohio, and under 28 U.S.C. § 1391(b)(2) in that all of the events described herein have and will transpire (absent judicial relief) within this judicial district. Defendant Strickland exercises his final authority over the other Defendants in the seat of Ohio's government, located in Franklin County, Ohio; the lethal injection execution procedures were promulgated by Defendants Collins, Voorhies, and Houk in Franklin County, Ohio; and Voorhies has executed other Ohio inmates and intends to execute Plaintiff in Scioto County, Ohio, by the method of lethal injection described herein.

## ADMINISTRATIVE REMEDIES

17.    Plaintiff has exhausted his administrative remedies and/or has done everything required for exhaustion to be deemed complete and/or futile. He timely pursued his administrative remedies under the Ohio Administrative Code ("OAC") § 5120-9-31, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a).

18.    On March 1, 2007, Broom filed his grievance challenging among other things the lethal injection protocol that was adopted by the Defendants on or about July 10, 2006. Broom filed his grievance directly with the DRC Office of the Chief Inspector, in Columbus, Ohio, the exhaustion procedure recognized by this Court in its recent Order in this case dated September 20, 2006. See Order Denying Without Prejudice Motion of Jeffrey Lundgren to Intervene, Docket No. 73 ("[T]he administrative remedy of a grievance directly to the Office of the Chief Inspector pursuant to O.A.C. 5120-9-31 is an available remedy within the meaning PLRA. See 42 U.S.C. § 1997e(a)."). A copy of Broom's grievance is attached hereto as Exhibit 1.

19.    The grievance was designated as CI-03-07-00015 and was received by Chief Inspector Gary R. Croft on March 5, 2007. See Exhibit 2. The Chief Inspector represented to Broom that a ruling on the grievance would be made within 30 days, or by April 4, 2007.

20.    The Chief Inspector did not respond to the grievance by April 4, 2007.  Instead, the State of Ohio used the delay to attempt to get an execution date in place for Broom. Thus, on April 4, 2007, rather than ensuring that a timely response was delivered by the Chief Inspector to Broom's grievance, the State filed a motion in the Ohio Supreme Court asking that Court to set Broom's execution date. See Exhibit 5.

21.    On or about April 16, 2007, and almost two weeks passed the deadline for

responding, the DRC Chief Inspector requested more time (without specifying any amount of time) to investigate and review Broom's grievance. See Exhibit 3. Pursuant to OAC 5120-9-31(L), the Chief Inspector may only have more than 30 days to grant or deny the grievance for *good cause shown*. No such showing has been made in this case. In addition, relief has never been granted by DRC to any death row inmate who has filed a grievance challenging lethal injection, and the State of Ohio, through the Office of the Ohio Attorney General, is vigorously opposing the lawsuit Broom is seeking to join.

22.     On April 17, 2007, the Chief Inspector issued his decision denying Broom's grievance in its entirety.  A copy of the denial is attached hereto as Exhibit 4.

23.     Under these circumstances, Plaintiff has thus timely and completely exhausted the administrative remedies available to him and/or has done everything required for exhaustion to be deemed complete and/or to be deemed futile. Accordingly, Plaintiff has complied with any and all mandatory pre-conditions to the filing of this action in federal court.

## FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT

24.     Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1 through 23 of this Complaint as if fully rewritten here.

25.     The State of Ohio intends to execute Plaintiff by employing means and methods of execution by lethal injection that will violate Plaintiff's rights under the United States Constitution.

26.     Under the Eighth Amendment to the United States Constitution, cruel and unusual punishment claims involving a particular means of effectuating a sentence of death are analyzed under a six prong test in which proof of any one prong establishes an Eighth Amendment violation:

a. the physical pain inflicted is excessive in light of readily available

-8-

alternatives;

b.  the risk of pain is more than the Constitution tolerates;

c.  the risk of pain and suffering is unnecessary in light of available alternatives;

d.  mutilation of the body during the execution;

e.  unnecessary psychological suffering;

f.  the particular means of effectuating the sentence of death violates evolving standards of decency.

29.     Defendants have created, maintained and implemented a method of execution (i.e., lethal injection), and procedures, practices, policies, protocols and/or means for accomplishing that method of execution, which, if utilized in Plaintiff's case, will subject Plaintiff to an unlawful deprivation of his constitutional rights, including his right to be free from cruel and unusual punishment, his right to substantive and procedural due process, his right to equal protection of the law, and his right to not be exposed to ex post facto laws.

30.     Specifically included within this complaint is a constitutional challenge under § 1983 to the Defendants' adoption and anticipated use of DRC Policy No. 01-COM-11, entitled "Execution," with an effective date of July 10, 2006 (hereinafter "DRC Execution Protocol"), and any other procedures, practices, policies, protocols and/or means for accomplishing Plaintiff's execution by lethal injection that are or might be adopted by Defendants for use at Plaintiff's contemplated execution and which are the same as or similar to the DRC Execution Protocol in those respects challenged herein. A copy of the DRC Execution Protocol is attached hereto as Exhibit 6.

31.     Defendants did not notify Plaintiff of the adoption of the DRC Execution Protocol

and did not provide him with a copy of it.

32.     In the event that the DRC Execution Protocol – and/or any other procedures, practices, policies, protocols and/or means for accomplishing Plaintiff's execution by lethal injection that are or might be adopted by Defendants for use at Plaintiff's contemplated execution and which are the same as or similar to the DRC Execution Protocol in those respects challenged herein – were to be utilized in Plaintiff's execution, Plaintiff would be subjected to an unlawful deprivation of his constitutional rights, including his right to be free from cruel and unusual punishment, his right to substantive and procedural due process, his right to equal protection of the law, and his right to not be exposed to ex post facto laws.

33.     Plaintiff further alleges that said Defendants have failed, at all times through and including the date of this complaint, to create, maintain and implement procedures, practices, policies, protocols and/or means for carrying out an execution by lethal injection that would allow for Plaintiff's execution by lethal injection to occur in a manner and by a means that would not violate his constitutional rights. Unless enjoined, Defendants will continue with their unconstitutional failure to create, maintain and implement procedures, practices, policies, protocols and/or means for carrying out an execution by lethal injection that do not violate Plaintiff's constitutional rights. Such constitutional means for carrying out an execution by lethal injection do exist; Defendants have refused to adopt a constitutional means and Defendants will persist in that refusal unless enjoined by this Court.

34.     Among other claims, and in addition to those already outlined above, Defendants' adoption and use of the DRC Execution Protocol – and/or any other procedures, practices, policies, protocols and/or means for accomplishing Plaintiff's execution by lethal injection that are or might

-10-

be adopted by Defendants for use at Plaintiff's contemplated execution and which are the same as

or similar to the DRC Execution Protocol in those respects challenged herein – violates and/or

would violate Plaintiff's constitutional rights in at least the following respects to be more fully

developed at trial:

(a)    The use of the three drugs specified in the DRC Execution Protocol (i.e., thiopental sodium, pancuronium bromide, and potassium chloride), and the manner in which those drugs are to be administered, create an undue risk that Plaintiff will be subjected to extreme, excruciating and unnecessary pain and suffering and that Plaintiff will be forced to endure an agonizing death.

(b)    The Defendants have failed to incorporate into the DRC Execution Protocol a requirement that the personnel assigned to establish and maintain the intravenous (IV) lines are properly trained. Further, Defendants have made insufficient preparation for the real possibility, encountered in, for example, the execution of Joseph Clark on May 2, 2006, that IV access to Plaintiff's veins cannot be successfully established or maintained.

(c)    The Defendants have failed to incorporate into the DRC Execution Protocol the same safeguards that accompany the administration of anesthesia in medical procedures, they have failed to require that execution teams include persons with sufficient training in the intravenous administration of anesthesia, they have failed to permit personnel to be close enough to the Plaintiff during the execution to monitor the administration of the anesthesia, and they have failed to require the use of trained personnel to determine whether Plaintiff has been properly and effectively anesthetized before the other two drugs are injected. The Defendants have failed to require that the anesthesia provided to the Plaintiff is to be provided by only those individuals who possess the experience and proficiency of physicians who have completed residency training in the specialty of Anesthesiology and/or by nurses who have undergone the requisite training to become Certified Registered Nurse Anesthetists.

(d)    The use of the drug pancuronium bromide serves no rational or legitimate purpose and compounds the risk that Plaintiff will suffer excruciating pain during his execution. Pancuronium bromide paralyzes all voluntary muscles, but does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. Pancuronium bromide is a neuromuscular blocking agent. Its effect is to render the muscles unable to contract but it does not affect the brain or the nerves. It is used in surgery to ensure that there is no movement and that the patient is securely paralyzed so that surgery can be

-11-

performed without contraction of the muscles. If sodium thiopental has not first been properly administered in a dose sufficient to cause death or at least the loss of consciousness for the duration of the execution procedure, then the use of pancuronium places the Plaintiff at risk for consciously experiencing paralysis, suffocation and the excruciating pain of the intravenous injection of high dose potassium chloride.

(e)     By mandating the use of pancuronium bromide in the DRC Execution Protocol, or any other paralytic agent designed to paralyze the Plaintiff, the Defendants are seeking to ensure that Plaintiff will be physically unable to signal consciousness, and thus unable to cry out or scream for help, in the event that Plaintiff is experiencing extreme, excruciating and unnecessary pain and suffering during the execution. Defendants are mandating the use of this drug because they are much more interested in creating the appearance of a humane execution, and in concealing from the execution team, the witnesses, and the public how truly horrific a death by potassium chloride is for the inmate, than they are in ensuring that Plaintiff's execution is in fact humane and is in fact consistent with the Eighth Amendment.

(f)     By mandating the use of the drug potassium chloride in the DRC Execution Protocol, Defendants have needlessly increased the risk that Plaintiff will experience excruciating pain prior to his execution. There exist, however, alternative chemicals that do not present such a risk. Defendants have failed to choose a chemical that would cause death in a manner that does not subject Plaintiff to extreme, excruciating and unnecessary pain and suffering.

(g)     Defendants have failed to incorporate into the DRC Execution Protocol a requirement that a qualified and licenced Ohio physician be in attendance at the execution, and that such physician be responsible for supervising the conduct of the execution team during the execution, and for ensuring that the execution is carried out in accordance with basic tenets of medical practice and safety.

(h)     The DRC Execution Protocol is not compliant with the guidelines set forth by the American Veterinary Medical Association for the euthanasia of animals.

35.     The DRC Execution Protocol does not disclose all of the material details surrounding the process by which an inmate sentenced to die will be executed pursuant to lethal injection; nor have the Defendants disclosed the details surrounding the qualifications and training of the

-12-

personnel involved in the administration of lethal injection. Accordingly, as more information about the process is made available to Plaintiff thorough discovery in this litigation or otherwise, Plaintiff reserves the right to make additional constitutional challenges to the DRC Execution Protocol and to any other procedures, practices, policies, protocols and/or means Defendants' intend to employ in carrying out Plaintiff's execution by lethal injection.

36.    Plaintiff is unaware of any efforts by or assurances from Defendants with respect to the adoption and implementation of methods of lethal injection, including those set forth in the DRC Execution Protocol, that are in keeping with contemporary medical, community and constitutional standards that proscribe the infliction of cruel and unusual punishment in the administration of the death sentence by lethal injection.

37.    According to the opinions of qualified medical experts and other reliable sources, detailed at length in, for example, pleadings filed by other plaintiffs in this litigation (see, e.g., Docket Entry No. 2) and in similar litigation throughout the country,[1] in recent court opinions,[2] and

---

[1] See, e.g., **Brown v. Beck**, Case No. 5:06-CT-3018-H, U.S. Dist. Court, E.D. North Carolina, Docket Entry No. 3 and Exh. F thereto (Affidavit of Dr. Mark J.S. Heath), Exh. G thereto (Affidavit of Philip G. Boysen, M.D., FACP, FCCP, FCCM), Exh. H thereto (Affidavit of Kevin Concannon, D.V.M., D.A.C.V.A.), Exh. I thereto (Affidavit of Nancy Bruton-Maree, CRNA); **Nooner v. Norris**, Case No. 5:06-CV-00110, U.S. Dist. Court, E.D. Arkansas, Docket Entry No. 21 and Exh. 7 thereto (Declaration of Mark J.S. Heath, M.D.); **Taylor v. Crawford**, Case No. 05-CV-04173, U.S. Dist. Court, W.D. Missouri, Docket Entry No. 5 and Exh. 1 thereto (Declaration of Mark J.S. Heath, M.D.), Docket Entry No. 149 (Expert Witness Report of Mark Heath, M.D.), Docket Entry No. 187 (Supplemental Expert Witness Report of Mark Heath, M.D.), Docket Entry No. 202 and Exh. 1 thereto (Supplemental Declaration of Mark J.S. Heath, M.D.). See generally Boalt Hall Death Penalty Clinic, Resources Regarding Challenges to Lethal Injection (www.law.berkeley.edu/clinics/dpclinic/resources.html).

[2] See, e.g., Taylor v. Crawford, 2006 U.S. Dist. LEXIS 74896 (D. Mo. 2006)(although the State's revisions to the protocol were "an improvement, there were still several areas which the Court finds do not meet Constitutional standards. The State's response does nothing to address these concerns and indicates its lack of willingness to even attempt to comply with the Court's order"); Morales v. Tilton, 465 F. Supp. 2d 972 (D. Cal. 2006)(California's lethal-injection protocol, "as actually administered in practice," violates the Eighth Amendment. California's "implementation of lethal injection is broken, but it can be fixed.").

in recent publications authored by reliable sources,[3] and to be more fully developed at trial, it cannot be established to a reasonable degree of medical certainty that the drugs administered in the lethal injection process will adequately sedate Plaintiff so as to spare him the excruciating pain and suffering that attends death by suffocation and heart failure. More particularly, Plaintiff alleges that the DRC Execution Protocol creates an unacceptable risk that he will not be anesthetized to the point of being unconscious and unaware of pain for the duration of the execution procedure.

38.    Likewise, the DRC Execution Protocol does not require that a person with adequate medical training administer and monitor the execution so as to detect whether a condemned inmate is suffering pain and if so to determine whether and what appropriate medical steps may be taken to alleviate that pain.

39.    The DRC Execution Protocol does not include or require the use of medical equipment designed to effectively and accurately monitor a condemned person's heartbeat, pulse rate or brain waves during the execution. The absence of such equipment from the protocol suggests that the procedures employed by the Defendants to cause death by lethal injection are inadequate and indifferent to whether a condemned person experiences extreme pain and suffering during the course of his or her execution by reasons of any number of factors including but most especially due to the injection of inappropriate drugs or the injection of inadequate doses or combinations of drugs

---

[3]See, e.g., So Long as They Die: Lethal Injections in the United States, HUMAN RIGHTS WATCH, Vol. 18, No. 1(G) (April 2006)(available at http://hrw.org/reports/2006/us0406/); T.A. Zimmers, J. Sheldon, D.A. Lubarsky, et al., Lethal Injection for Execution: Chemical Asphyxiation?, PLoS Med, Vol. 4, Issue 4, e156 (April 2007)(available at: http://medicine.plosjournals.org).

-14-

or the improper delivery of drugs into the condemned inmate's body.

40.    For the foregoing reasons, the DRC Execution Protocol – and/or any other procedures, practices, policies, protocols and/or means for accomplishing Plaintiff's execution by lethal injection that are or might be adopted by Defendants for use at Plaintiff's contemplated execution and which are the same as or similar to the DRC Execution Protocol in those respects challenged herein – is inadequate, unreliable and arbitrary such that the lethal injection process will likely cause Plaintiff to suffer excruciating pain and cruel and unusual punishment in the course of his death.

41.    Under the circumstances set forth in this Complaint, Plaintiff faces the risk of irreparable harm in the form of excruciating pain and suffering in the course of his execution for which there is no adequate remedy at law in the absence of temporary, preliminary and permanent injunctive relief enjoining the Defendants from using means and methods of execution by lethal injection that cause cruel and unusual punishment in violation of the United States Constitution.

## FIRST CLAIM: EIGHTH AMENDMENT VIOLATION

42.    Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1 through 41 of this Complaint as if fully rewritten here.

43.    Defendants have created, maintained and implemented lethal injection procedures, practices, customs, and methods, including the DRC Execution Protocol, that they intend to use to execute Plaintiff. Defendants' lethal injection methods manifest their deliberate indifference towards Plaintiff's constitutional rights, both by what Defendants include and what they exclude from their methods of execution by lethal injection. Despite due notice of the constitutional deficiencies in their lethal injection methods and in the DRC Execution Protocol, Defendants have failed and refused,

-15-

and are persisting in their failure and refusal, to adopt lethal injection procedures, practices, customs, and methods that comply with the U.S. Constitution.

44.    Application by Defendants of Defendants' lethal injection methods and of the DRC Execution Protocol will violate Plaintiff's constitutional rights to be free from arbitrary, capricious, cruel, and unusually painful punishment, which rights are secured and guaranteed to him by the Eighth Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment of the United States Constitution to limit Defendants' powers while acting individually or under the color and authority of state law.

**SECOND CLAIM: FOURTEENTH AMENDMENT DUE PROCESS VIOLATION**

45.    Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1 through 44 of this Complaint as if fully rewritten here.

46.    Defendants have created, maintained and implemented lethal injection procedures, practices, customs, and methods that they intend to use to execute Plaintiff. Defendants' lethal injection methods manifest their deliberate indifference towards Plaintiff's constitutional rights, both by what Defendants include and what they exclude from their methods of execution by lethal injection.  Despite due notice of the constitutional deficiencies in their lethal injection methods and in the DRC Execution Protocol, Defendants have failed and refused, and are persisting in their failure and refusal, to adopt lethal injection procedures, practices, customs, and methods that comply with the U.S. Constitution.

47.    Application by Defendants of Defendants' lethal injection methods and of the DRC Execution Protocol will violate Plaintiff's constitutional rights to substantive and procedural due process as secured and guaranteed to him by the Fourteenth Amendment of the United States

Constitution, which limits Defendants' powers while acting individually or under the color and authority of state law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant him the following relief:

A.      Plaintiff requests a temporaryrestraining order and a preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out Plaintiff's execution during this lawsuit.

B.      Plaintiff requests a temporary restraining order and a preliminary and permanent injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out Plaintiff's execution in the manner they currently utilize for carrying out lethal injections including that manner set forth in the DRC Execution Protocol. Plaintiff also seeks an order declaring that the DRC Execution Protocol violates the Eighth and Fourteenth Amendments.

C.      Plaintiff requests a temporary restraining order and preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out his execution until they come up with a reasonable, humane means for guaranteeing venous access during his execution.

D.      Plaintiff requests a temporary restraining order and a preliminary injection barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out his execution by a lethal injection process that does not administer an analgesic. Plaintiff also seeks an order declaring that the failure to administer an analgesic during the lethal injection process violates the Eighth and Fourteenth Amendments.

-17-

E.      Plaintiff requests a temporary restraining order and a preliminary injection barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out his execution by a lethal injection process that utilizes thiopental sodium. Plaintiff also seeks an order declaring that the use of thiopental sodium in lethal injections violates the Eighth and Fourteenth Amendments to the United States Constitution.

F.      Plaintiff requests a temporary restraining order and a preliminary injection barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out his execution by a lethal injection process that utilizes pancuronium bromide. Plaintiff also seeks an order declaring that the use of pancuronium bromide in lethal injections violates the Eighth and Fourteenth Amendments to the United States Constitution.

G.      Plaintiff requests a temporary restraining order and a preliminary injection barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out his execution by a lethal injection process that utilizes potassium chloride.  Plaintiff also seeks an order declaringthat the use of potassium chloride in lethal injections violates the Eighth and Fourteenth Amendments to the United States Constitution.

H.      Plaintiff seeks an order declaring that Defendants' failure to consider using alternative chemicals in lethal injections constitutes deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

I.      Plaintiff requests a temporary restraining order and preliminary injunction barring

Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from executing him by lethal injection unless Defendants inject the chemicals directly into his vein.

J.     Plaintiff seeks a temporary restraining order and preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out Plaintiff's execution without adequate procedures for monitoring for the ability to feel pain prior to and during the injections of pancuronium bromide and potassium chloride.  Plaintiff also seeks an order declaring that Defendants' failure to monitor for the ability to feel pain prior to and during the injections of pancuronium bromide and potassium chloride violates the Eighth and Fourteenth Amendments to the United States Constitution.

K.     Plaintiff seeks a temporary restraining order and preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out Plaintiff's execution unless a licensed and board certified anesthesiologist monitors for consciousness throughout the execution, and unless such anesthesiologist can take remedial measures to stop Plaintiff from feeling pain if the anesthesiologist determines that Plaintiff is in pain at any point during the execution.

L.     Plaintiff seeks a temporary restraining order and preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from using a cut down procedure and an order declaring that using a cut down procedure in lethal injections violates the Eighth and Fourteenth Amendments to the United States Constitution.

M.     Plaintiff seeks a temporary restraining order and preliminary injunction barring

Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from attempting to insert an IV into Plaintiff for more than 20 minutes and an order declaring that attempting to insert an IV for more than 20 minutes violates the Eighth and Fourteenth Amendments to the United States Constitution.

N.    Plaintiff seeks a temporary restraining order and preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out Plaintiff's execution until Defendants have the proper equipment for maintaining life after thiopental sodium and pancuronium bromide have been injected, and until Defendants have properly trained individuals to operate that equipment. Plaintiff also seeks an order declaring that Defendants' current equipment for maintaining life after the injection of thiopental sodium and pancuronium bromide is injected is insufficient to maintain life, and that their failure to have the proper equipment at the execution chamber violates the Eighth and Fourteenth Amendments to the United States Constitution.

O.    Plaintiff requests a temporary restraining order and preliminary injunction barring Defendants and their agents, officials, representatives, and employees or others working in concert or cooperation with any of them from carrying out Plaintiff's execution until Plaintiff has been provided with a copy of all of the lethal injection protocols that will be used at Plaintiff's execution and given adequate time to review the protocols. Plaintiff also seeks an order declaring that the failure to disclose all of the execution protocols that will be used at Plaintiff's execution violates due process and fundamental notions of fairness.

P.    Plaintiff requests that this Court grant him declaratory relief by issuing an Order declaring that the Defendants' current means, methods, practices, procedures, and customs regarding

execution by lethal injection, including the DRC Execution Protocol, violate the Eighth and

Fourteenth Amendments to the United States Constitution.

       Q.     Plaintiff requests that this Court grant him reasonable attorney fees pursuant to 42

U.S.C. § 1988 and the laws of the United States.

       R.     Plaintiff requests that this Court grant such other and further relief in his favor as the

Court deems just and proper.

Dated:  April 25, 2007

                                          Respectfully Submitted,

                                          /s/ Timothy F. Sweeney
                                          Timothy F. Sweeney, Esq. (0040027)
                                          LAW OFFICE OF TIMOTHY FARRELL SWEENEY
                                          The 820 Building, Suite 430
                                          820 West Superior Ave.
                                          Cleveland, Ohio   44113-1800
                                          (216) 241-5003
                                          (216) 241-3138 (fax)
                                          Tim@timsweeneylaw.com

                                          S. Adele Shank
                                          3380 Tremont Road, 2nd Floor
                                          Columbus, OH   43221
                                          (614) 326-1217
                                          (614) 326-1231 (fax)
                                          shanklaw@att.net

                                          Counsel for Petitioner Romell Broom

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 25th day of April 2007, the foregoing INTERVENOR-PLAINTIFF'S PROPOSED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, ATTORNEY FEES, AND COSTS OF SUIT PURSUANT TO 42 U.S.C. §1983, with all exhibits, was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Timothy F. Sweeney
Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY

# **EXHIBIT 1**

4/4
4D31

# NOTIFICATION OF GRIEVANCE

| Name: | | Institution: |
|---|---|---|
| ROMELL BROOM | | OSP |
| Number: | Grievance No. (To be completed by Inspector's Office): | |
| #187-343 | CI - 03 -07 - 015 | |
| Housing Assignment: | Date: | |
| B-2-11 | 3 - 1 - 07 | |

A. Explain your complaint. (Be specific. Address only one incident or concern. Include what would solve your complaint.)   The Warden of OSP, Marc Houk, and others were and are personally and knowingly involved in violating my constitutional rigth to be free from cruel and unusual punishment by adopting and using the polfcy/protocol for lethal injection now in effect in the State of Ohio as reflected in, for example, DRC Policy No. 01-COM-11 dated 7/10/06, and they have failed to adopt policies and protocols for lethal injection that are constitutional. See the attached two pages for a more complete description of my complaint, which are incorporated fully herein.

B. I will experience a substantial risk of **PHYSICAL INJURY** if this grievance is not promptly addressed.

☒ Yes    ☐ No

C. I filed an informal complaint on _____ with _____

Date          Name                    Position

(Attach informal complaint resolution).

D. I have read Administrative Regulation 5120-9-31.    ☒ Yes    ☐ No

Inmate Signature: Romell Broom #87-343

DRC 4088 (Rev. 11/01)        DISTRIBUTION:    WHITE & CANARY - Inspector        PINK - Inmate        ACA 4271, 4331

ATTACHMENT TO GRIEVANCE AGAINST WARDEN AND OTHERS

I, **Romell Broom, Inmate No. 187-343**, incorporate the following detailed complaint into my Grievance form as if fully rewritten therein:

**Governor Ted Strickland, DRC Director Terry J. Collins, SOCF Warden Edwin C. Voorhies, Jr., OSP Warden Marc Houk**, and certain "other persons" whose names and titles are not known to me at this time (Strickland, Collins, Voorhies, Houk, and said "other persons" are hereinafter collectively called "the Respondents") have created, maintained and implemented a method of execution (lethal injection), and procedures, practices, policies, protocols and/or means for accomplishing that method of execution, which, if utilized in my case, will subject me to an unlawful deprivation of my constitutional rights, including my right to be free from cruel and unusual punishment, my right to substantive and procedural due process, my right to equal protection of the law, and my right to not be exposed to ex post facto laws.

I specifically include within this complaint a challenge to the newly adopted DRC Policy No. 01-COM-11, "Execution," with an effective date of July 10, 2006 (hereinafter "DRC Execution Protocol"). In the event the DRC Execution Protocol (or any other subsequently-adopted DRC policy that is the same as or similar in material respects to the DRC Execution Protocol) was to be utilized in my execution, I would be subjected to an unlawful deprivation of my constitutional rights, including my right to be free from cruel and unusual punishment, my right to substantive and procedural due process, my right to equal protection of the law, and my right to not be exposed to ex post facto laws. I further complain that said Respondents have failed, at all times through and including the date of this informal complaint, to create, maintain and implement procedures, practices, policies, protocols and/or means for carrying out an execution by lethal injection that would allow for my execution by lethal injection to occur in a manner and by a means that would not violate my constitutional rights. Such constitutional means for carrying out an execution by lethal injection do exist; Respondents have chosen not to adopt a constitutional means.

Among other deficiencies in the DRC Execution Protocol, and in addition to those already outlined above, my complaint against the Respondents includes the following:

(1)  The use of the three drugs specified in the DRC Execution Protocol (i.e., thiopental sodium, pancuronium bromide, and potassium chloride), and the manner in which those drugs are to be administered, create an undue risk that I will be subjected to extreme, excruciating and unnecessary pain and suffering and that I will be forced to endure an agonizing death.

(2)  The Respondents have failed to incorporate into the DRC Execution Protocol a requirement that the personnel assigned to establish and maintain the intravenous (IV) lines are properly trained. Further, Respondents have made insufficient preparation for the real possibility, encountered in, for example, the execution of Joseph Clark on May 2, 2006, that IV access to the inmate's veins cannot be successfully established or maintained.

(3) The Respondents have failed to incorporate into the DRC Execution Protocol the same safeguards that accompany the administration of anesthesia in medical procedures, they have failed to require that execution teams include persons with sufficient training in the intravenous administration of anesthesia, they have failed to permit personnel to be close enough to the condemned inmate during the execution to monitor the administration of the anesthesia, and they have failed to require the use of trained personnel to determine whether the condemned inmate has been properly and effectively anesthetized before the other two drugs are injected. The Respondents have failed to require that the anesthesia provided to the

Page 1 of  2

condemned inmate is to be provided by only those individuals who possess the experience and proficiency of physicians who have completed residency training in the specialty of Anesthesiology and/or by nurses who have undergone the requisite training to become Certified Registered Nurse Anesthetists.

(4) The use of the drug pancuronium bromide serves no rational or legitimate purpose and compounds the risk that an inmate may suffer excruciating pain during his execution. Pancuronium bromide paralyzes all voluntary muscles, but does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. Pancuronium bromide is a neuromuscular blocking agent. Its effect is to render the muscles unable to contract but it does not affect the brain or the nerves. It is used in surgery to ensure that there is no movement and that the patient is securely paralyzed so that surgery can be performed without contraction of the muscles. If sodium thiopental has not first been properly administered in a dose sufficient to cause death or at least the loss of consciousness for the duration of the execution procedure, then the use of pancuronium places the condemned inmate at risk for consciously experiencing paralysis, suffocation and the excruciating pain of the intravenous injection of high dose potassium chloride.

(5) By mandating the use of pancuronium bromide in the DRC Execution Protocol, or any other paralytic agent designed to paralyze the condemned inmate, the Respondents are seeking to ensure that I will be physically unable to signal consciousness, and thus unable to cry out or scream for help, in the event that I am experiencing extreme, excruciating and unnecessary pain and suffering during the execution. I believe the Respondents are mandating the use of this drug because they are much more interested in creating the appearance of a humane execution, and in concealing from the execution team, the witnesses, and the public how truly horrific a death by potassium chloride is for the inmate, than they are in ensuring that my execution is in fact humane and is in fact consistent with the Eighth Amendment.

(6) By mandating the use of the drug potassium chloride in the DRC Execution Protocol, the Respondents have needlessly increased the risk that I will experience excruciating pain prior to death. There exist, however, alternative chemicals that do not present such a risk. Respondents have failed to choose a chemical that would cause death in a manner that does not subject me to extreme, excruciating and unnecessary pain and suffering.

(7) The Respondents have failed to incorporate into the DRC Execution Protocol a requirement that a qualified and licenced Ohio physician be in attendance at the execution, and that such physician be responsible for supervising the conduct of the execution team during the execution, and for ensuring that the execution is carried out in accordance with basic tenets of medical practice and safety.

(8) The DRC Execution Protocol is not compliant with the guidelines set forth by the American Veterinary Medical Association for the euthanasia of animals.

Romell Broom  187-343
Romell Broom

Dated: 3 - 1 - 07

Page 2 of 2

**EXHIBIT 2**



# Ohio Department of Rehabilitation and Correction

1050 Freeway Drive North
Columbus, Ohio  43229

Ted Strickland, Governor                    www.drc.state.oh.us                    Terry J. Collins, Director

**TO:**            Warden
                   OHIO STATE PENITENTIARY

**FROM:**          Gary R. Croft
                   Chief Inspector

**SUBJECT:**       Grievance No. CI-03-07-000015
                   BROOM, ROMELL - A187343

**DATE:**          March 09, 2007

A grievance designated as CI-03-07-000015 was received in this office on 03/05/2007. The above named inmate filed the grievance. It will be investigated and reviewed within 30 calendar days of receipt.

GC/sce

Cc: Inmate/Grievant

# EXHIBIT 3

**Thomas, Mark**

| | |
|---|---|
| **From:** | Evans, Suzanne |
| **Sent:** | Monday, April 16, 2007 10:43 AM |
| **To:** | Thomas, Mark |
| **Subject:** | Extension Letter |

 # Ohio Department of Rehabilitation and Correction

1050 Freeway Drive North
Columbus, Ohio 43229

Ted Strickland, Governor          www.drc.state.oh.us          Terry J. Collins, Director

| | |
|---|---|
| **TO:** | BROOM, ROMELL - A187343<br>OHIO STATE PENITENTIARY |
| **FROM:** | Gary R. Croft<br>Chief Inspector |
| **SUBJECT:** | Notification of Additional Time Required |
| **DATE:** | April 16, 2007 |

Dear BROOM, ROMELL ,

Please be advised that additional time will be required before a decision can be made concerning your grievance CI-03-07-000015. This extension is needed to effect a fair and proper resolution.

/se

Cc: Director,
    File

4/16/2007

# **EXHIBIT 4**

# Decision of the Chief Inspector on a Grievance

| Inmate: BROOM, ROMELL | Institution: OSP |
|---|---|
| Number: A187343 | Grievance No.: CI-03-07-000015 |
| Date: 04/17/2007 | |

The office of the Chief Inspector is in receipt of your Notification of Grievance against

_____Warden Houk_____ at the _____Ohio State Penitentiary_____

*(Name of Warden or Inspector)*          *(Name of Institution)*

In your complaint you state that Governor Strickland, Director Collins, Warden Voorhies, and Warden Houk have created and maintained a method of execution (lethal injection), and procedures, practices, policies, protocols and/or means for accomplishing that method of execution, which, if utilized in your case, will subject you to and unlawful deprivation of your constitutional rights, including your right to be free from cruel and unusual punishment, your right to substantive and procedural due process, your right to equal protection of the law, and your right not to be exposed to ex post facto laws. You allege that the use of the three drugs specified in the DRC Execution Protocol (i.e., thiopental sodium, pancuronium bromide, and potassium chloride) and the manner which the drugs are to be administered, create an undue risk that you will be subjected to extreme, excruciating and unnecessary pain and suffering. You state that you will be forced to endure an agonizing death. You state that the DRC Execution Protocol does not require the personnel assigned to the execution team to be properly trained in maintaining intravenous lines and administering anesthesia. You state that the DRC Execution Protocol does not require that a licenced Ohio physician be in attendance during the execution to supervise the execution team.

| Inmate: | | Institution: | |
|---|---|---|---|
| | BROOM, ROMELL | | OSP |
| **Number:** | | **Grievance No.:** | |
| | A187343 | | CI-03-07-000015 |
| **Date:** | | | |
| | 04/17/2007 | | |

Upon my review, I find that Administrative Rule 5120-9-31, Inmate Grievance Procedure makes no provisions for grievances to be filed directly to the Office of the Chief Inspector against the Governor or the Director. I find that Administrative Rule 5120-9-31, Inmate Grievance Procedure states in part that

The inmate grievance procedure will not serve as an additional or substitute appeal process for hearing officer decisions, rules infraction board decisions or those issues or actions which already include an appeal mechanism beyond the institutional level or where a final decision has been rendered by central office staff. Other matters that are not grievable include complaints unrelated to institutional life, such as legislative actions, policies and decisions of the Adult Parole Authority, judicial proceedings and sentencing or complaints whose subject matter is exclusively within the jurisdiction of the courts or other agencies.

In carrying out a court ordered death sentence, the Department acts in accordance with Section 2949.22 of the Ohio Revised Code "Execution of Death Sentence". It provides that a death sentence shall be executed by causing the application to the person, upon whom sentence was imposed, a lethal injection of a drug or combination of drugs of sufficient dose to quickly and painlessly cause death. It further states that lethal injection as described in the statute will be applied unless declared unconstitutional. As of the date of this disposition of grievance, the method of legal injection used by the Department has not been declared unconstitutional. Any argument that this procedure is unconstitutional must be addressed through the courts.

| Inmate: | | Institution: | |
|---|---|---|---|
| | BROOM, ROMELL | | OSP |
| Number: | | Grievance No.: | |
| | A187343 | | CI-03-07-000015 |
| Date: | | | |
| | 04/17/2007 | | |

Legislative enactment has made lethal injection the only prescribed method of execution in Ohio.

You cite to a variety of alleged deficiencies in the Department's execution protocol with respect to training and the painful effects of the chemicals utilized.

Dr. Mark Dershwitz previously reviewed DRC's execution procedures in the case of In re: Lewis Williams and In re: John Glenn Roe, U.S. to App. (6th Cir.) Case No. 04-3014. Dr. Dershwitz provided the following information in the affidavit filed with the court in the cited case:

> By the time all 80 ml of thiopental sodium solution are injected, at the rate of 1mL/second, it is my further opinion, to a reasonable degree of medical certainty, that over 99.99999% of the population would be unconscious. …[T]here is approximately a 0.00006% probability that a condemned inmate given this dose would be conscious, and able to experience pain, after a period of five minutes. …[T]here is approximately a 0.003% probability that a condemned inmate given this dose would be conscious, and able to experience pain, after a period of ten minutes.

Thus, in the medical opinion of Dr. Dershwitz, there is "an exceedingly small risk that a condemned inmate under these circumstances would experience any pain associated with the infusion of lethal doses of pancuronium bromide and potassium chloride."

As you note DRC Policy 01-COM-11 addresses executions. The members of the execution team are trained to perform their assigned tasks. The persons responsible for handling and administering the drugs are qualified to do so under Ohio law.

Administrative Rule 5120-9-31, Inmate Grievance Procedure, states in part that grievances in which the Warden or Inspector of Institutional Services has been made a party must show that the Warden or Inspector of Institutional Services was personally and knowingly involved in a violation of law, rule, or policy and approved it or did nothing to prevent it. You have failed to clearly indicate how Warden Houk and Warden Voorhies were personally and knowingly involved in a violation of law, rule, or policy and approved it or did nothing to prevent it.

Accordingly this grievance is DENIED. This office will take no further action on this matter at this time.

| Signature: | Title: |
|---|---|
| | CHIEF INSPECTOR |

# **EXHIBIT 5**

NO. 87-1674

---

IN THE SUPREME COURT OF OHIO

---

STATE OF OHIO

Plaintiff-Appellee

-vs.-

ROMELL BROOM

Defendant-Appellant

---

**MOTION TO SET DATE FOR EXECUTION**

---

**WILLIAM D. MASON**
Cuyahoga County Prosecutor

**JON W. OEBKER (0064255)**
Assistant Prosecuting Attorney
Counsel for Plaintiff-Appellee
1200 Ontario Street
Courts Tower – Justice Center
Cleveland, Ohio  44113

Counsel for Plaintiff-Appellee

**TIMOTHY F. SWEENEY,**
820 W. Superior Ave.
Cleveland, Ohio 44113

Counsel for Defendant-Appellant



FILED

APR 0 4 2007

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

NO. 87-1674

IN THE SUPREME COURT OF OHIO

STATE OF OHIO

Plaintiff-Appellee

-vs.-

ROMELL BROOM

Defendant-Appellant

## MOTION TO SET DATE FOR EXECUTION

Appellant Romell Broom ("Broom") is an Ohio death row inmate. Broom received the death penalty for the 1984 murder of Tryna Middleton who was fourteen at the time. Now, over two decades after this murder, Tyler has exhausted all of his state and federal remedies. Thus, the State of Ohio respectfully requests that this Court set an execution date for Romell Broom.

In 1984, a Cuyahoga County jury found Romell Broom appellant guilty of aggravated murder with capital punishment specifications. Broom was sentenced to death. In affirming Broom's conviction and sentence on direct appeal, this Court described the facts of this case as follows:

> In the fall of 1984 in the Cleveland area, three separate but related incidents occurred involving five young girls. The first incident occurred on September 18, 1984 between 8:15 and 9:00 p.m. Twelve-year-old Venita McKenney was walking to her home on East 120th Street, Cleveland, after visiting her cousins, when a car drove past her, turned around and parked. After Venita walked past the car, the driver got out of the car, grabbed her from behind, and threatened her with a knife. When she struggled and fell, he said, "Get up bitch, shut * * * up bitch, get up bitch." Fortunately, two

1

residents in a nearby home overheard the incident, and opened their door allowing Venita to escape from her assailant. One of these residents identified appellant as the assailant in a lineup and at trial. She said his car was a four-door brown car. Also, an investigating police officer testified that a witness reported the car as a four-door brown "possibly a Ford Granada."

The second incident resulted in the rape and murder of fourteen-year-old Tryna Middleton late Friday and in the early morning hours of Saturday, September 21 and 22, 1984. Tryna, a ninth-grade student at Shaw High School, attended a Friday night football game accompanied by her friends and neighbors, Tammy Sims and Bonita Callier.

Tammy had a midnight curfew, so after the game the girls started to walk home to Henderson Avenue, where they all lived. They went from Terrace Road, which runs alongside Shaw High, and southeast up Oakhill Road, where they saw a parked car which they thought looked suspicious because of the way it was parked "between the streets." Neither Tammy nor Bonita could identify the make or color of the suspicious car. The girls retraced their steps down Oakhill to Terrace Road and then they went southwest on Terrace Road and then south onto Lee Road which, like Oakhill, goes up an incline. At the top of the hill, the girls stopped to rest for a few minutes. The time was between 11:20 and 11:30 p.m. From Lee Road the girls turned east onto Glynn Road, which is a lighted, level, tree-lined street of homes situated on large lots.

As the girls proceeded eastward along Glynn on the sidewalk, a car without its lights on came toward them and parked about two houses in front of them. The driver got out of the car and ran past the girls to a spot a couple of houses behind them. The girls had walked past the parked car when they heard footsteps from behind, and the assailant tried to grab all three girls. During the struggle, the assailant said, "[c]ome here bitch" and pulled a knife. Tryna, who was five feet tall and slightly built, could not get free. Tammy and Bonita ran across the street where a homeowner let them in     to     call     the     police     and     their     mothers.

The girls were unable to get the license number of the car, but they described the car as "brown," "tan," or "a goldish color," and as a four-door Ford Granada, with a light-colored top. They described the assailant as a young black male, possibly in his early twenties, weighing approximately one hundred sixty pounds and five feet nine inches in height, with a light to medium complexion and a thin mustache.

Approximately two hours later Tryna's body was found in a parking lot adjacent to an abandoned swimming pool in Forest Hills Park in Cleveland. Sperm cells were found in her rectum and vagina. She had been stabbed seven times in the chest and abdomen. Five of the stabbings

2

perforated Tryna's heart and lungs causing almost instantaneous death. Tryna had also incurred an incised wound on her right forearm which the coroner testified was the result of Tryna's efforts to defend herself.

Tammy and Bonita each examined hundreds of photographs, but they were unable to identify any suspect until after the third incident described hereafter.

On December 6, 1984 around 6:30 p.m., eleven-year-old Melinda Grissom had gone to a corner store close to her home on Chamberlain Avenue in Cleveland. The day before it had snowed and the side streets, such as Chamberlain, were still slippery. On her way home Melinda noticed a car following her. The car pulled onto Chamberlain. As Melinda turned the corner from East 74th onto Chamberlain, a man who was "going down in his pocket" as if to get something walked past her and without a word grabbed her neck from behind and started hitting her. She struggled and screamed as she was thrown into the assailant's car. Once inside the car the assailant said, "[b]itch, get your feet off of me."

Melinda's younger sister witnessed the beating and abduction and called to her mother. Mrs. Grissom, who was barefoot, ran outside to the car, and grabbed the locked door of the driver's side of the car in which Melinda had been thrown. Mrs. Grissom hung on to the door while screaming for help and for her daughter to jump from the car. The icy road made the car's wheels spin and slowed its travel, thus allowing Mrs. Grissom to hold on to the door and to pound the window and push the car with her hip so that the car bumped into a parked car. Melinda followed her mother's entreaties, and unlocked the door on the passenger's side and jumped out. The commotion was witnessed by two young men who got the license number of the departing car and gave it to Mrs. Grissom. Melinda was taken to the hospital because her leg had been injured. Within an hour the car, a 1973 Buick, had been traced to its owner, the father of the appellant. The engine was still warm when the police arrived. The appellant, who was at his father's house, admitted that he had been driving the car. He was read his *Miranda* rights and voluntarily accompanied the police to the hospital, where he was positively identified by Mrs. Grissom and her daughter. The two other witnesses to the incident later picked appellant out of a lineup and at trial.

Police noticed the similarities between the three incidents, which occurred within several miles of each other. All the victims and witnesses of the two September incidents independently picked the appellant out of lineups after Tammy and Bonita first identified his photograph in a photo array. Police investigation revealed and defendant's witnesses confirmed that prior to November 6, 1984, when he wrecked it, appellant drove his girlfriend's car, a goldish-brown Ford Granada with a light top. Tammy identified the car at the police impound lot. Bonita said the car in the

impound lot was the same kind and color of car as that used by her assailant.

Tests determined that the sperm found in Tryna came from a person whose blood was type B, which approximately twelve percent of the national population possesses. The appellant has type B blood, while the victim had type O blood. In addition, two hairs were removed from Tryna's hand. One matched her hair and the other one could not be excluded as belonging to the appellant. According to Detective Svekric, appellant voluntarily advised police during questioning that "he couldn't admit to anything, because he didn't want to go to jail for something that he couldn't remember."

A police officer testified that "we asked him * * * if we were wrong in believing that he was responsible for these crimes. His response to that was No." Appellant also admitted that he drove a used, gold 1978 Ford Granada. Finally, another prisoner testified that after appellant was identified in a lineup, appellant referred to Tryna and asserted that the state could not prove anything.

*State v. Broom* (1988), 40 Ohio St.3d 277.

In addition to his direct appeal, Broom also filed a state petition for post-conviction relief. The trial court dismissed the petition and the Eighth District affirmed the dismissal. *State v. Broom,* (May 7, 1998), Cuyahoga App. No. 72581. Thereafter, this Court declined jurisdiction on September 23, 1998. *State v. Broom* (1988), 83 Ohio St.3d 1430.

After his state appeals were completed, Broom, on June 21, 1999, filed a petition for writ of habeas corpus in federal court. Judge Kathleen O'Malley denied his petition. Broom appealed to the Sixth Circuit Court of Appeals, which unanimously affirmed the denial of Broom's petition on March 17, 2006. *Broom v. Mitchell* (2006), 441 F.3d 392.

Broom thereafter filed a petition for a writ of certiorari to the United States Supreme Court. The U.S. Supreme Court denied Broom's petition for certiorari on March 1, 2007 (attached).

4

Accordingly, because Broom has exhausted his state and federal court review of his conviction and sentence and has not asked for a stay of execution from this Court, the State of Ohio respectfully asks that this Court set an execution date in this matter.

Respectfully Submitted,

WILLIAM D. MASON
Cuyahoga County Prosecutor

**JON W. OEBKER (0064255)**
Assistant Prosecuting Attorney
Counsel for Plaintiff-Appellee
1200 Ontario Street
Courts Tower – Justice Center
Cleveland, Ohio  44113

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Motion to Set Date for Execution* was sent via ordinary U.S. Mail, postage prepaid this ___ day of April, 2007, to:

**TIMOTHY F. SWEENEY,**
820 W. Superior Ave.
Cleveland, Ohio 44113

Counsel for Defendant-Appellant

**JON W. OEBKER (0064255)**

5

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No: 03-4370

Filed: March 1, 2007

ROMELL BROOM

        Petitioner - Appellant

   v.

BETTY MITCHELL, Warden

        Respondent - Appellee

MANDATE

   Pursuant to the court's disposition that was filed 3/17/06 the mandate for this case hereby issues today.

A True Copy.

COSTS:   NONE                Attest:

Filing Fee ..........$
Printing ............$

       Total ........$            Deputy Clerk

# EXHIBIT 6



STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>**Execution** | PAGE ___1___ OF _9_ |
| | NUMBER: 01-COM-11 |
| RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>01-COM-11 dated 01/08/2004 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>July 10, 2006 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*Terry J Collins* |

## I.   AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

## II.   PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III.   APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV.   DEFINITIONS

As used in this policy, the following will apply:

Execution Team:  A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF).  Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

Critical Incident Debriefing Team:  A group selected by the SOCF Warden available to assist any persons involved in the execution process.  A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.

DRC 1361

| SUBJECT: **Execution** | PAGE  2  OF  9 |

- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

Stay:  A court-ordered suspension or postponement of a legal execution.

Lethal Injection:  The form of execution whereby a continuous intravenous injection of a series of drugs in sufficient dosages is administered to cause death.

Reprieve:  The postponement of an execution.

V.  **POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law.  All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed.  The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

VI.  **PROCEDURES**

A. General Guidelines

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing.  Upon completion of the reception process the offender will immediately be transferred to the designated institution:  Mansfield Correctional Institution (MANCI) or Ohio State Penitentiary (OSP) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

4. The Ohio Supreme Court shall designate the date of execution.  Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

DRC 1362

5. Attendance at the execution is governed by the Ohio Revised Code, section 2949.25 and includes:

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction. or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect, subject to the approval of the Warden.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 03-OVS-06, Victim Involvement in the Execution Process.
- Representatives of the news media as the Director or his designee authorizes which shall include at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

DRC 1362

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

   a. The MANCI, OSP or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

   b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2. Approximately seven (7) days prior to the execution:

   a. The MANCI, OSP or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner. This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

   b. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in this Policy.

   c. The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

3. Approximately twenty-four (24) hours prior to the scheduled execution:

   a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

   b. The SOCF staff psychologist will interview the prisoner periodically and submit progress reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

   c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4. The following events will take place upon arrival at the Death House:

   a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

DRC 1362

SUBJECT: **Execution**

Director and/or designee(s)
Warden
Chief Public Information Officer(s)
Institution Deputy Warden
Administrative Assistant to the Warden
Chaplain
Physician
Chief of Security
Maintenance Superintendent
Any other person as deemed necessary by the Warden.

b.  Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines. The condemned prisoner shall be evaluated by appropriately trained staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. At a minimum, the inmate shall be evaluated upon arrival, later that evening at a time to be determined by the warden, and on the following morning prior to nine a.m. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

c.  SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

d.  The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

e.  The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

f.  The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

g.  The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h.  The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

DRC 1362

    i. All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

    j. Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

    k. The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

    l. The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

    m. The Warden will relay any out of the ordinary activity to the South Regional Director.

    n. The Execution Team will continue to drill/rehearse.

5. These procedures shall be followed concerning the medications used in the execution.

    a. Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, pancuronium bromide and potassium chloride. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

    Prior to the execution and upon arrival of the inmate at the institution, a medical review of the inmate shall be conducted to establish any unique factors which may impact the manner in which the execution team carries out the execution. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

    b. On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, pancuronium bromide and potassium chloride from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The person qualified under Ohio law to administer medications shall deliver the drugs to the death house.

    The person qualified under Ohio law to administer medications shall, in the presence of a witness, give possession of the drugs to a person qualified to prepare intravenous injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

    c. The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous injections. The preparation of the drugs

DRC 1362

shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

d. The execution team shall make every effort to establish IV sites in two locations, and they shall take the amount of time necessary when pursuing this objective. This step shall be accomplished in the holding cell, and the staff shall utilize heparin locks to create the sites and keep them open. The team shall test the viability of the IV site with a small amount of saline, to be flushed through the heparin lock.

e. Once the inmate has been escorted to the chamber, a low-pressure saline drip shall be connected to the IV sites.

f. The drugs shall be prepared as follows:[1]

   i. Two grams of Thiopental Sodium prepared with 25 mg/cc concentration for a total of 80cc which are placed in two syringes labeled "one" and "two."

   ii. 100 mg of Pancuronium Bromide is prepared with 2mg/ml concentration for a total of 50cc which is placed into two 25cc syringes labeled "three" and "four."

   iii. 100 milliequivalents of Potassium Chloride are prepared with 2 meq/cc concentration for a total of 50cc. The preparation is placed in a syringe labeled "five."

g. The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the injection. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the intravenous dose of drugs, a qualified medical person authorized to administer intravenous drugs shall use an alternative site to deliver the drugs as they may be authorized by law.

6. Approximately one (1) hour prior to the scheduled execution:

a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

---

[1]     Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.
DRC 1362

| SUBJECT: **Execution** | PAGE__8__ OF _9_ |
|---|---|

7. Approximately fifteen (15) minutes prior to the scheduled execution:

   a.   The warden shall read the death warrant to the condemned prisoner.

   b.  All authorized witness groups will be escorted to the death house separately by designated staff.

8.  Execution:

   a.  The Warden and Execution Team will escort the condemned prisoner to the execution chamber, place the condemned prisoner on the lethal injection bed, secure the straps and insert the intravenous injection tubes.

   b.  The Warden will ask the condemned prisoner if he has any last words.  If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone.  There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

   c.  Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous injections.  The start and finish time of each syringe shall be reported to the command center and recorded in a log.  The low-pressure saline drip shall be allowed to flush saline through the lines for at least sixty seconds between syringes two and three, between syringes four and five, and again after syringe five.

   d.  The execution team leader and the warden shall observe the inmate's IV sites for signs of infiltration throughout the time that the drugs are being administered to the inmate.   In the event that both IV sites become compromised, the team shall take such time as may be necessary to establish a viable IV site.

   e.  Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

   f.   The curtains will be opened for the Warden to pronounce the time of death.  Witnesses will be escorted from the Death House.

9. Post-Execution:

   a.  The Warden, or his designee, will notify the Director that the execution has been carried out.

   b.  The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

DRC 1362

| SUBJECT: **Execution** | PAGE___9___ OF __9__ |
| --- | --- |

    c.  Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d.  The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

10. Debriefing:

    a.  The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b.  The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

ATTACHMENTS:

DRC 1808 Execution Information Release

DRC 1362