IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KENNETH BIROS                              )
Inmate No. A 249-514                       )          Case No. 2:04 CV 1156
Ohio State Penitentiary                    )
878 Coitsville Hubbard Rd.                 )
Youngstown, OH 44505                       )
                                           )          Judge Gregory Frost
                                           )
                                           )          Mag. Judge Abel
          Plaintiff,                       )
                                           )
vs.                                        )
                                           )
Ted Strickland, Governor                   )          <u>Amended and Supplemental</u>
State of Ohio                              )          <u>Complaint For Injunctive and</u>
77 South High Street, 30th Floor )         <u>Declaratory Relief,</u>
Columbus, OH 43215                         )          <u>Attorney Fees, and</u>
                                           )          <u>Costs of Suit under</u>
Terry Collins, Director                    )          <u>42 U.S.C. 1983</u>
Ohio Dept. Of Rehab. And Corrections       )
770 West Broad Street                      )
Columbus, OH 43222                         )
                                           )
Phillip Kerns, Warden                      )
SOCF                                       )
1724 Rte 728                               )
Lucasville, OH 45699                       )
                                           )
David Bobby, Warden                        )
OSP                                        )
878 Coitsville Hubbard Rd.                 )
Youngstown, OH 44505                       )
                                           )
Anonymous Execution                        )
Team Members                               )
1-16                                       )
(names and addresses unknown)              )

Intervenor-Plaintiff,  Kenneth Biros, by and through his undersigned counsel and pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure, and having sought and been granted leave to do so, hereby amends and supplements his previously filed complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit pursuant to 42 U.S.C. 1983 against Defendants Ted Strickland, Terry Collins et al. (hereinafter "Amended and Supplemental Complaint"), and he alleges and avers as follows:

<u>**Nature of Action**</u>

1.      This action is brought pursuant to 42 U.S.C. 1983 for violations and threatened violations of Plaintiff's right to be free from cruel and unusual punishment under the Eight and Fourteenth Amendments of the U.S. Constitution, and Plaintiff's right to be free from violations of his substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. Plaintiff seeks equitable, injunctive and declaratory relief.

2.      Plaintiff is a death row inmate with an execution date of December 8, 2009, at 10:00 a.m.

3.      By this Amended and Supplemental Complaint, Plaintiff continues to pursue his challenge under section 1983 to the Defendants' policies, practices, procedures and protocols for conducting lethal injection in the State of Ohio, as said policies, practices, procedures and protocols will be used, or are expected to be used, at Plaintiff's scheduled execution on December 8, 2009. Plaintiff's challenge includes a challenge to the "new" execution protocol, as that protocol was recently announced by Defendants and was issued in written form on November 30, 2009. <u>See</u> Affidavit of Collins, Doc. No. 601-1. <u>See also</u> DRC Policy No. 01-COM-11, Executions, issued effective November 30, 2009 (a copy of which is attached hereto as Exhibit 1.)  The Defendants' "new" execution protocol dated effective November 30, 2009, and

as attached hereto as Exhibit 1, is hereinafter called "the Subject Execution Protocol."

4.      Unless enjoined, Defendants are expected to use at Plaintiff's execution on December 8, 2009, or on some other later date, the Subject Execution Protocol which calls for the use of one of two, or possibly a combination of two, execution methods which have never been used on humans in the history of the United States or any known civilized nation. See Subject Execution Protocol; Doc. 601-1, paragraph 7 and 8.

5.      The Defendants have chosen to adopt the Subject Execution Protocol as a direct result of this litigation and of the claims made in this litigation by Plaintiff and other inmate-plaintiffs concerning previous versions of the Defendants' lethal injection protocols, and also because Defendants knew, when the elected to change their earlier protocols and adopt effective November 30, 2009 the Subject Execution Protocol, that they were at substantial risk of being found liable to Plaintiff and others in this litigation. The Subject Execution Protocol thus represents a rushed effort by Defendants to avoid and/or minimize their liability in this litigation. But the Subject Execution Protocol does not address all of the legal claims and challenges made in Plaintiff's original complaint and, in addition, it raises new claims and challenges, all of which Plaintiff intends to assert in this Amended and Supplemental Complaint.

6.      Defendants have also rushed to adopt the Subject Execution Protocol because, for unreasonable and arbitrary reasons, they do not want there to be any delay in Plaintiff's scheduled execution date of December 8, 2009. As a result, in adopting the Subject Execution Protocol, the Defendants have sacrificed carefulness, competence, prudence, diligence, openness, professionalism and caution – all of which are essential when performing the solemn duty attendant to the adoption of new execution protocols in the circumstances of this case (see, e.g., the Romell Broom events) –, in favor of a process that has been hurried, rushed, arbitrary,

3

secretive, unprofessional, and driven to an unreasonable degree by an imprudent desire to meet the arbitrary deadline of Ken Biros's execution date. As a result, Plaintiff has grave concerns that his execution under the Subject Execution Protocol will not result in the dignified, humane, quick, and painless death that is required by the federal and state constitutions and by ORC § 2949.22(A).

7.      The claims in this amended complaint are cognizable under 42 U.S.C. 1983. See paragraph 5 of the original complaint. Hill v. McDonough, 126 S. Ct. 2096 (2006); Nelson v. Campbell, 541 U.S. 637 (2004). Baze v. Rees, 128 S. Ct. 1520 (2008).

8.      Plaintiff seeks, among other relief, temporary, preliminary, and permanent injunctions preventing Defendants, and those acting in concert with them, from executing Plaintiff by means of the Subject Execution Protocol or any other protocol, "new" or "old," which violates Plaintiff's constitutional rights in the same or similar manners as alleged herein. Plaintiff also seeks an order declaring that Defendants' current method for conducting an execution, either through IV access or through intramuscular access, or through a combination of the two methods and other methods unknown to Plaintiff at this time, violates the Eight and Fourteenth Amendments to the U.S. Constitution and International Common law.

### Parties, Jurisdiction and Venue

9.      This action arises under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights violations and equitable relief under an act of Congress), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

10.     This Court has personal jurisdiction over Defendants as they are residents of the

State of Ohio and are presently located in the State of Ohio and are elected or appointed officials of the State of Ohio.

11.     This Court has supplemental jurisdiction over any state statutory or other state claim asserted by Biros under 28 U.S.C. § 1367, in that the state and federal claims are derived from a common nucleus of operative facts.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

13.     Ken Biros is a United States citizen and a resident of the State of Ohio.  He is presently incarcerated on death row at the Ohio State Penitentiary in the custody of Defendants, and under the control and supervision of the State of Ohio Department of Rehabilitation and Correction, who have him incarcerated at the Ohio State Penitentiary, 878 Coitsville - Hubbard Road, Youngstown, OH 44505. If Biros's capital conviction and/or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will execute him on December 8, 2009, or on some later date.  Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use the Subject Execution Protocol to execute Ken Biros in the death house located on the grounds of the Southern Ohio Correctional Facility in Lucasville, Ohio, which is operated and controlled by the Defendants.

14.     Defendant Ted Strickland is the Governor of the State of Ohio and has been since January 1, 2007.  He is the final executive authority in the state, statutorily and constitutionally responsible for the execution of all sentences of death in Ohio and the manner in which those sentences are executed.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Terry J. Collins is the Director of the State of Ohio Department of

5

Rehabilitation and Correction ("DRC"), a department of the State of Ohio that was created and is maintained pursuant to Ohio Revised Code Section 5120.  As such, Defendant Collins is charged with and authorized under Ohio Revised Code Section 5120.01 to prescribe and direct the promulgation of rules and regulations for the DRC, including the rules and regulations for the conduct of prison operations and execution procedures.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

16.    Defendant Phillip Kerns is Warden of the Southern Ohio Correctional Facility at Lucasville ("SOCF"), a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code Section 5120.05, and which is the prison at which sentences of death are executed in the State of Ohio.  Pursuant to Ohio Revised Code Section 5120.38, Defendant Kerns, as the Warden of SOCF, is charged with management of SOCF and the oversight and conduct of operations there, including the oversight and conduct of executions carried out there.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

17.    Defendant David Bobby is Warden of the Ohio State Penitentiary (OSP) a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code Section 5120.05.  OSP is the prison at which prisoners sentenced to death in Ohio, including Ken Biros, are primarily housed for the purpose of serving their sentences until the day before the execution is to be carried out, at which time Biros will be transferred to the Southern Ohio Correctional Facility where he is to be executed. Pursuant to Ohio Revised Code Section 5120.38, Defendant Bobby, as the Warden of OSP, is charged with management of OSP and the oversight and conduct of operations there, including the oversight and conduct of preparing death sentenced inmates for the inmate's execution that will be conducted at SOCF.  He is sued

here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

18.     The unnamed and anonymous execution team members are individuals involved with administering the lethal injection protocol during executions at the Southern Ohio Correctional Facility.  They are sued in their individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

19.     Defendants, and each of them at all times relevant hereto, are acting in their respective official capacities with respect to all acts described herein, and are, in each instance, acting under the color and authority of state law.  Upon information and belief, unless temporarily, preliminarily and permanently enjoined, the Defendants, and each of them, intend to act in their respective official capacities and under the authority of state law by executing Biros by utilizing lethal injection protocols and procedures -- including the Subject Execution Protocol -- in a manner that carries a substantial risk of imposing on Plaintiff excruciating pain and suffering prior to his death, and/or that will subject him to an undignified, slow and torturous death, all in violation of: (a) his constitutional rights to be free from cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; (b) his  constitutionally protected liberty and property interests (as arising from ORC Sec. 2949.22) in expecting and receiving a "quick and painless death," rights which are protected under the substantive and procedural elements of the 14th Amendment's Due Process Clause; and (c) his right to counsel at a critical stage.

## Administrative Remedies

20.     Plaintiff's claims in this Amended and Supplemental Complaint are based upon the Defendants' announced adoption on or about November 13, 2009, of new procedures,

7

practices, protocols and/or methods for conducting lethal injection executions, and these new procedures, practices, protocols and/or methods were formally adopted effective November 30, 2009, as the Subject Execution Protocol (attached hereto as Exhibit 1.)

21.     Biros has already exhausted his administrative remedies for pursuing his challenges to Defendants' procedures, practices, protocols and/or methods for conducting lethal injection executions in the State of Ohio.  He completed exhaustion in the fall of 2006, as alleged more specifically in his original complaint and in earlier filings Biros has made in this litigation. See Docket Nos. 114, 127. He is not required to go through the administrative procedures again in order to challenge in this litigation the most recent version of Defendants' frequently changing execution protocols.

22.     To the extent Plaintiff is required to specifically grieve the new protocol at issue here, he will do so in a timely manner and/or it will be futile for him to do so given that his date to be executed by use of the Subject Execution Protocol is only 8 days after that new protocol was issued by Defendants.

23.     Biros first received Notice that the Defendants intended to execute him with one of these new methods of execution on November 13, 2009. Without conceding the need to do so, Biros will timely seek to exhaust the administrative remedies available to him now that the Subject Execution Protocol has been adopted. Plaintiff on or about December 2, 2009, filed a grievance challenging among other things the Subject Execution Protocol. He filed this grievance directly with the DRC Office of the Chief Inspector, in Columbus, Ohio. See Docket No. 73 ("[T]he administrative remedy of a grievance directly to the Office of the Chief Inspector pursuant to O.A.C. 5120-9-31 is an available remedy within the meaning of PLRA. *See* 42 U.S.C. § 1997e(a).").

24.     By filing his grievance in December, 2009, Biros has in the circumstances exhausted his administrative remedies and/or has done everything required for exhaustion to be deemed complete and/or futile.

25.      As of this filing, Biros has received no response to his grievance.

26.     Because defendant Strickland has the discretion to grant Biros a reprieve and delay his December 8 execution, but as of this filing said defendant Strickland has not exercised that discretion, it is impossible and/or impracticable for Biros to make any further efforts at exhaustion at this time. In these extraordinary circumstances, where defendants have themselves made it impossible for Biros to exhaust in a timely manner, the efforts Biros has made must be deemed sufficient and any further exhaustion requirements are excused as impracticable and/or impossible and/or futile.

27.     Alternatively, Biros is not required to exhaust administrative remedies before bringing his challenges to the Subject Execution Protocol because modification of the Defendants' lethal injection protocol is not possible through the internal grievance process as was earlier stated to Biros in response to an earlier grievance, and therefore exhaustion is futile. See Docket No. 127, paragraphs 17-23 of Biros's original complaint adopted herein as if fully rewritten. It is not expected that any grievance will be timely answered under Ohio Administrative Code 5120-9-31 especially given the time frame of the "new" protocol and the execution scheduled for Biros both of which are under the exclusive control of the Defendants.

28.     Under these circumstances, Plaintiff has thus timely and completely exhausted the administrative remedies available to him and/or has done everything required for exhaustion to be deemed complete and/or to be deemed futile. Accordingly, Plaintiff has complied with any and all mandatory pre-conditions to the filing of this action in federal court.

**Facts Common to All Claims and Relief Sought**

29.     Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1-28 of this Amended and Supplemental Complaint as if fully rewritten.

30.     The Defendants intend to execute Plaintiff on December 8, 2009, or some other later date, by employing means and methods of execution by lethal injection – including the Subject Execution Protocol -- that will violate Plaintiff's rights under the U.S. Constitution and which have never been used before on another human being in the history of the United States or any other civilized nation.

31.     Under the Eighth Amendment, cruel and unusual punishment claims involving a particular means of effectuating a sentence of death are analyzed under a six prong test in which proof of any one prong establishes an Eighth Amendment violation:

> A. The physical pain inflicted is excessive in light of readily available alternatives;
>
> B. The risk of pain is more than the Constitution tolerates;
>
> C. The risk of pain and suffering is unnecessary in light of available alternatives;
>
> D. Mutilation of the body during execution;
>
> E. Unnecessary psychological suffering;
>
> F. The particular means of effectuating the sentence of death violates evolving standards of decency.

32.     Defendants have created an untested method of execution, to wit, the Subject Execution Protocol, which if utilized in Plaintiff's execution will subject him to an unlawful deprivation of his Constitutional rights, including his right to be free from cruel and unusual punishment, his right to substantive and procedural due process, his right to equal protection of

10

the law, his right to not be exposed to ex post facto law, and his right to a "quick and painless" death as guaranteed by the Ohio Revised Code.

33. Specifically included within this Amended and Supplemental Complaint is a constitutional challenge under section 1983 to the adoption and anticipated use of the Subject Execution Protocol, effective on or about November 30, 2009, and any other practices and procedures and policies meant to be implemented by the Defendants in the execution of the Plaintiff on December 8, 2009, or some later date.

34. The Plaintiff himself has never been served a copy of the Subject Execution Protocol, although his lawyers saw it for the first time when it was released publicly on November 30, 2009.

35. The Subject Execution Protocol will subject Plaintiff to human experimentation and deprive him of his Constitutional rights including but not limited to his right to be free from cruel and unusual punishment, his right to substantive and procedural due process, his right to equal protection of the law, his right to not be exposed to ex post facto laws, and his right to a "quick and painless" death under the Ohio Revised Code.

36. Plaintiff further alleges that Defendants have failed at all times to create and maintain a policy, practice, procedure and/or protocol for carrying out an execution in compliance with the U.S. Constitution, Ohio Revised Code and International law (See Nuremberg Code on Medical Experimentation).

37. Among other claims, in addition to those outlined in the original complaint adopted herein by reference as if fully rewritten, and those outlined earlier in this Amended and Supplemental Complaint, the Subject Execution Protocol violates the Plaintiff's constitutional rights in at least the following aspects to be more fully developed at trial:

A. Defendants are continuing their unconstitutional practice of utilizing procedures which require them to obtain and maintain intravenous ("IV") access to the inmate's veins using IV needles. This presents a substantial risk that use of the Subject Execution Protocol will cause Plaintiff unconstitutional pain and suffering, both physical and psychological, as demonstrated in the unsuccessful and aborted execution attempt on Romell Broom by the Defendants on September 15, 2009. (See Broom v. Strickland, 09 CV 00823, filed September 18, 2009, U.S. D.C. S. D. Ohio, Judge Frost).  Defendants have failed to adequately address the IV access issues encountered in Broom's failed execution.

B. Defendants are continuing their unconstitutional practice of employing untrained and insufficiently competent medical technicians to make the IV insertions of the catheters into the inmate's veins. This presents a substantial risk that use of the Subject Execution Protocol will cause Plaintiff unconstitutional pain and suffering, both physical and psychological, as demonstrated in the unsuccessful and aborted execution attempt on Romell Broom by the Defendants on September 15, 2009. (See Broom v. Strickland, 09 CV 00823, filed September 18, 2009, U.S. D.C. S. D. Ohio, Judge Frost).  Defendants have failed to adequately address the IV access issues encountered in Broom's failed execution.

C. Defendants are continuing their unconstitutional practice of failing to place any reasonable and humane limitations, indeed any limitations, on how long these incompetent technicians will be permitted to poke and stick the inmate before they (or their Defendant-supervisors) will finally acknowledge that they have gone too far and must stop. This presents a substantial risk that use of the Subject Execution Protocol will cause Plaintiff unconstitutional pain and suffering, both physical and psychological, as demonstrated in the unsuccessful and aborted execution attempt on Romell Broom by the Defendants on September 15, 2009. (See Broom v. Strickland, 09 CV 00823, filed September 18, 2009, U.S. D.C. S. D. Ohio, Judge Frost).  Defendants have failed to adequately address the IV access issues encountered in Broom's failed execution.

D. Defendants fail to recognize that each inmate presents unique issues of IV access and have thus failed to prepare and train for the unique issues Kenneth Biros may present.

E.  The defendants' flawed protocol still calls for the team members to take as much time as they need to obtain IV access, even as long as 14 hours, and by thus having no known time limit for attempting peripheral IV access, let alone no reasonable time limit, the defendants continue to place the team members in an oppressively stressful situation.

F.  The "back up" procedure involving the use of midazolam and hydromorphone through intramuscular injection has never been used in a human execution in the history of the United States and is completely untested. Further, the possible combination of the back-up drugs/procedure in conjunction with a failed

12

administration of the "first alternative" involving thiopental sodium is also a human experiment and completely untested. The back up procedure violates the Eighth and Fourteenth Amendments, the guarantee of a "quick and painless" death contained in the Ohio Revised Code as protected under the Fourteenth Amendment, and International Common Law.

G. The defendants have failed to require anesthesia provided to the Plaintiff by individuals who possess the experience and proficiency of physicians who have completed residency in the training of Anesthesiology and/or by nurses who have undergone the requisite training to become certified registered nurse anesthetists.

H. Defendants have failed to incorporate in the Subject Execution Protocol the requirement of a physician to supervise and monitor the administration of the "lethal injection" protocol in ensuring the execution is carried out in accordance with the basic tenets of medical practice and safety. They have failed in this respect even though other States use a physician during the execution process; even though Defendants themselves used a physician who was untrained in the Ohio protocol during the Broom aborted execution; and even though Defendants have had physicians volunteer to assist in the execution process.

I. Defendants who are untrained in the area of medicine will decide which alternative to use in the execution of the Plaintiff. Defendants will thus be practicing medicine upon Plaintiff without a license to do so, which is the essence of human experimentation. Further, at the sole discretion of the Defendants, they may proceed with the first alternative, or back up plan, or a combination of the two methods, even though Defendants have no competence for making the choice, no training for doing so, and their judgment which respect to any such decisions is demonstrably poor as evidenced by the bad choices they made during at least the executions of Joseph Clark, Chris Newton, and Romell Broom.

J. At present, the protocol lacks any definition or constraint regarding how long the attempts at IV access can persist, and/or how many attempts can be made. Based on prior executions, the Defendants have shown a willingness to engage in highly excessive attempts at establishing peripheral IV access.

The protocol uses overly broad language to describe the amount of time and the number of attempts that the team can use to obtain IV access.   Specifically, section VI.B.f (page 8 of 11) states that:

> "The team member(s) shall make such number of attempts to establish IV sites as may be reasonable under the circumstances and shall take the amount of time necessary when pursuing this objective."

Similar vague language is repeated in section VI.B.7.h, which states that:

> "The team members who establish the IV sites shall be allowed as
> much time as is necessary to establish one or two viable sites."

The problematic language appears again in section VI.8.e, which refers to a
situation in which, during the injection of the drugs the IV sites become
"compromised," and which states that:

> "the team may take such time as is necessary to establish a viable
> IV site"

This vague language in essence grants permission for the IV team to carry out a
repeat of the excessive and futile IV access attempts that were carried out on Mr.
Broom on September 15, 2009.  Indeed, this language would allow the team to
persist for many more attempts and many more hours than were inflicted upon
Mr. Broom.

By contrast, other states' protocols limit the amount of time the IV team can take
to establish peripheral IV access. For example, the Kentucky protocol at issue in
<u>Baze</u> places a 60 minute limit on the amount of time that an inmate can be
subjected to attempted IV access.  Under the present Ohio procedure, the attempts
at IV access could persist (and in the past have persisted) for hours. The ultimate
decision to abandon attempts at peripheral IV access is left to the discretion of the
Warden and Director, but in the past the Warden and Director have failed to
restrain the IV insertion team and have allowed excessive persistent needling to
continue.  The Subject Execution Protocol provides no constraints, and does not
even provide guidance, regarding how the decision to abandon IV access attempts
should be made.

K.  Another major problem with the Subject Execution Protocol is that there is no
evidence that the technical skills and expertise of the execution team have been
bolstered to the point where these individuals should be permitted to attempt IV
access for future executions. An adequately competent practitioner should have
encountered no difficulty in placing intravenous access in Mr. Broom. The failure,
after multiple attempts, to obtain IV access in Mr. Broom, combined with the
events of the Joseph Clark execution, make it all too clear that that the current IV
access team lacks the skill set necessary to reliably achieve IV access in a
reasonable manner.  The Defendants have failed to assemble a team with the
necessary skills.  The poor record shown by the current team falls far below other
states.

L.   The Subject Execution Protocol sets improperly low criteria for the
professional experience of the personnel who are responsible for the medical
aspects of the procedure (i.e., starting IV lines, mixing drugs, injecting drugs).
The procedure requires that the personnel have "at least one year experience as a
certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman."

One year of prior experience is an insufficient qualification.  The Defendants' expert, Dr. Dershwitz, has repeatedly testified that the personnel placing the IV lines must have <u>current</u> experience and that they must do this as part of "their day job".  Yet according to Ohio's protocol, the personnel attempting the procedure might not have had any hands-on experience for many years, and may in fact not have the currency of practice necessary to maintain the manual skills and dexterity that are necessary to place IV lines.

Certified Medical Assistants are typically only allowed to practice clinical activities under the supervision of a nurse, physician assistant, or physician. There is no evidence that such a person will be present and will have formally assumed such a supervisory position.  Many Certified Medical Assistants do not have the skills or experience to put in IV catheters.   While at present the Defendants may have in mind a Certified Medical Assistant with the requisite skill-set, the protocol does not itself explicitly require such experience, and thus it is deficient.

Phlebotomists typically insert needles to draw blood from veins; they do not typically have responsibility for inserting IV catheters to be used for injecting drugs, which is a much more complex process with a much narrower margin of error.  While at present the Defendants may have in mind a phlebotomist with the requisite skill-set, the protocol does not itself explicitly require such experience, and thus it is deficient.

The protocol places improper reliance on licensure over actual competence and current/recent clinical experience.  Specifically, section VI.B.7.f (page 8 of 11) states that:

> "The member(s) of the execution team who inserts the needle and starts the intravenous connection shall be a person trained and licensed under Ohio law to administer intravenous and intramuscular injections".

Again, just because a person is legally permitted by their licensure to do a medical procedure does not in any way mean that they are capable or competent at performing the procedure.  The important thing is that they do the procedure as part of their regular "day job".

M. The Subject Execution Protocol also uses vague language that appears to leave open essentially any route or method of achieving IV access, including cut-downs.  Section VI.B.7.g states that:

> "in the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the intravenous dose of drugs, a qualified medical person authorized to administer intravenous and intramuscular drugs may use an alternative site to

deliver the drugs as they may be authorized by law."

Since the protocol calls for the Warden to have in attendance "such number of physicians" as he thinks necessary, this means that the physician could elect to step in and perform a procedure such a cut-down procedure. See Nelson, 541 U.S. at 641 (the "cut-down" procedure at issue entailed "prison personnel ... mak[ing] a 2-inch incision in petitioner's arm or leg; the procedure would take place one hour before the scheduled execution; and only local anesthesia would be used").

Additional problematic language occurs in section VI.B.4.b, which states that in the event that the pre-execution examination of the prisoner's veins raises concerns,

> "potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution".

This reference to "potential solutions" appears to leave open any manner of intravenous access, including cut-downs.

By contrast, other states' protocols, including Kentucky, explicitly preclude the use of any IV access method other than peripheral IV access. The failure of the Subject Execution Protocol to specifically exclude cut-down procedures renders it deficient.

N. Another problem with the Subject Execution Protocol is that it does not describe what the execution team should do if the thiopental injection infiltrates. According to Defendant Terry Collins' affidavit, if the prisoner does not exhibit unconsciousness and lack of respiration, additional thiopental may be administered. This is not an acceptable plan. If the first dose of thiopental failed to take effect because it infiltrated, administration of an additional dose would result in the further infiltration and accumulation of thiopental in the tissue surrounding the vein. This in turn could result in significant or agonizing pain to the prisoner. The events of the Clark execution demonstrate that this concern is valid. The protocol still lacks instructions for detecting and correcting IV infiltration, and is thereby deficient.

O. The use of the "back up" or "Plan B" will produce a slow transition to unconsciousness. When drugs seep into the circulation from an intramuscular injection the speed of onset of their effects is greatly reduced when compared with intravenous administration. The transition from full consciousness to unconsciousness in plan B will be slow, taking place over a time frame of several or many minutes. During the time it takes for the hydromorphone and midazolam to seep through the muscle tissue and into the circulatory system via the capillary vessels, the prisoner will progress through increasingly severe impairments of his or her cognitive faculties. The prisoner may experience and display any of a broad suite of the manifestations of intoxication, including

    i.  Confusion
   ii.  Combativeness
  iii.  Disinhibited speech
  iv.  Delirium
   v.  Anxiety
  vi.  Fear
 vii.  Euphoria
viii.  Dysphoria
  ix.  Delusional ideation
   x.  Hallucinations
  xi.  Sensory distortions
 xii.  Disorientation

Because Plan B places the prisoner in a state of conscious intoxication it deprives him or her of dignity during the execution.  Indeed, it is inevitable that some prisoners exposed to this Plan B will, through reasons beyond their control, produce a behavioral spectacle that is disturbing and offensive to the conscience of the witnesses, staff, citizenry, and courts.

The unacceptable risk of conscious delirium will be exacerbated and prolonged when Defendants' first attempt to infuse thiopental sodium fails due to vein infiltration, as happened during Clark's execution.  In that event, by the time Defendants turn to Plan B, some of the thiopental will have entered the prisoner's circulatory system, thereby suppressing cardiac output.   In turn, that will substantially prolong the time it takes for intramuscular drugs to enter the vascular system, flow into the cranium, and penetrate the blood-brain barrier to cause unconsciousness and death. See generally Mark Dershwitz, M.D., Ph.D. & Thomas K. Henthorn, M.D., The Pharmacokinetics And Pharmacodynamics Of Thiopental As Used In Lethal Injection, 35 Fordham Urb. L.J. 931 (June 2008) (discussing how thiopental decreases cardiac output, which slows the pace by which drugs injected into the veins achieve their intended effect).

Nausea and vomiting are well-recognized and well-documented effects of opioid narcotics such as hydromorphone.  It is inevitable that a significant number of prisoners who are subjected to Plan B will become nauseated and will vomit. And among those prisoners, it is an unacceptable if not inevitable risk that some of them will experience pulmonary aspiration and die either by drowning in their vomitus, or by suffering chemical burns to their lung tissue caused by stomach acids.  This risk is rendered all the more substantial by the fact the prisoner is immobilized in a supine position (Subject Execution Protocol, Section VI.B.8.a), thereby thwarting reflexive and instinctive attempts to turn face down when vomiting.

Plan B is at odds with Section V of the procedure (page 2 of 11) which requires that "All execution processes shall be performed in a professional, humane,

sensitive, and dignified manner."

P.  Another problem with Plan B is that the literature shows a broad range of absorption rates and sensitivities to midazolam and hydromorphone when these drugs are administered via the intramuscular route.  Put another way, in some individuals the drugs are rapidly absorbed and delivered to the brain, while in others this process is slow.  And some individuals are sensitive to the effects of these drugs, while others are relatively insensitive.  These factors will produce, in an unpredictable manner, great variation in the length of time during which the prisoner is conscious but has very disrupted mentation.

Of note, the protocol includes language that seems to allow unlimited modification of the injection formulation.  Specifically, section VI.B.7.e.iii states that "…it may be necessary to modify the preparation of syringes.  In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and the changes recorded".

Such modifications, particularly if undertaken at the last minute (as could be inferred from the requirement to notify the command center), mean that minimally-reviewed alterations in the most centrally important aspect of the protocol are permitted.  This is unparalleled in the protocols of other states and renders the Subject Execution Protocol inadequately vague and therefore deficient.

Before undertaking an execution that might use Plan B, the Defendants must make every reasonable attempt to best understand what may happen when this procedure is first applied to a human being. They need to engage in a detailed pharmacokinetic and pharmacodynamic analysis that will predict the results of the administration of these drugs in the execution context.

38.     Under these circumstances, Plaintiff faces the risk of irreparable harm in the form

of excruciating pain and suffering in the course of his execution for which there is no adequate

remedy at law, in the absence of temporary, preliminary and permanent injunctive relief

enjoining the Defendants from using the Subject Execution Protocol or any other means and

methods of execution that either: (a) violate the cruel and unusual punishments clause of the

Eighth Amendment of the U.S. Constitution, and/or (b) fail to protect Plaintiff's statutorily

created (i.e., ORC § 2949.22(A)) liberty and property interests in a "quick and painless

execution," as well as his liberty and property interests in an expectation to a quick and painless execution, all as guaranteed by the substantive and procedural due process components of the Fourteenth Amendment.

### First Claim: Eighth and Fourteenth Amendment Violations

39.    Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1-38 of this Amended and Supplemental Complaint as if fully rewritten herein.

40.    Defendants have created, maintained and implemented a lethal injection procedure and protocol, to wit, the Subject Execution Protocol, that they intend to use on Plaintiff on December 8, 2009, or some other date.

41.    The Subject Execution Protocol manifests Defendants' deliberate indifference towards Plaintiff's constitutional rights, both by what Defendants include and what they exclude from the Subject Execution Protocol. The Subject Execution Protocol, if used at Plaintiff's execution, will violate Plaintiff's constitutional rights to be free from arbitrary, capricious, cruel, and unusually painful punishment, which rights are secured and guaranteed to him by the Eighth Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment of the United States Constitution to limit Defendants' powers while acting individually or under the color and authority of state law.

42.    Moreover, the Subject Execution Protocol constitutes human experimentation. The methods and procedures specified by Defendants therein have never been used in another execution in the history of the civilized world.

43.    The use of these untried and hurriedly-adopted procedures at Plaintiff's execution on December 8, 2009, or some other later date, would present a constitutionally unacceptable

risk that Plaintiff will suffer severe pain, will be subjected to an undignified death, and/or will be subjected to a slow, lingering and/or prolonged death.

44.     Further, in spite of a history of failed IV access in other recent executions and execution attempts, see Joseph Clark and Romell Broom, the Defendants have failed to recruit and train personnel who are competent to properly and humanely access the Plaintiff's veins and conduct the first alternative set forth in the Subject Execution Protocol. Further, there is no evidence to suggest that any of the execution team members are adequately trained in the "back up" or "Plan B" procedure involving intramuscular administration of two drugs that have never been used in any execution in the United States.

45.     The Subject Execution Protocol as written and as applied is arbitrary, capricious and cruel and will violate the Plaintiff's rights under the Eighth and Fourteenth Amendments.

## Second Claim: Fourteenth Amendment Due Process Violation

46.     Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1-45 of this Amended and Supplemental Complaint as if fully rewritten.

47.     Defendants have created, maintained and implemented a lethal injection procedure and protocol, to wit, the Subject Execution Protocol, that they intend to use on Plaintiff on December 8, 2009, or some other later date.

48.     The Subject Execution Protocol manifests Defendants' deliberate indifference towards, or intentional deprivation of, Plaintiff's statutorily created liberty and property interests in expecting and receiving a quick and painless death protected as rights by the substantive and procedural elements of the 14th Amendment's Due Process Clause by what Defendants include and exclude from the Subject Execution Protocol.

49.     The Subject Execution Protocol, if used at Plaintiff's execution, will violate the

Plaintiff's constitutionally protected liberty and property interests (as arising from ORC Sec. 2949.22) in expecting and receiving a "quick and painless death," rights which are protected under the substantive and procedural elements of the 14th Amendment's Due Process Clause.

### Third Claim For Relief

50.    Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1-49 of this Amended and Supplemental Complaint as if fully rewritten.

51.    Defendants have made sweeping changes to the drugs used in the lethal injection process and the manner in which the drugs will be administered only 8 days before the scheduled execution of the Plaintiff.

52.    These new procedures and protocols have never been used to execute a human in the United States, and the short time frame between the announcement of the new protocol and its implementation against the Plaintiff violates his rights to due process under the Fourteenth Amendment of the U.S. Constitution and his rights under the Eighth Amendment not to be subjected to cruel and unusual punishments.

53.    The unknown effect of the drugs used in the "back up" plan, and the possible combination of all three drugs in the "new" protocol, violate the Plaintiff's right to a "quick and painless" death as previously alleged herein.

54.    Plaintiff is entitled to more notice than 8 days before such sweeping changes to the execution protocol are implemented against him so that he may exercise his Constitutional and statutory rights in a meaningful manner.  It violates the "evolving standards of decency" under the Eighth Amendment, and the due process provisions of the Fourteenth Amendment, to execute Biros with a new and untested method of execution without subjecting that method to review that comports with constitutional standards of due process and fundamental fairness.

**Fourth Claim for Relief**

55.     Plaintiff incorporates by reference each and every statement and allegation set forth in paragraphs 1-54 of this Amended and Supplemental Complaint as if fully rewritten.

56.     The execution is the final critical stage of a criminal proceeding. As proven by problematic executions, and especially the Broom execution attempted by Ohio, it is critically important to have counsel present and for the client to be able to have the ability to communicate with his counsel.

57.     The Subject Execution Protocol does not allow for counsel to be present to witness the execution, nor does it allow for the client to communicate with his counsel in the event problems develop during the execution.

58.     Plaintiff must give up one of his allotted three execution witnesses if his counsel is to witness the execution. See O.R.C. 2949.25(A)(5).

59.     Plaintiff wants at least one of his counsel to witness his execution. Moreover, Plaintiff must be able to communicate with his counsel in the event problems develop during the execution.

60.     As demonstrated by the attempted execution of Broom, Broom was denied access to his counsel during the two hour attempted execution.

61.     Defendants must adopt procedures, as part of the Subject Execution Protocol or otherwise, which makes communication between Plaintiff and his counsel feasible in the event problems develop during the execution. Also, the Defendants must provide a setting for such communications that, to the extent feasible, protects the attorney-client privilege and allows for confidential communications.

62.     Defendants' failure to provide for Plaintiff's right to counsel violates his rights to

22

due process under the Fourteenth Amendment of the U.S. Constitution and his rights under the Sixth and Eighth Amendments.

63.     Plaintiff is entitled to temporary, preliminary, and permanent injunctive relief against any attempt by Defendants to execute him unless or until provisions have been made to insure that he has access to confidential consultation with his lawyers, that he has access to counsel if the execution process begins to go wrong, and he through his counsel has access to assistance including from the courts by providing for the use of telephones from the death house.

64.     He is also entitled to such other relief as may be appropriate in his favor.

## INJUNCTIVE RELIEF WARRANTED

65.     Plaintiff is entitled to a temporary and preliminary injunction stopping Defendants from executing him with the methods and procedures described herein because: (1) there is a significant likelihood that he will prevail on the merits; (2) he will suffer irreparable harm if he is executed; (3) there is a great impact on the public's interest in making sure our government does not behave like those of other nations we roundly condemn for utilizing execution methods that violate our nation's constitutional proscription against cruel and unusual punishment; and (4) there is a substantial possibility that others under a sentence of death in Ohio will suffer unconstitutional executions unless this Court requires Defendants to design constitutionally acceptable execution procedures.

66.     Plaintiff does not seek injunctive relief under 42 U.S.C. § 1983 as a means of attacking his underlying conviction or death sentence; rather, he simply seeks to utilize 42 U.S.C. § 1983 as a legitimate means to stop Defendants from executing him in a manner that violates his constitutional rights.

67.     42 U.S.C. § 1983 provides, in pertinent part, for the protection of "any rights,

privileges, or immunities secured by the Constitution and laws" against infringement by the states. When these rights are violated, 42 U.S.C. § 1983 creates an action for damages and injunctive relief for the benefit of "any citizen of the United States" against the state actor responsible for the violation. In accordance with the remedial nature of the statute, the coverage of 42 U.S.C. § 1983 must be liberally and beneficently construed. In order to effect this liberal construction, the Court has "given full effect to [the statute's] broad language" by recognizing that 42 U.S.C. § 1983 provides a remedy "against all forms of official violation of federally protected rights."

68.     The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a death sentence. A punishment is particularly constitutionally offensive if it involves the foreseeable infliction of suffering.

69.     State officials cannot use methods of execution that create a substantial risk of serious harm while, at the same time, they reject without penological justification readily available alternate means that would significantly reduce a substantial risk of severe pain. It is foreseeable that death by lethal injection under the methods employed by Defendants will violate these constitutional standards including those announced in Baze; thus, Plaintiff is entitled to temporary, preliminary and permanent injunctive relief until and unless Defendants bring their execution protocol within the commands of the constitution.

70.     Similarly, the facts of the unsuccessful Broom execution, along with the Defendants' failure to address in its new execution protocol the very elements that caused Broom to suffer torturous physical and mental pain, show that it is foreseeable that Defendants are violating and will violate Plaintiff's liberty and property interests created under Ohio Rev. Code § 2949.22 and protected as rights by the substantive and procedural dues process elements of the

24

Fourteenth Amendment.

**PRAYER FOR RELIEF**

A.  Plaintiff requests that this Court grant him injunctive relief by granting temporary, preliminary and permanent injunctions barring Defendants from executing Plaintiff in the manner by which Defendants intend to execute Plaintiff, in order to prevent Defendants from violating Plaintiff's federal constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution and International common law, all for the reasons set forth in this Amended and Supplemental Complaint and to be more fully developed in discovery.

B.  Plaintiff requests that this Court grant him declaratory relief by issuing an Order declaring that the Defendants' current means, methods, practices, procedures, and customs regarding execution by lethal injection, including the Subject Execution Protocol, violate the Eighth and Fourteenth Amendments to the United States Constitution and international common law, all for the reasons set forth in this Amended and Supplemental Complaint and to be more fully developed in discovery.

C.  Plaintiff requests that this Court grant him injunctive relief by granting temporary, preliminary and permanent injunctions barring Defendants from executing Plaintiff unless and until constitutionally sufficient arrangements have been made by Defendants to insure Plaintiff access to confidential attorney-client meetings, access to counsel when the execution process appears to be going wrong, and that he has access through counsel to courts and other assistance by allowing cell phones or use of the prison telephones in the death house.

D.  Plaintiff requests that this Court grant him reasonable attorney fees under 42 U.S.C. § 1988

25

and the laws of the United States.

E.  Plaintiff requests that this Court grant such further relief as it deems just and proper.

Respectfully Submitted,

/s/ Timothy F. Sweeney

Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY
The 820 Building
820 West Superior Ave., Suite 430
Cleveland, Ohio   44113-1800
(216) 241-5003

/s/ John P. Parker

John P. Parker, Esq. (0041243)
Attorney at Law
988 East 185th Street
Cleveland, Ohio   44119
Phone: (216) 881-0900
johnpparker@earthlink.net

Counsel for Kenneth Biros

## CERTIFICATE OF SERVICE

This is to certify that on December 2, 2009, the foregoing Amended and Supplemental Complaint For Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit under Section 1983 was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Timothy F. Sweeney

Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY