IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **RICHARD COOEY** <br> **KENNETH BIROS**, et al., <br><br> Plaintiff, <br><br> vs. <br><br><br> **TED STRICKAND, Governor**, et al., <br><br><br> Defendants. | Case Number: 2:04-CV-1156 <br><br> Judge Gregory L. Frost <br><br> Magistrate Judge Abel <br><br><br><br> **EMERGENCY MOTION OF INTERVENOR-PLAINTIFF KENNETH BIROS FOR A TEMPORARY RESTRAINING ORDER, OR, AT THE VERY LEAST, FOR AN ORDER UNDER THE ALL WRITS ACT STAYING HIS EXECUTION BY DEFENDANTS AND THE STATE OF OHIO** <br><br> **(Death Penalty Case with Execution Date of Dec. 8, 2009)** |

Kenneth Biros, by and through his undersigned counsel and pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, hereby moves this Honorable Court for a temporary restraining order ("TRO") that prevents defendants from executing Biros using the protocol described in Biros's proffered amended and supplemental complaint.

At the very least, and certainly in the event this Court declines to grant a TRO at this time as requested herein, Biros requests that this Court, pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651(a), and the Anti Injunction Act, 28 U.S.C. §2283, issue an order in aid and preservation of its jurisdiction in this §1983 action prohibiting the defendants and the State of Ohio, and their and its agents, from proceeding with Biros's execution by lethal injection on December 8, 2009, in clear disregard of this Court's jurisdiction over this litigation and Biros's constitutional

challenges to the very lethal injection protocol the State plans to use in Biros's execution. The requested order under the All Writs Act should prohibit the defendants and the State of Ohio, and their and its agents, from proceeding with Biros's execution until such time as some initial discovery can be completed on the defendants' revised execution protocol, adopted effective November 30, 2009, to allow the to Court to address, in a deliberative manner and fully informed by the relevant facts and legal authorities, the merits of Biros's serious Eighth Amendment challenges to that newly-adopted, revised execution protocol.

An order under the All Writs Act is necessary to preserve this Court's jurisdiction over a matter properly before it (and scheduled for trial in July 2010) and to preserve the integrity of these proceedings in which Biros has for three years been an active participant. Otherwise, the defendants will have effectively undermined this Court's authority by rushing to adopt a new protocol in time to execute Biros before he has any reasonable chance to litigate the serious issues the new protocol presents. An order may be issued under the All Writs Acts without **any requirement for the Court to evaluate the four factors applicable to traditional injunctions**. See, e.g., Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1100 (11th Cir. 2004)("The requirements for a preliminary injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.").

The reasons in support of this motion are more fully set forth in the attached Memorandum in Support which is fully incorporated herein.

                                  Respectfully Submitted,

                                  /s/ Timothy F. Sweeney
                                  Timothy F. Sweeney, Esq. (0040027)
                                  LAW OFFICE OF TIMOTHY FARRELL SWEENEY
                                  The 820 Building, Suite 430

-1-

820 West Superior Ave.
Cleveland, Ohio   44113-1800
(216) 241-5003
(216) 241-3138 (fax)
Tim@timsweeneylaw.com

John P. Parker, Esq. (0041243)
988 East 185th Street
Cleveland, OH    44119
(216) 881-0900
(216) 881-3928
johnpparker@earthlink.net

Counsel for Kenneth Biros

## **BIROS'S MEMORANDUM IN SUPPORT**

### **I. FACTUAL BACKGROUND**

Plaintiff Ken Biros is set to be executed December 8, 2009 at 10:00 a.m. The defendants have made wholesale changes in Ohio's execution protocol effective November 30, 2009. (See Doc. 607-1) The defendants' new protocol is called "the Subject Execution Protocol."

On December 2, 2009, Biros filed a motion for leave to file *instanter* an amended complaint under FRCP 15(a) or, in the alternative, to file a supplemental complaint under FRCP 15(d). (See Doc. 608). By his motion, Biros sought leave to amend his current complaint to include legal challenges under 42 U.S.C. § 1983 to the Subject Execution Protocol, which is now the third version of a lethal injection protocol Biros has challenged since he joined this litigation as an intervenor in November 2006.

The Defendants' newest protocol calls for the use of drugs and methods that have never been used in an execution in the history of the United States or any other civilized country. The Defendants have chosen to adopt the Subject Execution Protocol as a direct result of this litigation and of the claims made in this litigation by Biros and other inmate-plaintiffs concerning previous versions of the Defendants' lethal injection protocols, and also because Defendants knew, when they elected to change their earlier protocols and adopt the Subject Execution Protocol, that they were at substantial risk of being found liable to Biros and others in this litigation. (Doc. 608, Amended & Supp. Complaint, ¶ 5.) The Subject Execution Protocol thus represents a rushed effort by Defendants to avoid and/or minimize their liability in this litigation. But the Subject Execution Protocol does not address all of the legal claims and challenges made in Biros's original complaint and, in addition, it raises new claims and challenges, all of which Biros has asserted in his proffered Amended and Supplemental Complaint. (Id.)

Defendants have also rushed to adopt the Subject Execution Protocol because, for unreasonable and arbitrary reasons, they do not want there to be any delay in Plaintiff's scheduled execution date of December 8, 2009. As a result, in adopting the Subject Execution Protocol, the Defendants have sacrificed carefulness, competence, prudence, diligence, openness, professionalism and caution – all of which are essential when performing the solemn duty attendant to the adoption of new execution protocols in the circumstances of this case (see, e.g., the Romell Broom events) –, in favor of a process that has been hurried, rushed, arbitrary, secretive, unprofessional, and driven to an unreasonable degree by an imprudent desire to meet the arbitrary deadline of Ken Biros's execution date. As a result, Biros has grave concerns that his execution under the Subject Execution Protocol will not result in the dignified, humane, quick, and painless death that is required by the federal and state constitutions and by ORC § 2949.22(A). (Doc. 608, Amended & Supp. Complaint, ¶ 6.)

In the last attempted execution in the State of Ohio, the execution team was famously unable to execute Romell Broom due to its inability to access his peripheral veins with IVs. The State attempted to access veins for more than two hours before the Governor granted a reprieve.

The first alternative method for executing Ken Biros continues to be the same IV access procedure with the same people who were unable to access Broom's veins. As far as Plaintiff knows, the State has not had additional training for or altered the personnel who administer or attempt to administer the IVs. The procedures for IV access have also not changed.

The so called "back up" method of executing Ken Biros is an intramuscular procedure using two drugs that have never been used in a human execution in the history of the United States or any other civilized country. It is possible that if the IV fails during the attempted execution of Ken Biros, or for any other reason in the Defendants' discretion, the Defendants will switch to the "back up"

plan mid-execution. They might also choose to use that Plan B first, if they determine in their discretion that it would not be feasible to use Plan A on Biros. The interaction of the three drugs is also completely untested and whether the execution would proceed in a "quick and painless" manner is unknown to the Plaintiff and quite possibly unknown to the Defendants.

The radical changes in the execution protocol by the Defendants only 8 days before the execution of Ken Biros should be a basis alone for the granting of the TRO and/or for relief under the All Writs Act. The rush to execute Ken Biros by novel and untested methods can not defeat the protections he enjoys under the Eighth and Fourteenth Amendments of the federal Constitution and the Ohio Revised Code which guarantee him the right to be free from cruel and unusual punishment and the right to a "quick and painless" execution.

## II.  LEGAL ARGUMENT

### A. Biros is Entitled to a TRO under Rule 65(a) of the Federal Rules of Civil Procedure.

Biros is entitled to a TRO that prevents defendants from executing Biros on December 8, 2009, using the Subject Execution Protocol, until further order of the Court.

"The purpose of a [temporary restraining order] under Rule 65 is to preserve the status quo so that a reasoned resolution of the dispute may be had." Leaf Funding Inc v. Butera, Case No. 3:06 CV 00938, 2006 U.S. Dist. LEXIS 72887 at 13-14 (M.D. Tenn Oct 5, 2006)(citing P & G Co. v. Bankers Trust Co., 78 F.3d 219, 226 (6th Cir. 1996)).  In determining whether to grant a temporary restraining order under FRCP 65, the Court must consider the four preliminary injunction factors:

    1. Whether the party seeking the order has a strong likelihood of prevailing on the merits of the case;

    2. Whether the moving party will suffer irreparable injury if the order is not entered;

    3. The potential harm the order would cause others;

    4. The public interest.

Leaf Funding Inc., supra at 7 (citing Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000)).

  The four factors are to be balanced; they are not prerequisites to be met. Certified Restoration Dry Cleaning network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir 2007) (citing Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003); In re De Lorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985)). Accordingly, the degree of likelihood of success required to obtain a preliminary injunction, and thus by implication a temporary restraining order, may depend on the strength of the other three factors. See In re De Lorean at 1229.

  In addition to consideration of the four preliminary injunction factors, FRCP 65(b) requires support of the alleged immediate and irreparable injury through affidavit or verified complaint. Counsel is also required to certify in writing the "efforts, if any, which have been made" to give notice to the adverse party and the reasons supporting the claim that notice should not be required.

  FRCP 65 (b) states:

> **(b) Temporary Restraining Order.**
>
> (1) Issuing Without Notice.
>
> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
>> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>>
>> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
>
> (2) Contents; Expiration.
>
> Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is

> irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry — not to exceed 14 days — that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.
>
> (3) Expediting the Preliminary-Injunction Hearing.
>
> If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.
>
> (4) Motion to Dissolve.
>
> On 2 days' notice to the party who obtained the order without notice — or on shorter notice set by the court — the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

**1.      Biros has a strong likelihood of success on the merits.**

Biros has a strong likelihood of success on the merits of his Eighth and Fourteenth Amendment claims.

In partial support of his claims is the attached declaration of Dr. Mark Heath.(Exhibit 1 hereto.) Dr. Heath is a nationally recognized expert on lethal injection. In fact, he testified before this Court in March 2009 during a week long preliminary injunction hearing. Also supporting Biros's motion are the deposition transcripts previously filed with this Court concerning the events of the Romell Broom execution on September 15, 2009. (Docket Nos. 572-82, 585-88.)

As detailed in Dr. Heath's declaration and as is clear from the extensive deposition testimony about the Broom events, the defendants' new "Plan A" fails to address the IV access issues that plagued Romell Broom's attempted execution on September 15, 2009. The protocol still relies on unqualified and insufficiently competent medical technicians to obtain IV access, still requires that

IV access is to be obtained exclusively through the peripheral veins, and still lacks any limitations as to how long the team is permitted to poke and stick in an effort to obtain IV access. Indeed, in public statements, the defendants and/or their agents have continued to insist that the team will be allowed as much time as necessary to obtain IV access. For example, Julie Walburn, DRC's spokesperson, was recently quoted saying: The team is "allowed as much time as is necessary to establish one or two viable sites." (See Exhibit 2, attached hereto).

In other words, the purported changes do not address the prolonged venous access problems that plagued Romell Broom's execution on September 15, 2009, and which are detailed at length in the record before this Court and in Biros's (and the other plaintiffs') pending motion for summary judgment. See, e.g., Docket Nos. 584, 589, 572-82, 585-88. There will be just as much risk on December 8, 2009, for Biros to be subjected to the same torturous, inhumane and undignified execution process that Romell Broom was subjected to on September 15, 2009. Biros is thus likely to succeed on the merits of his claims challenging the risk of severe pain attendant to these venous access issues. See, e.g., Docket Nos. 584, 589, Plaintiffs' Motion for Partial Summary Judgment; Reynolds v. Strickland, 583 F.3d 956, *3 (6th Cir. 2009)(Cole, J., concurring) ("[An argument that the Broom execution was stopped as per the protocol] overlooks the possibility that Broom has already suffered an Eighth Amendment violation by being subjected to this failed execution attempt.").

The recent changes to the protocol also fail to address Biros's claim that defendants' continued reliance on drug delivery through peripheral IV access, and the continued use of incompetent and insufficiently trained technicians to establish and maintain that IV access, subjects Biros to the prospect of a death that is not the "quick and painless death" unambiguously required by Ohio Rev. Code Ann. § 2949.22(A). Because of these continuing and unremedied defects, Biros's

statutorily created liberty and property interests in a "quick and painless execution," as well as his liberty and property interests in an expectation to a quick and painless execution, are still being denied in violation of his substantive due process rights under the Fourteenth Amendment Due Process Clause. See Docket Nos. 584, 589, Plaintiffs' Motion for Partial Summary Judgment.

If the team is unable to establish or maintain IV access – and with no constraints on them as to how long they are permitted to try – Biros, under the Subject Execution Protocol, will be given a massive intramuscular injection of midazolam and hydromorphone. He may also be given these drugs in the first instance if the defendants, in their discretion, determine that IV access would be problematic. These drugs have never before been used in the execution of a human being. They are totally unknown and their use is human experimentation. Will these drugs bring about death? Will such a death be painless? Will such a death be quick? Will it take many minutes or many hours before death occurs? Will these drugs allow for a dignified death, or will the death be ugly and undignified as the inmate vomits all over himself and/or convulses with hallucinations caused by the powerful opiate? If administration of sodium thiopental begins but cannot be maintained on an inmate because of IV access issues (see, e.g., Joseph Clark), how does a human body react when subjected to large doses of both sodium thiopental and hydromorphone? All of these questions need to be answered before any court should permit an execution to take place that may use such drugs.

The Defendants should also be required to provide evidence that they have some reasonable basis for believing that the usage of these two drugs in combination will result in a humane death. Biros should not be made a guinea pig for an execution method. There needs to be some reasonably reliable proof, subject to adversarial testing, that the method used will meet constitutional standards. There is no evidence that the defendants' decision to use midazolam and hydromorphone was anything other than a rushed effort by them to meet an arbitrary execution date of December 8. Biros

is entitled to know whether the defendants have evidence that these drugs will bring about a humane death, whether that evidence has been tested, whether it is reliable, and whether it is credible. He is also entitled to know whether the execution team is competent to administer these drugs and to monitor their course and effects, whether the team has received any training on these drugs, etc.

Biros's amended and supplemental complaint raises these and other issues. Biros is likely to succeed on them.

Moreover, Biros has serious concerns about the use of these drugs based on Dr. Heath's initial review of the new protocol. As Dr. Heath explains in his affidavit:

> By contrast, the transition from full consciousness to unconsciousness in plan B will be slow, taking place over a time frame of several or many minutes. During this time the prisoner will progress through increasingly severe impairments of his or her cognitive faculties. The prisoner may experience and display any of a broad suite of the manifestations of intoxication, including
>
> Confusion
> Combativeness
> Disinhibited speech
> Delerium
> Anxiety
> Fear
> Euphoria
> Dysphori
> delusional ideation
> Hallucinations
> Sensory distortions
> Disorientation

Pages 6-7 of attached Declaration of Dr. Heath.

Dr. Heath goes on to explain that it is inevitable that "significant numbers of prisoners" will become nauseated and vomit. One can infer from this that some prisoners will likely choke to death on their own vomit. Given the fact that Plan B has never been used to execute a human anywhere in the United States and given Ohio's right to a "quick and painless" execution, there is a strong likelihood of success on the merits of Biros's claims concerning the adoption and use of Plan B.

-9-

**2.     Irreparable Injury to Biros**

After the Broom attempted execution, and given the affects of the drugs used in Plan B, there is compelling evidence that Biros will suffer an unconstitutional execution or attempted execution. Further, Biros will not be able to consult with counsel if and when the process goes wrong and counsel will be unable to access the Courts on his behalf.

For defendants to execute Biros before he has a chance to be heard on this new protocol, and especially when he has been actively litigating this case since 2006 and was prepared for trial on November 2, 2009, would be irreparable harm for which he has no adequate remedy.

**3.     The public interest**

The public has a strong interest in seeing that its laws are constitutionally enforced.  See Chabad, 363 F.3d at 436 (citing Chabad of S. Ohio v. City of Cincinnati, 233 F. Supp.2d 975, 987 (S.D. Ohio 2002); Deja Vu of Nashville, Inc., v. Metro Gov't of Nashville & Davidson County, 274 F.3d 377, 400 (6th Cir. 2001).The public has no interest in seeing its citizens tortured to death. In fact, the Eighth and Fourteenth Amendments continue to prohibit cruel and inhumane executions. See Baze.

The public interest will also be served because Ohio will likely continue to encounter problematic executions until it is forced to amend its protocol to allow for constitutionally acceptable executions. In fact, Ohio has executions scheduled for one per month from December 8, 2009 through at least May 2010.The public has no interest in rushing into an execution 8 days after Ohio radically changed its protocol and without an opportunity to thoroughly review the new Plan A and Plan B. It must be emphasized that no State has ever used the proposed method and means to execute a human being. Ken Biros is not a human guinea pig. The State must not be allowed to experiment on him with their novel and untested execution protocol.

The public has an interest in addressing the new protocol in a meaningful and rational manner. The factual development necessary to evaluate the new protocol will take some time, but not an inordinate amount of time. This case is already scheduled for trial in July 2010. Any fact development can occur well before that. The arbitrary and artificial times constraints in this case should not be allowed to trump the Constitutional protections Ken Biros enjoys. The Defendants have chosen to release the new protocol 8 days before the scheduled execution. The public's interest in vetting the new protocol outweighs the rush to execution under the new and untested methods proposed by the Defendants.

**4.    No harm to others**

The granting of a temporary restraining order will cause no harm to others and may in fact prevent others from being harmed.

**5.    Certification of Notice**

The undersigned counsel for Biros certify that they have given notice of this motion for a TRO to counsel for defendants, Charles Wille, by emailing a copy of this motion and all attachments to him on this 3rd day of December 2009. Mr. Wille will also receive notice through the court's ECF system.

**B. At the Very Least, This Court Should Stay Biros's Execution Pursuant to its Clear Authority to Do So Under the All Writs Act and the Anti-Injunction Act. Such a Stay Is Necessary in Aid and Preservation of the Court's Jurisdiction in this §1983 Action and to Give Effect to Its Orders.**

The All Writs Act authorizes "[t]he Supreme Court and all courts established by Act of Congress [to] issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Courts have read the language of this statute broadly. The statute has been found to authorize the issuance of writs to protect "not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1099 (11th Cir. 2004). See also Adams v. United States, 317 U.S. 269, 273 (1942). Indeed, unless specifically constrained by an act of Congress, the Act authorizes a court to issue writs any time "the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it." Adams v. United States, 317 U.S. at 273.

The Anti-Injunction Act serves as a check on the broad authority recognized by the All Writs Act. 28 U.S.C. § 2283. It prohibits federal courts from utilizing that authority to stay proceedings in state court unless the requirements of one of three exceptions are met. Under the Anti-Injunction Act, an injunction halting a state court proceeding is inappropriate, "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

"The All Writs Act and the Anti-Injunction Act are closely related, and where an injunction is justified under one of the exception's to the latter a court is generally empowered to grant the injunction under the former." Burr & Forman v. Blair, 2006 U.S. App. LEXIS 29133, *18-19 (11th Cir. 2006)(citing Olin Corp. v. Ins. Co. of North America, 807 F. Supp. 1143, 1152 (S.D.N.Y. 1992)). Thus, in assessing the propriety of an injunction entered to stop a state court proceeding, the

relevant inquiry is whether the injunction qualifies for one of the exceptions to the Anti-Injunction Act.

Among the circumstances in which federal courts may apply the All Writs Act and the Anti-Injunction Act to enjoin a state court proceeding, or some aspect of a state court proceeding, is when an injunction is necessary: (1) to preserve the federal court's jurisdiction, (2) "to protect the integrity or enforceability of existing judgments or orders," and/or (3) to avoid disruption with the orderly resolution of litigation pending before the federal court. See, e.g., Atlantic C. L. R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295 (1970)("Both exceptions to the general prohibition of [the Anti-Injunction Act] imply that some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."); Hill v. McDonough, 464 F.3d 1256, 1258-59 (11th Cir. 2006)("An injunction under the All Writs Act 'must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior.'"); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1025 (9th Cir. 1998); Brother Records, Inc. v. Jardine, 432 F.3d 939, 944-45 (9th Cir. 2005)(the purpose of the "in aid of jurisdiction" exception is "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."); Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(Anti-Injunction Act permits injunction against state proceedings that threaten to frustrate federal multi-district litigation proceedings and disrupt the orderly resolution of the federal litigations); In re Lease Oil Antitrust, 48 F. Supp. 2d 699, 704 (S.D. Tex. 1998).

A writ under the All Writs Act may be directed toward not only the immediate parties to a proceeding (such as the defendants in this case), but to "persons who, though not parties to the

original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." United States v. New York Tel. Co., 434 U.S. 159, 174 (1977). See also Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1100 (11th Cir. 2004).

Thus, under the All Writs Act as constrained by the Anti-Injunction Act, the federal court may issue such orders as are necessary to enjoin state actors (such as the defendants in this case), who are proceeding under the authority of state court orders, from taking action "which, left unchecked, would have . . . the practical effect of diminishing the [federal] court's power to bring the [federal] litigation to a natural conclusion." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1102 (11th Cir. 2004). See also Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1261, 1263 (11th Cir. 2005)(Tjoflat, J., dissenting from the denial of rehearing en banc).

**Finally, "the requirements for a traditional injunction do not apply to injunctions under the All Writs Act because the historical scope of a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns." Klay v. United Healthgroup, Inc., 376 F.3d at 1100-01 (citing numerous cases). See also United States v. New York Tel. Co., 434 U.S. at 174; De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 219 (1945).**

At the very least, and even if it denies Biros's motion for a TRO under Rule 65(a), this Court should issue a limited injunction under the All Writs Act and the Anti-Injunction Act. Such injunction should prohibit the defendants and the State of Ohio, and their and its agents, from proceeding with Biros's execution until such time as some limited discovery can occur about the new protocol, and the record has been sufficiently developed for the Court to address, in a deliberative manner and fully informed by the relevant facts and legal authorities, the merits of Biros's serious

challenges. The limited injunction sought under the All Writs Act is warranted by this Court's absolute right to: (1) preserve its jurisdiction, (2) manage this litigation in a prudent and thoughtful way, (3) avoid disruption with the orderly resolution of this litigation, (4) protect the integrity of its orders (including the order setting a trial in this case for July 12, 2010 (Docket No. 590 at 2.), and (5) ensure the proper administration of justice in this case.

Biros has been litigating in this action since 2006. Important issues of federal constitutional law are involved in this case. The issues are hardly frivolous and, indeed, are substantial and troubling. There is simply no legitimate reason for the parties properly before this Court (**such as Biros**), who have presented their federal constitutional claims in a timely and expeditious manner (**such as Biros**), to have their claims decided on a rushed, fast-track schedule that is dictated **not by this Court** but by the State's insistence on proceeding with an execution under a new protocol before that protocol can even be reviewed.

Whatever interest the State may have in carrying out its criminal judgments pales in comparison to Biros's interests under the Eighth Amendment to be free from cruel and unusual punishment and his constitutionally protected liberty and property interests (as arising from ORC Sec. 2949.22) in expecting and receiving a "quick and painless death," rights which are protected under the substantive and procedural elements of the 14th Amendment's Due Process Clause.

The execution date of December 8, 2009 can be delayed by defendant Stickland, but he has not done so. The insistence on proceeding with a rushed execution has disrupted the orderly resolution of this litigation. If the All Writs Act confers **any** power on Article III judges empowered by the U.S. Constitution to say what the law is on issues of federal constitutional law,[1] it certainly gives such judges the power to prevent a party properly before the court from being executed

---

[1] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-78 (1803).

pursuant to a death warrant issued **after** the federal court took jurisdiction to adjudicate that party's constitutional challenges to the method that will be used to execute him. At the very least, the Act gives Article III judges the power to prevent such an execution until the federal court has taken as much time as it needs, in the exercise of its jurisdiction, to fairly and properly deliberate the issues before the court in the interest of justice.

### III.  CONCLUSION

For all of these reasons, and in the interest of justice, Kenneth Biros respectfully requests that his motion be GRANTED and that this Court grant Biros a TRO prohibiting the defendants from executing him on December 8, 2009, until further order of the Court. At the very least, and certainly in the event a TRO is denied, the Court should issue a limited injunction under the All Writs Act and the Anti-Injunction Act prohibiting the defendants and the State of Ohio, and their and its agents, from proceeding with Biros's execution until such time as some limited discovery can occur about the new protocol, and the record has been sufficiently developed for the Court to address, in a deliberative manner and fully informed by the relevant facts and legal authorities, the merits of Biros's serious challenges.

Respectfully Submitted,

/s/ Timothy F. Sweeney
Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY
The 820 Building, Suite 430
820 West Superior Ave.
Cleveland, Ohio   44113-1800
(216) 241-5003
(216) 241-3138 (fax)
Tim@timsweeneylaw.com

/s/ John P. Parker
John P. Parker, Esq. (0041243)

988 East 185th Street
Cleveland, OH   44119
(216) 881-0900
(216) 881-3928
johnpparker@earthlink.net

Counsel for Kenneth Biros

**CERTIFICATE OF SERVICE**

This is to certify that on December 3, 2009, the foregoing EMERGENCY MOTION OF INTERVENOR-PLAINTIFF KENNETH BIROS FOR A TEMPORARY RESTRAINING ORDER, OR, AT THE VERY LEAST, FOR AN ORDER UNDER THE ALL WRITS ACT STAYING HIS EXECUTION BY DEFENDANTS AND THE STATE OF OHIO, and MEMORANDUM IN SUPPORT, with all exhibits, was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Timothy F. Sweeney
Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY