## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD COOEY,** | ) | **Case No.  2:04-cv-1156** |
| | ) | |
| *Plaintiff,* | ) | **District Judge Gregory L. Frost** |
| | ) | |
| **GRADY BRINKLEY,** | ) | **Magistrate Judge Mark R. Abel** |
| | ) | |
| *Intervenor-Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **TED STRICKLAND, Governor** | ) | |
| **State of Ohio** | ) | **First Amended Complaint for** |
| **77 South High Street, 30th Floor** | ) | **Injunctive and Declaratory** |
| **Columbus, Ohio 43215,** | ) | **Relief, Attorney Fees, and Costs of** |
| | ) | **Suit Pursuant to 42 U.S.C. § 1983** |
| **and** | ) | |
| | ) | |
| **TERRY J. COLLINS, Director** | ) | |
| **Ohio Dept. of Rehabilitation** | ) | |
| **     & Correction** | ) | |
| **770 West Broad St.** | ) | |
| **Columbus, Ohio 43222** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PHILLIP KERNS, Warden** | ) | |
| **Southern Ohio Correctional Facility** | ) | |
| **1724 State Route 728** | ) | |
| **Lucasville, Ohio 45699** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **Anonymous Execution Team** | ) | |
| **Members ## 1-21** | ) | |
| **(Names and Addresses unavailable to** | ) | |
| **Plaintiff)** | ) | |
| **c/o Southern Ohio Correctional Facility** | ) | |
| **1724 State Route 728** | ) | |
| **Lucasville, Ohio 45699** | ) | |
| | ) | |

1

      ***Defendants*.**          )

Intervenor-Plaintiff, Grady Brinkley, by and through his undersigned counsel and pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure, and having sought and been granted leave to do so, hereby amends his previously filed Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit pursuant to 42 U.S.C. 1983 against Defendants Ted Strickland, Terry Collins, et al. (hereinafter "Amended Complaint"), and he alleges and avers as follows:

## I.  NATURE OF THE ACTION

1.      Plaintiff Grady Brinkley ("Plaintiff" or "Brinkley") brings this action under 42 U.S.C. § 1983 for violations and threatened violations of his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, his right to be free from violations of his substantive and procedural due process rights under the Fourteenth Amendment to the United States Constitution, his right to unfettered access to counsel during the execution process under the Sixth and Fourteenth Amendments, and his right to equal protection under the laws as guaranteed by the Fourteenth Amendment. Brinkley seeks equitable, injunctive, and declaratory relief.

2.      Brinkley also seeks equitable, injunctive, and declaratory relief under Ohio state law for violations and threatened violations of his rights and interests to expect and receive a "quick and painless" execution as guaranteed under Ohio state statutory and constitutional law.

3.     Defendants' new protocol, policies, practices, customs, and procedures[1] for executing his sentence of death through the administration of lethal injection present a substantial risk of serious physical and psychological pain to him, as well as an execution that will involve a torturous or lingering death, and that such an execution will not accord with the "dignity of man" as required by well-settled principles of the Eighth Amendment.

4.     The substantial risk of serious, torturous, physical and psychological pain that is not in accord with a dignified execution, in violation of his rights under the Eighth and Fourteenth Amendments, arises from the substantial likelihood of Defendants' maladministration of the execution policy. This includes, but is not limited to, the delivery mechanisms used, the personnel and training involved, Defendants' substantial and documented pattern of repeated deviation from the written policy in administering executions, the functional nonexistence of the policy's safeguards as administered, the repeated inability to carry out an execution without encountering serious problems, and the unfettered discretion granted in the policy to several of the official actors involved.

5.     Brinkley will be subject to a substantial risk of serious physical and psychological pain, as well as a torturous, lingering, and undignified execution, as a result of inclusion of the drugs used in the so-called "Plan B" part of the policy, in violation of his rights under the Eighth

---

[1]To ensure clarity and avoid confusion over similar but critically different terminology, Brinkley adopts Defendants' vernacular for these phrases. Defendants refer to document 01-COM-11 as a "policy." Thus, Brinkley will use "policy" or "written policy" to refer to this document, rather than "protocol" or "written protocol" as Plaintiffs and the Sixth Circuit have done in the past in this case. Defendants also use the term "policy" to refer to Defendants' processes, procedures, customs, and the like. Thus, Brinkley will use the term "policy" to refer broadly to Defendants' execution practices, procedures, customs, unwritten and written policy, and as administered. Defendants use "protocol" merely as shorthand to refer to what occurs following the inmate's last statement, i.e. the injection of the fatal drug(s) and administrative actions that occur during injection.

3

and Fourteenth Amendment.

6.      Defendants' policy violates Brinkley's rights under the Fourteenth Amendment because it will not provide a painless or quick death, contrary to his interests in expecting and receiving a quick and painless death.  These interests are created by Ohio law, Ohio Revised Code § 2949.22(A), vested in a narrow class of individuals that includes Brinkley, and protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment.  This denial of Brinkley's expectation and receipt of a quick and painless death violates his rights under the federal constitution's Fourteenth Amendment.

7.      Defendants' policy violates Brinkley's right to unfettered access to counsel during his execution, in violation of the Sixth Amendment and Fourteenth Amendments.

8.      Defendants' demonstrated pattern of deviating from the policy, without any legitimate governmental interest, combined with the nearly limitless discretion vested in certain actors in the execution process, means that his death sentence will be administered in an arbitrary manner that violates his constitutional rights under the Fourteenth Amendment's Equal Protection Clause.

9.      Defendants' policy also violates Brinkley's rights under Ohio statutory and constitutional law, namely Ohio Revised Code § 2949.22(A) and Ohio Constitution Article I, § 9 and § 16, because Defendants' policy denies his rights to expect and receive a quick and painless execution, and Defendants administer their execution policy arbitrarily without any legitimate governmental interest in doing so.

10.      Unless enjoined, Defendants intend to violate Brinkley's constitutional rights on an unspecified future date by executing him using their execution policy.

11.   The federal constitutional claims in this Amended Complaint are cognizable under 42 U.S.C. § 1983.  *Baze v. Rees*, 128 S. Ct. 1520 (2008); *Hill v. McDonough*, 126 S. Ct. 2096 (2006); *Nelson v. Campbell*, 541 U.S. 637 (2004).

12.   The state law claims under Ohio statutory and constitutional law are appropriately raised in this Amended Complaint because they arise out of a nucleus of operative facts common with the federal claims.

13.   Brinkley seeks, among other relief, preliminary and permanent injunctions under federal law preventing Defendants from executing him by means of their current execution policy, including the execution policy adopted November 30, 2009, or any other policy, new or old, which, as written and/or as administered including the protocol, violates his federal constitutional rights in the same or similar manners as alleged herein.

14.   Brinkley also seeks preliminary and permanent injunctive relief under Ohio state law preventing Defendants from executing him by means of the current execution policy, including the execution policy adopted November 30, 2009, or any other policy, new or old, which, as written and/or as administered including the protocol, violates his state statutory and constitutional rights in the same or similar manners as alleged herein.

15.   Brinkley also seeks an Order declaring that Defendants' current policy will subject him to a substantial risk of severe physical and psychological pain and suffering, and a torturous and lingering death that offends the dignity of man, resulting in cruel and unusual punishment, whether that method is through the policy's "Plan A" or "Plan B," and will thus violate Brinkley's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

16.     Brinkley also seeks an Order declaring that Defendants' current policy violates his Fourteenth Amendment substantive and procedural due process-protected liberty, life, and property interests in expecting and receiving a quick and painless death, which interests are created under Ohio Revised Code § 2949.22 and protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause.

17.     Brinkley also seeks an Order declaring that he has a right to unfettered access to counsel throughout the execution process under the Sixth and Fourteenth Amendments, and that Defendants' current policy likewise violates this right.

18.     Brinkley also seeks an Order declaring that Defendants' substantial and demonstrated pattern of deviations from the written policy and the safeguards contained therein during administration of the policy, without any legitimate governmental interest, is arbitrary and violates his rights to equal protection under the Fourteenth Amendment.

19.     Brinkley also seeks an Order that Defendants' current policy violates his due process and statutory rights under Ohio law, namely Ohio Revised Code § 2949.22(A) and Ohio Constitution Article I, § 9 and § 16, because Defendants' policy denies his rights to expect and receive a quick and painless execution and Defendants administer their policy arbitrarily without any legitimate governmental interest in such arbitrary and dissimilar administration.

## II.  JURISDICTION AND VENUE

20.     This action arises under 42 U.S.C. § 1983 for violations of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights violations and equitable relief under an act of Congress), 28 U.S.C. § 2201 (declaratory relief),

and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

21.     This action also arises under state law for violations of Ohio Revised Code § 2949.22(A) and Ohio Constitution Article I, § 9 and § 16.  The Court has subject matter jurisdiction over these state law claims under the supplemental jurisdiction provision of 28 U.S.C. § 1367 as the state and federal claims are claims that arise out of a common nucleus of operative facts.

22.     This Court has personal jurisdiction over Defendants as they are residents of the State of Ohio, and are presently located in the State of Ohio, and are elected or appointed officials of the State of Ohio.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

### III.  PARTIES

### A. Plaintiff

24.     Grady Brinkley is a United States citizen and a resident of the State of Ohio.  He is presently incarcerated on death row at the Ohio State Penitentiary in the custody of Defendants, and under the control and supervision of the State of Ohio Department of Rehabilitation and Correction, who have him incarcerated at the Ohio State Penitentiary, 878 Coitsville-Hubbard Road, Youngstown, OH 44505.  If Brinkley's capital conviction and/or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will execute him on a date yet unspecified.  Upon information and belief, it is the intention of Defendants, acting in concert with other state officials not named as defendants herein, to use their current execution policy, including the written execution policy adopted November 30, 2009, to execute Brinkley in the death house located on the grounds of the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio.  Defendants operate and

7

control SOCF.

## B. Defendants

25.     Defendant Ted Strickland is the Governor of the State of Ohio and has been since

January 1, 2007.  He is the final executive authority in the state, statutorily and constitutionally,

responsible for the execution of all sentences of death in Ohio and the manner in which those

sentences are executed.  He is sued here in his individual and official capacity for the purpose of

obtaining declaratory and injunctive relief.

26.     Defendant Terry J. Collins is the Director of the State of Ohio Department of

Rehabilitation and Correction ("DRC"), a department of the State of Ohio that was created and is

maintained pursuant to Ohio Revised Code § 5120.  As such, Defendant Collins is charged with

and authorized under Ohio Revised Code § 5120.01 to prescribe and direct the promulgation of

rules and regulations for the DRC, including the rules and regulations for the conduct of prison

operations and execution procedures.  He is sued here in his individual and official capacity for

the purpose of obtaining declaratory and injunctive relief.

27.     Defendant Phillip Kerns, is Warden of SOCF, a correctional institution of the

DRC that was created and is maintained pursuant to Ohio Revised Code § 5120.05, and which is

the prison at which sentences of death are executed in the State of Ohio.  Pursuant to Ohio

Revised Code § 5120.38, Defendant Kerns, as the Warden of SOCF, is charged with

management of SOCF and the oversight and conduct of operations there, including the oversight

and conduct of executions carried out there.  He is sued here in his individual and official

capacity for the purpose of obtaining declaratory and injunctive relief.

28.     The unnamed and anonymous execution team members are individuals involved

with administering Defendants' execution policy at SOCF. They are sued in their individual and

official capacity for the purpose of obtaining declaratory and injunctive relief.

29.     Defendants, and each of them at all times relevant hereto, are acting in their respective official capacities with respect to all acts described herein, and are, in each instance, acting under the color and authority of state law.  Upon information and belief, unless preliminarily and permanently enjoined, the Defendants, and each of them, intend to act in their respective official capacities and under the authority of state law by executing Brinkley by administering Defendants' lethal injection policy in a manner that will deviate from the written execution policy and carries a substantial risk of imposing torturous physical and psychological pain prior to the death of Brinkley in an undignified execution that will violate his constitutional rights to be free from cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; will violate his liberty, life, and property interests, created by state law and protected as rights by the Due Process Clause of the Fourteenth Amendment, to expect and receive a quick and painless death; will violate his right to the unfettered access to counsel protected by the Sixth and Fourteenth Amendments; will violate his right to equal protection under the law as protected by the Fourteenth Amendment; and will violate Ohio state statutory and constitutional law by denying his rights to expect and receive a "quick and painless" death.

### IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

30.     Brinkley's claims in this Amended Complaint are based upon the Defendants' current execution policy, including the written lethal injection execution policy, DRC Policy 01-COM-11, adopted November 30, 2009 (attached as Exhibit 1).

31.     Brinkley has already exhausted his administrative remedies for pursuing challenges to Defendants' policy for conducting lethal injection executions in the State of Ohio. Brinkley exhausted his administrative remedies under Ohio Administrative Code  § 5120-9-31,

9

as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a), in 2007 as alleged in his original intervenor complaint.  He is not required to go through the administrative procedures again in order to challenge in this litigation the most recent version of Defendants' frequently changing execution policies.

33.    To the extent Brinkley is required to specifically grieve the new policy at issue here, he will do so.

33.    Alternatively, Brinkley is not required to further exhaust administrative remedies before bringing his challenges to Defendants' current execution policy because modification of the lethal injection policy is not possible through the internal grievance process.  This was made clear in response to an earlier grievance.  Consequently, exhaustion is futile.

34.    Brinkley has complied with any and all mandatory pre-conditions to the filing of this action in federal court.

### V.  FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT

35.    Brinkley incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

36.    Defendants formally adopted their current lethal injection execution policy, 01-COM-11, on November 30, 2009. The November 30, 2009 written policy retains several critical elements of the former written policy, especially regarding requirements for administration of an execution.

37.    Upon information and belief, Defendants will employ an execution policy encompassing the November 30, 2009 written policy to execute Brinkley.

38.    A preliminary injunction and a permanent injunction are appropriate here. Brinkley does not have an execution date.

39.     In 2002, the Ohio Legislature changed the State's manner of execution from electrocution to lethal injection.  Ohio Rev. Code § 2949.22. At all times from 1994 to present, Ohio's statute governing lethal injection guaranteed that this manner of execution -- namely, lethal injection -- would result in a "quick and painless" death.

40.     The November 30, 2009 policy contains two methods by which Defendants may administer a lethal injection execution: "Plan A" and "Plan B."

**Plan A of Defendants' Written Execution Policy**

41.     Plan A in Defendants' November 30, 2009 policy requires a single 5-gram dose of sodium thiopental, administered via peripheral IV.

42.     Upon information and belief, Brinkley's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to achieving IV access on Romell Broom, resulting in severe, torturous pain.

43.     Upon information and belief, Brinkley's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, a torturous, lingering, undignified death.

44.     Upon information and belief, Team Members ## 9, 17, and 21 still comprise the medical team that establishes peripheral IV access on the inmate in an execution using Plan A, and these three team members will therefore be the individuals responsible for establishing IV site(s) in Brinkley.

**Plan B of Defendants' Written Execution Policy**

45.     Plan B in Defendants' November 30, 2009 policy provides for an intramuscular injection containing 10 mg of midazolam and 40 mg of hydromorphone.

11

46.     Little is known about the efficacy of Plan B, as it has never been used in a human execution anywhere in the world, and is thus completely untested.

47.     Plan B will produce a slow transition to unconsciousness. When drugs seep into the inmate's circulation from an intramuscular injection, the speed of onset of their effects is greatly reduced when compared with intravenous administration.

48.     The transition from full consciousness to unconsciousness in Plan B will be slow, taking place over a time frame of several or many minutes. During the time it takes for the hydromorphone and midazolam to seep through the muscle tissue and into the circulatory system via the capillary vessels, the prisoner will progress through increasingly severe impairments of his or her cognitive faculties.

49.     The prisoner may experience and display any of a broad suite of the manifestations of intoxication, including Confusion, Combativeness, Disinhibited speech, Delirium, Anxiety, Fear, Euphoria, Dysphoria, Delusional ideation, Hallucinations, Sensory distortions, and Disorientation.

50.     Because Plan B places the prisoner in a state of conscious intoxication it deprives him or her of dignity during the execution. Indeed, it is inevitable that some prisoners exposed to this Plan B will, through reasons beyond their control, produce a behavioral spectacle that is disturbing and offensive to the conscience of the witnesses, staff, citizenry, and courts.

51.     With respect to Plan B, nausea and vomiting are well-recognized and well-documented side effects of opioid narcotics such as hydromorphone.

52.      "A few papers suggest that hydromorphone may produce fewer side effects

12

(nausea, pruritus) than morphine, but the evidence for this is weak." Mark Dershwitz & C.E. Rosow, *Pharmacology of Opioid Analgesics*, ANESTHESIOLOGY, D.E. Longnecker et al. eds., McGraw-Hill 3d ed. 2008, p. 883.

53.     Additionally, "[o]pioids suppress cough [reflexes] by depressing cough centers in the medulla [the part of the brain that controls autonomic functions]." *Id.*, p. 876.

54.     Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will become nauseated and will vomit before they lose consciousness but after their cough reflex is depressed.

55.     Among those prisoners, it is an unacceptable if not inevitable risk that some of them will experience painful choking on their own vomit.

56.     And it is inevitable that some of those who vomit will do so while still conscious but under enough of the effect of the drugs as to have their cough reflex depressed, which will result in inhaling vomitus.

57.     When that vomitus contains particulate matter from a recent meal (e.g. the breakfast served to the inmates on the morning of their 10:00 a.m. execution), it will cause death by asphyxiation.

58.     When that vomitus does not contain particulate matter, it will cause extreme pain and suffering as the stomach acids come in contact with the upper airway passages.

59.     These risks are rendered all the more substantial and certain by the fact the prisoner is immobilized in a supine position, (November 30, 2009 policy, ¶ VI.B.8.a), thereby thwarting reflexive and instinctive attempts to turn face down when vomiting.

60.     With respect to Plan B, the painful condition of biliary colic is a well-documented side effect of opioid narcotics such as hydromorphone.

61.     "Opioids cause contraction of the smooth muscle in the gall bladder and spasm of the sphincter of Oddi. In some individuals this can precipitate biliary colic. The pain is steady, starts rapidly and lasts at least 30 minutes and up to several hours. There may be radiation to the back and shoulders and other concomitant symptoms such as vomiting and diarrhea." Mark Dershwitz & C.E. Rosow, *Pharmacology of Opioid Analgesics*, ANESTHESIOLOGY, D.E. Longnecker et al. eds., McGraw-Hill 3d ed. 2008, p. 879.

62.     Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will suffer the pain of biliary colic before they lose consciousness.

63.     Upon information and belief, Brinkley's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, a torturous, lingering, undignified death.

64.     Upon information and belief, Brinkley's individual physical and psychological characteristics and conditions mean that Plan B will not work on him as Defendants claim, resulting in a lingering death that is physically torturous as Brinkley endures biliary colic and aspirates his own vomitus, searing his upper airway tract with stomach acids and bile and/or choking on the vomit, while suffering from a broad range of psychologically torturous symptoms such as dysphoria, fear, anxiety, and hallucinations.

65.     In other words, Plan B will subject Brinkley to a "spectacle execution" that is far from a dignified death that is in accord with the common decency of man.

66.     Brinkley will also suffer serious physical and/or psychological pain and suffering

14

and a lingering, slow death if Defendants first attempt to execute him via Plan A, then abandon

Plan A after injecting the sodium thiopental, and implement Plan B.

**Problems With The November 30, 2009 Policy**

67.    While the November 30, 2009 written execution policy made some material

changes from the previous policy, the changes do not eliminate the constitutional problems with

Defendants' execution policy.

68.    A plain reading of Defendants' written policy requires that Defendants must

attempt to execute an inmate using Plan A first, before turning to Plan B.  (See 01-COM-11, 8, &

VI.B.7.e.ii.)  Plan B will only be used if the execution team is unable to obtain peripheral IV

access and the Director and Warden decide not to use IV administration, or if an IV injection is

initiated and then abandoned.  (See *id.* at 8, & VI.B.7.3.ii; 10, & VI.B.8.f.)  Thus, all inmates,

including Brinkley, will by written policy be subjected to attempts to site an IV catheter,

regardless of any unique factors presented by the inmate's physical and/or psychological

condition and history.

69.    Defendants employed their new policy for the first time to execute Kenneth Biros

on December 8, 2009. The medical team members responsible for establishing peripheral IV

access under Plan A for the Biros execution required approximately half an hour and

approximately 9-10 needle sticks to establish a single IV site for him.

70.    Defendants' policy continues to use untrained and insufficiently competent

medical technicians to insert the IV catheters into the inmate's veins.  Defendants have failed to

adequately address the IV access issues encountered in Romell Broom's failed execution, which

implicated Defendants Team Member # 9, Team Member # 17, and Team Member # 21 as the

team members who were unable to obtain viable IV access after two hours of attempts.  Team Member # 9, Team Member # 17, and Team Member # 21 have been the primary "medical team" members for the last several executions made or attempted in Ohio. Team Member # 9 and Team Member # 17 have served on the medical team for several years.  Upon information and belief, these three medical team members still comprise the medical team and will continue to do so in the future, including for Brinkley's execution, despite the demonstrated history of problematic performance under the stress of an execution.

71.     Defendants' policy lacks any restraint on the number of attempts at peripheral IV access or the length of time those pokes, sticks, and stabs to the inmate can persist under Plan A. Based on prior executions and evidence adduced, Defendants have shown a willingness to engage in multiple, lengthy attempts at establishing peripheral IV access. This physical and psychological torture could continue as long as 14 hours based on Defendants' understanding of their policy.

72.     Defendants' failure to have a time limit for attempting peripheral IV access continues to place the team members in an oppressively stressful situation, rendering the team members unable to constitutionally administer an execution.

73.     The inmate's physical and mental suffering is not included in the policy's considerations for whether to halt further peripheral IV access attempts.

74.     Defendants' policy and protocol fails to recognize that each inmate may present unique physical or psychological issues that may affect the efficacy of a particular execution method, whether Plan A or Plan B, and have thus failed to prepare, train, or adjust the drug dosages to account for the unique issues Brinkley or other inmates may present.

75.     Defendants' policy fails to require a physician to supervise and monitor the

16

administration of the lethal drugs to ensure the execution is carried out in accordance with the basic tenets of medical practice and safety.  Other states require the use of physicians during the execution process.

76.    Defendants used a physician, untrained in the Ohio policy, during the Broom execution attempt.

77.    The physician who participated in the attempted Broom execution, Dr. Carmelita Bautista, is licensed to practice medicine in Ohio working as a contract employee for Defendants at SOCF.  Dr. Bautista has not suffered any professional disciplinary action or complaints, nor any threat to her Ohio licensure as a result of her participation in the Broom execution attempt.

78.    Defendants have admitted that they have had physicians volunteer to assist in the execution process.

79.    Defendants' policy sets improperly low criteria for the professional experience for the medical team members responsible for starting IV lines, mixing drugs, and injecting drugs. Under the terms of Ohio's written policy, the personnel attempting to administer the policy may not have had any hands-on experience for many years, and may in fact not have the currency of practice necessary to maintain the manual skills and dexterity that are necessary to place IV lines.

80.    Defendants' policy places improper reliance on licensure over actual competence and current/recent clinical experience.

81.    The controlling statutes and regulations do not allow or expressly prohibit the current medical team members from administering any of the drugs involved in the execution policy.

82.    Defendants were recklessly ignorant of this fact before, were put on notice of this

critical problem before November 30, 2009, and yet the policy and the actors involved remain the same under the new policy.

83.     The Defendants' policy does not describe what the execution team should do if the thiopental sodium injection in Plan A infiltrates.  According to Defendant Terry Collins's affidavit, if the prisoner does not exhibit unconsciousness and lack of respiration, additional thiopental may be administered.  If the first dose of thiopental failed to take effect because it infiltrated, administration of an additional dose would result in the further infiltration and accumulation of thiopental in the tissue surrounding the vein.  This in turn would result in significant or agonizing pain to the prisoner.  The policy still lacks instructions for detecting and correcting IV infiltration.

84.     Defendants' policy mandates that execution team members must receive specific training before they commence service on the execution team, and at least once a year.  This safeguard is a nullity, however, due to a lack of any enforcement mechanism or consequence for not having undergone this training.

85.     Likewise, Defendants' policy requires rehearsal training in advance of a particular execution for all execution team members who will participate in that execution.  This requirement is similarly a nullity due to a lack of any enforcement mechanism or consequence for missing one or any number of rehearsals in advance of an execution.

86.     Defendants' policy provides unfettered discretion to the team members and the supervisory personnel.  While this discretion may be vaguely limited by requirements that the alteration or modification should be necessary to ensure the completion of a humane, dignified, and professional execution, evidence from past administration of the policy demonstrates that this is not in actuality a functional limitation on the exercise of this discretion in fact.

18

87.     The medical team members, along with other members of the execution team, are still not undergoing the training and rehearsals required by the written policy, and/or are not required to have used their IV-setting skills regularly.

88.     Team Member # 9 is a phlebotomist employed by DRC who draws blood as part of her daily work. Drawing blood through a simple hollow needle is critically different from setting an IV with a needle housed in a catheter that must be set much more precisely within a vein so that the pressure of fluid infused—not simply blood flowing out under its own pressure––does not rupture the vein or dislodge the catheter.

89.     Team Member # 17 is a full-time corrections officer employed by DRC.  He does not set IV catheters as part of his job, nor does he use his EMT-Intermediate training as part of his job. The only exposure he has to setting IVs comes from his part-time work as a volunteer EMT-Intermediate.

90.     Team Member # 21 is also a full-time DRC employee, a former corrections officer, whose job does not require him to set IV catheters or use his EMT training on a daily or even regular basis. He is licensed as an EMT-Paramedic, but he has not worked as an EMT for several years. Aside from his participation as a medical team member during executions since July 14, 2009, Team Member # 21 has not regularly set or administered IVs in live patients since approximately 2004. He testified that he has not set an IV or administered drugs intravenously in any live patients for at least the last year.

91.     Defendants fail to ensure that all execution team members have read the written policy document or understand its contents.

92.     Defendants fail to ensure that all execution team members fully understand the

19

entire lethal injection execution policy.

93.    Defendants' policy contains a critical safeguard whereby the injection site in Plan A is changed if problems are detected.  Unlike the previous policy, however, the November 30, 2009 policy only requires Defendants to establish a single IV site.  This change renders the purported safeguard null and void by making an on-the-spot change in injection site impossible or impracticable.

94.    Defendants' policy does not clearly state who decides whether to switch IV sites in case of a problem during the execution.

95.    Defendants' policy is unclear about the nurse/healthcare administrator's duties and responsibilities.

96.    Defendants' "training sessions" required under the written policy in advance of an execution are more accurately termed "rehearsals," as no substantive "training" occurs.

97.     Despite repeated and vivid problems involving establishing and maintaining peripheral IV access, Defendants' rehearsal sessions do not involve setting IVs in volunteer team members or otherwise practicing establishing IV access in a live subject.  Instead, during a rehearsal session, a maximum of two medical team members will "establish" an IV in the same dummy arm -- one member sticks the dummy arm once during the first rehearsal, while a second team member sticks the dummy arm once during the second rehearsal that day.

98.    The execution team walks through an execution rehearsal assuming everything works perfectly according to plan, despite demonstrated problems and deviations from the policy during administration of previous executions.  The team, as an ordinary course of things, ignores the mandate to "train" because they engage in no contingency training scenarios.

99.    Defendants have not planned or provided for a situation in which a problem

arises, or an execution is ordered halted, during administration of the thiopental sodium.  No physicians are standing by to administer life-saving measures, and no equipment is present to intubate an inmate to ensure the inmate will not die while a problem is diagnosed, discussed, and actions taken to resolve it.

100.    Defendants' policy continues to deny an inmate unfettered access to counsel -- or any access to counsel during the execution -- the primacy of which was made clear during the Broom matter.

**Defendants' Pattern of Deviations From the Written Execution Policy**

101.    The safeguards contained in Defendants' written execution policy allegedly provide the bulwark protecting against unconstitutional cruel and unusual punishment. Unfortunately, Defendants consistently and regularly deviate from the written policy when administering their execution policy.  By these deviations Defendants ignore and/or recklessly disregard the written policy's requirements.

102.    Defendants' pattern of deviations from the written policy means that Defendants will administer their policy differently each time they execute an inmate.

103.    Defendants cannot assert any legitimate governmental/penological reason for these deviations.

104.    Upon information and belief, Defendants' pattern of deviations from the written policy's requirements includes the following:

a.    Defendants fail to follow the policy's critical training requirements and claim the authority to waive non-compliance with the policy at will.  Defendants know they are not following the policy's training requirements, but they claim the authority to simply not attend execution rehearsal training, and/or to waive these

21

requirements whenever it is convenient.

b.    Defendants could not have conducted, and, upon information and belief, did not conduct, the required training on the four required topics (01-COM-11, at & VI.B.1.b) in advance of the execution of Kenneth Biros on December 8, 2009, only one week after Defendants adopted a materially changed policy.  While trainers from within DRC came to SOCF to conduct training in the first three of the four required training topics under the old, May 14, 2009 policy, there is no evidence that anyone on the execution team has received any of the required training under the new November 30, 2009 policy.

c.    Similarly, Defendants could not have conducted, and, upon information and belief, did not conduct, the appropriate and required minimum of four days of rehearsals in advance of the Biros execution given the compressed timeline between adoption of the new policy on November 30, 2009 and Biros's execution on December 8, 2009.

d.    Defendants have consistently permitted execution team members who have not received the mandatory training and/or missed execution rehearsals to participate in the subsequent execution(s) nonetheless.

e.    Team Member # 21 still has not been provided all the training required under the policy, despite his direct participation in the several recent executions and the Broom execution attempt.

f.    Team Member # 21 also did not participate in all of the required rehearsal sessions in advance of the Broom execution attempt in deviation from the written

policy's requirements.

g.  Team Member # 21 was one of the two team members primarily responsible for establishing IV access in Broom on September 15, 2009, and at least two of the notable mishaps involved Team Member # 21.

h.  Likewise Warden Kerns did not participate in all of the Broom execution rehearsal sessions, despite his primary role in administering an execution.

i.  The training sessions/rehearsals as conducted also fail to satisfy the policy's implicit requirement to actually "train," because they do not contemplate any difference from one inmate to the next.

j.  Warden Kerns claims the power under policy paragraph VI.B.4.o of the written policy to waive *any* of the policy's formal training requirements, including attendance at an execution rehearsal session, if he chooses.  Indeed, Warden Kerns has, in fact, waived these training requirements for recent executions.

k.  Defendants have and/or are injecting inmates at concentrations of the drugs other than as provided in the written policy.

l.  Defendants have and/or are injecting inmates at dosages of the drugs other than as provided in the written policy.

m.  Defendants fail to keep accurate records involving the drug(s) used as required in the written policy, or fail to create any records at all.

n.  Defendants fail to follow the written policy's requirement to document and verify correct preparation and dosage of the execution drugs.

o.  The various actors involved in administering executions are unsure or incorrect in their understanding of what the policy requires regarding preparation of backup

23

doses of the fatal drug(s) or any other backup execution method, and an adequate supply of the drug(s) is not on hand during an execution as required by the policy.

p.      Defendants will not halt, assess, and restart an execution as necessary, as required under the written policy, if a problem is observed during administration of the policy.

q.      Defendants are not acquiring the execution medications according to the written policy.

r.      Defendants do not plan to provide the mandatory, yearly training beyond the Theodore and Perez seminars in spring of 2009, which training covered the old policy.

105.    In addition to these deviations in advance of or following executions, Defendants' history of administering executions in Ohio is marred by repeated irregularities and deviations from the written policy in the course of actual executions.

**Wilford Berry**

106.    Defendants botched Ohio's first execution in the modern era when they or their predecessors executed Wilford Berry in 1999.  Upon information and belief, the members of Berry's execution team could not locate a vein for the IV line, so they resorted to violently beating his arms in order to raise a vein adequate to acquire an IV site for the transmission of the lethal drugs into his body.  And upon information and belief, details that remain undisclosed by Defendants will reveal that other inmates executed by Defendants (or their predecessors) since 1999 suffered from the same constitutional and statutory defects as alleged in this Amended Complaint.

**Joseph Clark**

24

107.    During the execution of Joseph Clark on May 2, 2006, prison officials could find only one accessible vein in Clark's arms to establish a heparin lock instead of the required two sites.  Once Defendants and their agents began administering the drugs, the vein collapsed. Clark informed the execution team that the process was not working.  The execution was halted. After more than 90 minutes of additional attempts to establish a viable IV injection site, including consideration of nontraditional injection sites, the execution team established one new IV site through which the lethal drugs were eventually administered.

**Christopher Newton**

108.    On May 24, 2007, Defendants executed Newton.  It took approximately twenty-two minutes to insert the first IV into Newton's arm.  It took approximately one hour and fifteen minutes to place the second IV.  In fact, placing the IVs took so long that Newton was given permission to get up from the bed and take a short bathroom break.

**Daniel Wilson**

109.    On June 3, 2009, Defendants executed Daniel Wilson.  Despite the mandate in the then-applicable May 14, 2009 policy that required assessment of the inmate's veins on the morning of the scheduled execution, Defendants, whether intentionally or otherwise, deviated from this important procedural safeguard required by the written policy.  Defendants did not conduct the required assessment, despite their understanding of how critical venous access is to accomplishing an execution and their recent experiences in Clark and Newton.

**Marvallous Keene**

110.    Approximately one month later, Defendants again demonstrated a willingness to deviate from the written policy's requirements.  The policy in place at the time explicitly required two functional IV sites at the start and during an execution, along with the related

25

requirement that if one IV site became compromised, the execution must be stopped, if only to assess the situation. Team Member # 17 (the "executioner") and Team Member # 21 (the back-up executioner, and the observer on hand in the Equipment Room with Team Member # 17) were each aware of a problem with one IV bag and line during the Keene execution but deviated substantially from the policy when they chose to ignore the problem and forged ahead with the execution rather than halting as the written policy required.

**Romell Broom**

111.    On September 15, 2009, Defendants attempted to execute Romell Broom. The evidence demonstrates myriad deviations from the written policy during the Broom execution attempt.

112.    The facts surrounding the failed Broom execution attempt are thoroughly set out in the deposition testimony taken in the weeks following September 15, 2009. See, e.g., ECF Nos. 580, 598, Broom Dep., Oct. 5, 2009, which is incorporated by reference here in full. The most salient details are recounted here.

113.    Defendants critically deviated from the written policy's requirements when they failed to conduct the mandatory venous access assessments on Broom, just as they failed to do in the Wilson execution.

114.    Defendants, namely Team Member # 9, Team Member # 17, and Team Member # 21, unsuccessfully attempted to insert IV lines in eighteen different spots on Broom's body, making approximately fifty needle insertions over the course of two hours.

115.    Defendants attempted to establish an operable IV by repeatedly inserting IV catheters into the crooks of both of Broom's elbows (the antecubital area), his left biceps, his left wrist, the base of his thumb on each hand, over the knuckles on the back of his right hand, the

26

top of his left foot, and his right medial malleolus (ankle bone on the inside part of the ankle).

116.    During Defendants' repeated attempts to establish IV access in Broom, venous access was obtained on at least two different occasions.  Upon information and belief, at least one of those instances failed when execution team members mishandled the IV apparatus after establishing a successful IV hook-up, resulting in the IV catheter being yanked out of Broom's vein.

117.    In at least one other instance, execution team members established but then lost venous access by virtue of their actions following successful IV catheter insertion.

118.    Personnel involved in attempting to execute Broom included at least one physician, Dr. Carmelita Bautista.  Defendants have consistently asserted they are unable to procure participation of a physician in the execution process.  The written policy does not provide for physician participation, and Dr. Bautista's participation in the failed Broom execution came as a distinct surprise to participating execution team members.

119.    After two hours of causing substantial, torturous physical and psychological pain to Romell Broom, Defendant Terry Collins requested that Defendant Governor Ted Strickland grant a reprieve to postpone the execution process for one week.

120.    At no time was the pain and suffering that Broom was enduring considered as part of the discussion and factors for whether to halt the execution attempt.  The only concern was for the execution team members' well-being, concern about generating future litigation, and concern about avoiding subsequent, more embarrassing problems if the execution continued and IV administration of the lethal drugs failed.

121.    During the course of this two-hour ordeal, Broom requested on at least one occasion, and perhaps more, to speak with his counsel.  Defendants denied these requests, citing

27

their execution policy, and then denied counsel's request to speak with Broom.

122.     The failed attempt to execute Romell Broom employed the May 14, 2009 policy. None of the changes in the November 30, 2009 policy address any of the problems that occurred with Broom on September 15, 2009.

123.     At least one member of Broom's execution team explicitly stated that he was looking forward to seeing the State execute another particular inmate.

124.     While none of the executions or attempted executions listed above were conducted under the November 30, 2009 policy, they all involved and demonstrated deviations in administration from the constitutionally required procedural safeguards in the written policy. This lengthy pattern of deviations remains consistent regardless of which policy was being administered at the time, and will continue under the November 30, 2009 policy.

125.     Defendants' demonstrated willingness to deviate from the policy's mandated, constitutionally required safeguards is exacerbated by the vast amounts of unfettered discretion that the policy vests in certain actors, including execution team members and supervisory officials.

## VI.  CLAIMS FOR RELIEF

### First Claim: Eighth and Fourteenth Amendment Violations

126.     Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

127.     Defendants have created, maintained and implemented a lethal injection policy, which includes the November 30, 2009 written policy 01-COM-11 and the administration of said written policy, by which they intend to execute Brinkley at some future date.

28

128.    The policy manifests Defendants' deliberate indifference towards Brinkley's constitutional rights, both by what Defendants include and what they exclude from the policy. The policy will violate Brinkley's constitutional rights to be free from arbitrary, capricious, cruel, and unusually painful punishment, which rights are secured and guaranteed to him by the Eighth and Fourteenth Amendments' limitations on Defendants' powers while acting individually or under the color and authority of state law.

129.    Defendants have repeatedly demonstrated a pattern of deviations from the written policy during administration of the policy, including while administering their protocol. The evidence produced during the Clark, Newton, Wilson, Fautenberry, Keene, Getsy and Biros executions, along with the vivid evidence from the Broom execution attempt, will show that Defendants fail to consistently and precisely administer executions according to the written mandates of the November 30, 2009 policy and its predecessors, thus making these events far from "isolated incidents" or "unfortunate adventures." These problems are repetitious and foreseeable, yet their prevalence in Ohio makes their subsequent occurrence highly likely, especially in light of the constant presence of the same problematic actors.

130.    Defendants' pattern of deviations from the policy's written safeguards -- safeguards that are essential to alleviate Eighth Amendment concerns -- create a substantial risk that Brinkley and any and all others on whom Defendants administer the execution policy will not be sufficiently protected by those critical safeguards.

131.    The pattern of deviation from Defendants' written policy by many of the actors involved, whether intentional or reckless, the amount of discretion that exists under the policy, and substantial evidence of Defendants' incompetence or inability to perform in the execution context, cumulatively point to an unacceptable risk of violating Brinkley's rights.

29

132.    Defendants' consistent pattern of failures to properly and competently administer the written execution policy renders the constitutionally critical safeguards contained in the policy null and functionally nonexistent.  Thus these written safeguards do nothing to protect Brinkley's Eighth Amendment rights against being subjected to a substantial risk of serious, torturous pain and a lingering, undignified death.

133.    This includes intentional and/or willful and/or reckless disregard for the policy's requirements, as well as negligent or reckless administration.  The unfettered discretion vested in the different actors involved further complicates matters by encouraging team members to act outside the dictates of the written policy.

134.    Further, in spite of a history of failed IV access in recent executions and execution attempts, the Defendants have failed to recruit and train personnel as required by the policy who are able to properly and humanely access Brinkley's veins to thereby constitutionally impose Plan A.

135.    Likewise, the evidence demonstrates that Defendants have not adequately trained the execution team personnel in the Plan B procedure which involves intramuscular administration of two drugs that have never been used in any execution in the United States.

136.    The execution team members could not have, in fact, engaged in the minimum of four rehearsal/training sessions under the November 30, 2009 policy before administering the policy during the December 8, 2009 execution of Kenneth Biros.

137.    Defendants' policy as written and administered, including but not limited to the protocol, is arbitrary, capricious and cruel and will violate Brinkley's rights under the Eighth and Fourteenth Amendments.

138.    Brinkley will demonstrate that the Defendants' policy presents a substantial "risk

30

of pain from maladministration" that will result in at least the substantial risk of infliction of serious, torturous physical and psychological pain leading to a lingering, undignified death, in violation of Brinkley's rights under the Eighth and Fourteenth Amendments.

139.    Brinkley will also demonstrate that he is subject to a substantial risk of serious, torturous physical and psychological pain and suffering in experiencing a lingering, undignified death due to the drugs administered to cause his death under Defendants' policy, in violation of his rights under the Eighth and Fourteenth Amendments.

140.    Ohio's procedures for obtaining intravenous access under the policy have proven to cause serious, torturous physical and psychological pain and suffering over an extended period of time as personnel unsuccessfully attempt to obtain and maintain intravenous access.

141.    Additionally, Defendants have failed to promulgate practices to respond to the numerous well-publicized problems and complications associated with lethal injection especially the setting of intravenous lines to administer the drugs, regardless of which drugs are employed. The new policy fails to address any of the foreseeable problems that subjected Romell Broom to torturous physical and psychological pain on September 15, 2009.

142.    The Defendants have failed to establish any procedure for monitoring or assessing the execution team members to insure that they are properly or adequately performing their assigned tasks so as to insure that the execution process does not result in an inhumane execution.

143.    Defendants have failed to insure that the executioner or other team members are adequately trained in the mixing of the drugs or that they understand the effects of the drugs and problems to look for during the administration of the drugs.  As a result, the executioner and all other team members possess inadequate knowledge of the effect of the drugs or problems that

31

may arise from their maladministration.

144.    Defendants have likewise failed to ensure that all execution team members are trained in accordance with the new policy's mandates.

145.    Deviations from the policy demonstrate that problems with any one particular execution are not an unforeseeable isolated mishap or innocent misadventure for which no one is liable.  A long line of problematic executions involving typical condemned inmates makes future problems executing Brinkley foreseeable and highly likely.  The problem lies with the policy as written and deviations therefrom as administered, not with each individual inmate.

146.    Based on evidence previously developed in this litigation and on information and belief, it is clear that the new method of execution and new execution policy still violates the Eighth and Fourteenth Amendment prohibitions on cruel and unusual punishment and that there exists a serious "risk of pain from maladministration" that will cause Brinkley excruciating physical and psychological pain before his death that has not been addressed in the November 30, 2009 policy and Defendants' protocol.

147.    The failures recounted above can be remedied in such as way as to substantially reduce the risk of serious pain.

148.    No government within the United States may employ a method of execution that carries with it such a significant risk of maladministration that will result in an arbitrary, cruel, inhumane, and undignified death, subject the inmate to severe pain, and/or a slow, lingering and/or prolonged death, as Defendants' execution policy does to Brinkley.

149.    Defendants' execution policy, including the policy as written and administered, and Plan A and Plan B, is arbitrary, capricious and presents a substantial risk of serious physical

and/or psychological pain, a torturous, lingering death that does not accord with the dignity of man.  The Defendants' policy is therefore cruel and unusual punishment, and subjecting Brinkley to the policy will violate Plaintiff's rights under the Eighth and Fourteenth Amendments.

**Second Claim: Fourteenth Amendment Due Process Violation**

150.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

151.    Defendants have created, maintained, and administered an execution policy that, if used to execute Brinkley's death sentence, will violate his constitutionally protected liberty, life, and property interests (as arising from Ohio Rev. Code § 2949.22(A)) in expecting and receiving a "quick and painless death."

152.    Ohio Revised Code § 2949.22(A) creates valid liberty, life, and property interests vested in Brinkley in expecting a "quick and painless" death.

153.    Ohio Revised Code § 2949.22(A) also creates valid liberty, life, and property interests vested in Brinkley in receiving a "quick and painless" death.

154.    These interests are rights vested in a small class of individuals that have a legitimate claim of entitlement to expect and receive a quick and painless death.  Brinkley, as a death row inmate, is a member of the only group that is the intended beneficiary of this statutory guarantee.  Defendants have no discretion in whether to provide a quick and painless death to Brinkley or some kind of death other than a quick and painless one.

155.    These interests arising under state law are protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment. Defendants, having granted Brinkley interests in expecting and receiving a quick and painless

33

execution, may not deprive him of those rights in violation of procedural and substantive due process under the Fourteenth Amendment.

156.    Defendants' denial of Brinkley's rights to expect and receive a quick and painless death is arbitrary and conscience-shocking.

157.    The pattern of deviation from Defendants' written policies exhibited by many of the actors involved, intentional or otherwise, combined with the amount of discretion that exists under the policy, and substantial evidence of incompetence or inability to perform in the execution context cumulatively point to an unacceptable risk of violating Brinkley's rights.

158.    By what Defendants include and exclude from their policy, their development of the November 30, 2009 policy, and their faulty administration of the execution policy, Defendants manifests deliberate indifference towards, or intentional deprivation of, Brinkley's statutorily created liberty, life, and property interests in expecting and receiving a quick and painless death, interests protected as rights by the substantive and procedural elements of the 14th Amendment's Due Process Clause.

159.    These rights are separate and distinct from the rights protecting Brinkley against cruel and unusual punishment as provided in the Eighth Amendment.

**Third Claim: Sixth Amendment Denial of Access To Counsel**

160.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

161.    Defendants have an execution policy in place by which they intend to arbitrarily, irrationally, and without a compelling State interest, deny Brinkley (as they have other condemned inmates) the unfettered right to have his counsel present to witness his execution and to represent his interests.

34

162.    An execution is the final, critical stage of a criminal proceeding.  As proven by problematic executions in Ohio, especially as compared to those in other states throughout the United States, an execution is a critical event at which the condemned inmate must have counsel at the ready to advocate on his behalf in the event something goes awry.

163.    Defendants' execution policy does not allow for counsel to be present to witness the execution, nor does it allow for the client to communicate with his counsel in the event problems develop during the execution.

164.    Defendants' execution policy does not provide an unfettered right for Brinkley's counsel to attend and witness his execution.  Instead, Defendants' execution procedures permit counsel for Brinkley to be a witness only if Brinkley gives up one of the three witness seats allotted to him for family or other supports.  See Ohio Rev. Code § 2949.25(A)(5).

165.    Brinkley needs his counsel's  presence to witness his execution and represent his interests without having to sacrifice a space for another witness from among the three witnesses allotted to him.  Brinkley must be able to communicate with his counsel in the event problems develop during the execution.

166.    Defendants' policy permits counsel for Defendants and a prosecuting attorney from the county where the condemned inmate was convicted to witness the execution without requiring representatives of the victim to yield one of the three witness positions they are entitled to select under Ohio Rev. Code. § 2949.25(A)(6).

167.    Just as Defendants have counsel present at an execution, Brinkley is entitled to have his counsel present as a witness -- not in some distant room outside of the death house as often happens to the inmate's counsel -- to ensure that Brinkley has an advocate present to

35

represent his interests if something goes wrong during the execution.

168.    Brinkley should have the right to have his counsel witness his execution just as counsel for Defendants, law enforcement, and the prosecuting attorney have a right to witness the execution.  Brinkley should be able to exercise this right without being forced to choose between having his counsel be a witness in lieu of one of the three persons he can otherwise choose to be witnesses under Ohio Rev. Code. § 2949.25(A)(5).

169.    Defendants plan to force Brinkley to choose between selecting his counsel at the cost of rejecting, as one of only three allotted witnesses, a personal loved one.

170.    Defendants do not impose a similar burden on themselves, because their counsel is present at executions; nor do they impose it on the victim's survivors, because they are not forced to give up one of their three allotted witness seats in order to permit the prosecuting attorney to witness the execution.

171.    By imposing this burden on Brinkley, Defendants place conditions on his right to have counsel present at a critical stage of his criminal proceedings that violate Brinkley's constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution.

172.    Defendants must adopt procedures, as part of their policy, which makes communication between an inmate and his counsel feasible in the event problems develop during the execution.

173.    Additionally, counsel while at SOCF must have available means to communicate with those persons responsible for the execution, and the courts as well.

174.    Also, the Defendants must provide a setting for communications that, to the extent

feasible, protects the attorney-client privilege and allows for confidential communications between the inmate and his attorney.

175.   Brinkley is entitled to preliminary and permanent injunctive relief against any attempt by Defendants to execute him unless or until provisions have been made to insure that he has access to confidential consultation with his lawyers, that he has access to counsel if the execution process begins to go wrong, and he, through his counsel, has access to assistance including from the courts by providing for the use of telephones from the death house.

**Fourth Claim: Fourteenth Amendment Equal Protection Violation**

176.   Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

177.   Defendants' execution policy, including the policy as written and as administered, violates Brinkley's rights to equal protection under the law as guaranteed by the Fourteenth Amendment.

178.   Brinkley has a fundamental right under the Eighth Amendment to be free from cruel and unusual punishment.  Plaintiff also has fundamental rights to the protections afforded by the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment.

179.   Equal Protection requires "minimal procedural safeguards" such that there is at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

180.   These rudimentary requirements are especially important in the capital punishment context, where the Supreme Court has said additional procedural protections apply, and where the Court has so clearly emphasized the necessity of procedural safeguards in a state's

37

lethal injection execution policy, especially including the written policy, to ensure against Eighth Amendment violations.

181.    The pattern of deviation from Defendants' written policy exhibited by many of the actors involved, intentionally and/or recklessly, combined with the amount of discretion that exists under the written policy and the policy as administered, and substantial evidence of incompetence or inability to perform in the execution context cumulatively point to an unacceptable risk of violating Brinkley's rights.  The *Baze* Court found the written procedural safeguards in Kentucky's execution policy critical to adjudicating constitutional that state's lethal injection policy.  The evidence in Ohio demonstrates, however, that Defendants essentially have a policy of adhering to their written execution policy, except when they do not.

182.    Defendants' actions administering their policy show a pattern of deviations from the written policy, intentionally and/or recklessly, such that the written policy's safeguards are applied to a particular inmate arbitrarily.  This affords Brinkley no guarantee that he will receive the full panoply of procedural safeguards in the written policy, without which he faces a substantial risk of serious, torturous physical and psychological pain and suffering.

183.    Similarly, Defendants have intentionally and arbitrarily deviated from the policy when they see fit and without legitimate justification, violating the constitutional requirement that "persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed."  *Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2153 (2008) (quoting *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887)).

184.    For instance, there is no guarantee that all members of the execution team will have participated in the mandatory training/rehearsal proceedings that are such a critical part of the written policy.  Evidence suggests that compliance with the training requirements in the

written policy is subject to the whims of Warden Kerns or even to the discretion of the individual team member.  Failure to participate in all the required rehearsals/training sessions, or failure to undergo the required initial training, has been overlooked and/or waived and not precluded participation in an execution by the team member.

185.    There is no standard for mandating that a team member participate in all training before participating in an execution.  Likewise, there is little if any standard for determining when a team member may or will deviate from the written policy during the course of an execution, such as involving a doctor or other such actions that are clearly outside the written policy.

186.    Brinkley has been or will be singled out arbitrarily and irrationally as a "class of one" who will not be afforded equal protection as represented by the procedural safeguards in Defendants' written execution policy, when such written safeguards are disregarded, ignored, or otherwise not followed, intentionally and/or otherwise during administration of the execution policy.

187.    Defendants also treat or will treat Brinkley differently than other similarly-situated individuals (i.e. other condemned inmates), without any legitimate governmental or penological interest, because there will be a difference in how Defendants will administer his execution and apply the policy's written safeguards as compared with how they will administer another inmate's execution and afford such other inmate the policy's safeguards.

188.    By arbitrarily and inconsistently following or deviating from the procedural safeguards in Defendant's written execution policy, Defendants are arbitrarily denying Brinkley's fundamental rights under the Eighth and Fourteenth Amendments, arbitrarily treating him differently than other similarly situated inmates, or irrationally singling him out as a class of

one.

189.     Accordingly, Defendants are violating Brinkley's rights to equal protection under the Fourteenth Amendment.

**Fifth Claim: Negligence for Failure to Properly Screen, Hire, Train, or Supervise**

190.     Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

191.     Defendants Collins, Kerns, and Team Member # 10 are all supervisory personnel personally involved in implementing Defendants' execution policy.

192.     Upon information and belief, Defendants Collins, Kerns, and Team Member # 10 are responsible for screening potential execution team members, for establishing the policies, practices, customs and procedures for adding a new member to the team, and making the decision to have a person join the execution team.

193.     Upon information and belief, Defendants Collins, Kerns, and Team Member # 10 have directly participated in disregarding known problems with team members' qualifications to participate on the execution team when extending an invitation for a team member to join the execution team.

194.     Upon information and belief, Defendants Collins, Kerns, and Team Member # 10 have directly participated in failing to obtain any background information about potential execution team members that would eliminate potential candidates whose personal physical and mental health characteristics or professional training and licensure represent a substantial possibility of inability to comply with the written policy requirements.

195.     At the least, Defendants Collins, Kerns, and Team Member # 10 are aware and implicitly authorize, approve, or knowingly acquiesce in Defendants' inadequate screening and

hiring policies, practices, customs and procedures.

196.    Upon information and belief, Defendants Collins, Kerns, and Team Member # 10 are responsible for conducting the training mandated by the November 30, 2009 policy and its predecessors.  This includes the formal classroom-type training, as well as the execution rehearsal training.  In this role, these Defendants are responsible for creating the policies, practices, procedures, and customs that dictate how Defendants will administer the November 30, 2009 policy's training requirements.

197.    In this role, Defendants Collins, Kerns, and Team Member # 10 are each direct participants in the Defendants' inadequate training that has resulted in myriad problems establishing and maintaining peripheral IV access during Ohio's executions.

198.    Similarly, the same defendants are each direct participants in the Defendants' substantial deviations from the policy's requirements, including waiving non-participation in required training by execution team members and/or not participating in the training personally.

199.    At the least, Defendants Collins, Kerns, and Team Member # 10 are aware and implicitly authorize, approve, or knowingly acquiesce in Defendants' clearly inadequate training and non-compliance with the written execution policy's required safeguards.

200.    As a result of the actions of Defendants Collins, Kerns, and Team Member # 10, and their negligence in failing to screen, hire, train and supervise the execution team members, Brinkley's rights under the Eighth and Fourteenth Amendments will be violated.

**Sixth Claim: Ohio state statutory and constitutional violation**

201.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

202.    Brinkley explicitly raises this Sixth Claim under Ohio state law, statutory and

constitutional, seeking relief under the Ohio Revised Code declaratory judgment and injunctive relief statutes.

203.    Defendants plan to violate Brinkley's due process, equal protection, and statutory rights under Ohio statutory and constitutional law to a quick and painless execution. See Ohio Const. art. I, § 9, § 16; Ohio Rev. Code § 2949.22(A).

204.    Ohio Revised Code § 2949.22 authorizes Defendants to execute Brinkley by lethal injection, and only lethal injection.  It provides that "(A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to *quickly and painlessly* cause death."  (Emphasis added).  The manner in which the Defendants seek to execute Brinkley will not end his life quickly or painlessly.

205.    The use of "shall" in O.R.C. §2949.22, "when qualifying a state's duty to provide a quick and painless death signifies that the duty is mandatory." This statutory language "demands avoidance of any unnecessary risk of pain, and as well, any unnecessary expectation by the condemned person that his execution may be agonizing, or excruciatingly painful."

206.    The mandatory nature of this duty creates "a property interest . . . in the benefit conferred upon the individual." See *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)).

207.    Further, the liberty, life, and property interests in a quick and painless death and expecting a quick and painless death are protected by the principles of due process.  See Ohio Const. art. I, § 16.  These interests outweigh any State interest in a "quick" execution, if such an interest exists.

42

208.    Defendants have created, maintained, and implemented a lethal injection policy that fails to fulfill the statutory mandate of a "quick and painless" execution.  This deprives Brinkley of his state constitutional and statutory rights to a "quick and painless" death.

209.    Defendants' November 30, 2009 policy fails to address the substantial risk of serious harm that was inherent in the previous policies.  Time and time again, Defendants have encountered severe or insurmountable problems establishing peripheral IV access to inject the lethal drug or drugs.  This litany of foreseeable problems demonstrates that Plan A of Ohio's lethal injection policy -- containing as it does the requirement of peripheral IV access as the preferred delivery mechanism, unchanged from the previous policies -- does not and will not comport with the directive of Ohio Revised Code § 2949.22(A) that the manner of death be quick and painless.

210.    Plan B and the problems that it presents likewise violates the statutory directive of a quick and painless death, in violation of Brinkley's rights under Ohio statutory and constitutional law.

211.    By adopting and employing a policy that, under Plan A uses peripheral IV access as the delivery mechanism, along with untrained, unqualified, and/or incompetent personnel who have a demonstrated pattern of deviation from the written policy's safeguards, and a Plan B that will not guarantee a quick and painless death, Defendants will violate Brinkley's constitutional rights to due process under Ohio Const. art. I, § 9 and § 16.

212.    Defendants' lethal injection policy, including the November 30, 2009 written execution policy, will cause Brinkley substantial pain.  Despite numerous botched execution attempts and/or completed executions, Defendants have refused to change their lethal injection

execution policy to fully comply with Ohio's statutory requirement to "quickly and painlessly cause death."  Ohio Rev. Code § 2949.22.

213.    Defendants' execution policy, as written and as administered, violates Brinkley's state constitutional rights because the policy is inconsistent with the intent of the General Assembly in enacting Ohio Revised Code § 2949.22  and violates the duty of the Department of Rehabilitation and Correction, mandated by Ohio Revised Code § 2949.22, to ensure the statutory right of the condemned person to an execution without pain, and to an expectancy that his execution will be painless.

214.    Despite changes reflected in the November 30, 2009 policy from the previously effective May 14, 2009 policy, Defendants have failed to address the known defects in their policy regarding, *inter alia*, IV drug administration through peripheral veins, the use of insufficiently trained technicians for establishing IV access in peripheral veins, and the large amounts of discretion that have led to a pattern of deviations from the written policy as administered.  Brinkley's physical and psychological conditions make IV access problems just as likely for him as for Broom.  Thus, there will be just as much risk for Brinkley to be subjected to the same torturous, inhumane and undignified execution process that Romell Broom was subjected to on September 15, 2009.

215.    Brinkley is aware of the events surrounding the problematic executions discussed above, and as such, knows that he is not guaranteed to be executed in a manner that is either quick or painless, thus violating his right to an expectation of a quick and painless death at Defendants' hands.

216.    Ohio's lethal injection policy violates Brinkley's statutory right to receive a quick

44

and painless execution, and also violates Brinkley's due process rights under the Ohio constitution, because it fails to protect his liberty, life, and property interests in the same, as outlined above.

217.    Ohio's lethal injection policy violates Brinkley's statutory right to expect a quick and painless execution, and also violates Brinkley's due process rights under the Ohio constitution, because it fails to protect his liberty, life, and property interests in the same, as outlined above.

218.    Defendants' lethal injection policy is administered arbitrarily without any legitimate governmental interest for this dissimilar administration, in violation of Brinkley's rights to equal protection under the Ohio constitution.

219.    Brinkley is entitled to declaratory judgment and injunctive relief under Ohio law.

## VIII.  PRAYER FOR RELIEF

A.    Brinkley requests that this Court grant him injunctive relief under federal law by granting a preliminary and permanent injunction barring Defendants from executing him in the manner by which Defendants intend to execute him under the November 30, 2009 execution policy, in order to prevent Defendants from violating Brinkley's federal constitutional rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

B.    Brinkley requests that this Court grant him declaratory relief under federal law by issuing an Order declaring that Defendants' lethal injection execution policy as administered, and as written in the November 30, 2009 execution policy 01-COM-11, and as administered including the protocol, violate the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

45

C.      Brinkley requests that this Court grant him declaratory and injunctive relief under federal

law by issuing an Order ordering Defendants to comply with all training requirements set forth in

the written policy, and prohibiting supervisory personnel from allowing execution team member

participation without full compliance with all of the written policy's training requirements.

D.      Brinkley requests that this Court grant him injunctive relief by granting a preliminary and

permanent injunction barring Defendants from executing him by a means that will deny his

liberty, life, and property interests in the expectation and receipt of a quick and painless death,

which interests are guaranteed by Ohio Rev. Code § 2949.22(A) and protected by the substantive

and procedural elements of the Due Process Clause of the federal constitution's Fourteenth

Amendment.

E.      Brinkley requests that this Court grant him injunctive relief by granting a preliminary and

permanent injunction barring Defendants from executing Brinkley unless Defendants first allow

him to exercise his right, under the Sixth and Fourteenth Amendments, to choose an attorney to

witness his execution without forcing him to choose to have counsel witness at the cost of using

one of the three witness slots allotted by Ohio Rev. Code § 2949.25(A)(5).

F.      Brinkley requests that this Court grant him injunctive relief under Ohio state law, Ohio

Revised Code §§ 2721.02, 2721.03, 2721.06, 2721.09, and 2727.03, by granting a preliminary

and permanent injunction barring Defendants from executing him by a means that will deny his

rights under Ohio Revised Code § 2949.22(A) and the Ohio Constitution, Article I, §§ 9 and 16 to

due process and the expectation and receipt of a quick and painless execution, as well as his

rights to equal protection under the Ohio constitution.

G.      Brinkley requests that this Court grant him declaratory relief under Ohio state law, by

46

issuing an Order declaring that Defendants' lethal injection execution policy as administered, and as written in the November 30, 2009 execution policy 01-COM-11, violate his statutory rights under Ohio Revised Code § 2949.22(A) and the Ohio constitution's due process and equal protection guarantees, including those provided in Article I, §§ 9 and 16.

H.      Plaintiff requests that this Court grant him reasonable attorney fees under 42 U.S.C. § 1988 and the laws of the United States.

I.      Plaintiff requests that this Court grant such further relief as it deems just and proper.

Dated:  January 8, 2010

                                                Respectfully Submitted,

                                                /s/ Timothy F. Sweeney
                                                _____

                                                Timothy F. Sweeney, Esq. (0040027)
                                                LAW OFFICE OF TIMOTHY FARRELL SWEENEY
                                                The 820 Building, Suite 430
                                                820 West Superior Ave.
                                                Cleveland, Ohio   44113-1800
                                                Phone: (216) 241-5003
                                                tim@timsweeneylaw.com

                                                John P. Parker, Esq. (0041243)
                                                Attorney at Law
                                                988 East 185th Street
                                                Cleveland, Ohio 44119
                                                Phone: (216) 881-0900
                                                johnpparker@earthlink.net

                                                Counsel for Plaintiff-Intervenor Grady Brinkley

47

**<u>Certificate Of Service</u>**

This is to certify that a copy of the foregoing **First Amended and Supplemental Complaint** was electronically filed this 8th day of January 2010.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Timothy F. Sweeney

Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY

48