# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**RICHARD COOEY, et al.,**

      Plaintiffs,

      v.

**TED STRICKLAND, et al.,**

      Defendants.

Case No. 2:04-cv-1156
**JUDGE GREGORY L. FROST**
**Magistrate Judge Mark R. Abel**

## OPINION AND ORDER

This matter is before the Court for consideration of Intervenor Plaintiff Michael Beuke's motion for a temporary restraining order or a preliminary injunction (Doc. # 752) and Defendants' memorandum in opposition (Doc. # 759). For the reasons that follow, this Court finds the motion not well taken.

## I. Background

Michael Beuke is an inmate on Ohio's death row who is set to be executed on May 13, 2010. After previously having dismissed Beuke from this case, the Court permitted him to intervene a second time on March 23, 2010. (Doc. # 702.) Thereafter, on May 6, 2010, Beuke filed a motion for injunctive relief to stay the State of Ohio from utilizing what has routinely been labeled "Plan B," one of two alternative methods of carrying out his scheduled execution under Ohio's current lethal injection protocol. (Doc. # 752.) The next day, this Court held a S. D. Ohio Civ. R. 65.1(a) informal preliminary conference by telephone, during which the parties agreed upon a briefing schedule related to the motion. The Court scheduled an in-court hearing

for May 10, 2010.[1]  During the hearing, Beuke presented testimony from two experts, Edward D. French, a pharmacology professor, and Mark J.S. Heath, an anesthesiologist who has frequently testified on behalf of plaintiffs in this and related litigation.  Defendants called no witnesses, but asked this Court to incorporate the testimony of Mark Dershwitz, another anesthesiologist, who has previously testified on several occasions in this litigation on behalf of Defendants.  At the conclusion of the hearing, the Court took the matter under advisement.

## II.  Discussion

### A.  Standard Involved

In considering whether injunctive relief staying use of Plan B in Beuke's execution is warranted, this Court must consider (1) whether Beuke has demonstrated a strong likelihood of success on the merits; (2) whether Beuke will suffer irreparable injury in the absence of equitable relief; (3) whether a stay would cause substantial harm to others; and (4) whether the public interest is best served by granting a stay.  *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  As the Sixth Circuit has explained, " '[t]hese factors are not prerequisites that must be

---

[1] The Court recognizes that because Beuke inexplicably waited until only one week prior to his execution to seek injunctive relief, time is of the essence and a prompt decision by this Court is necessary in order to afford Beuke time to pursue appellate review.  Accordingly, as in previous lethal injection orders, this Court again notes explicitly that a full account of the background facts and protocol details is contained within the record in this litigation and need not be set forth at length here.  The Court also directs the parties to the facts and the reasoning set forth in its prior decisions, which the Court incorporates by reference here.  *See, e.g.*, Doc. # 22 in Case No. 2:10-cv-27; Doc. # 39 in Case No. 2:10-cv-27; Doc. # 621 in Case No. 2:04-cv-1156.

2

met, but are interrelated considerations that must be balanced together.' " *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

**B. Analysis**

In their memorandum in opposition, Defendants raise the potentially threshold issue of whether Beuke has waited too long to request injunctive relief. They posit that because the State of Ohio modified its execution procedures in November 2009–which Defendants misidentify as "November 30, 2010" (Doc. # 759, at 7)–Beuke's waiting until only one week prior to his execution to seek injunctive relief constitutes unnecessary delay. Certainly, Beuke could have and should have pursued injunctive relief earlier than he did. A more diligent approach would have enabled the parties and this Court to approach today's issues without the time constraints confronting all involved. This Court declines to consider whether the inexplicable delay in the filing of Beuke's motion might prove dispositive of the weighty issues involved in today's inquiry, however, because an alternative non-procedural ground proves dispositive.

Defendants argue that the Sixth Circuit has foreclosed Beuke's assertion of an individualized or particularized set of circumstances that place him outside the company of those individuals who have failed to obtain stays in this litigation. This is of course incorrect. Rather, Beuke is pursuing precisely the avenue of potential redress that the court of appeals appears to have contemplated specifically in its decision in *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009). The Sixth Circuit has rejected, based on the evidence then before it, general claims against Ohio's lethal injection protocol while leaving what can only be fairly characterized as a narrow door open for individualized claims such as the type that Beuke asserts here. Thus, in contrast to Defendants' position, Beuke can rely on the expert testimony involved herein to

3

assert his particularized claim. Whether that testimony carries the day is a distinct question.

Stating the crux of the issue before this Court is deceptively simple: Beuke argues that he is entitled to injunctive relief because seizure medications that he is taking may interact with the Plan B drugs in such a way so as to violate the Constitution. There is no dispute that Beuke takes phenytoin and phenobarbital. The only evidence before this Court indicates that there is a risk that phenobarbital presents cross-tolerance with midazolam, one of the Plan B drugs, which means that more midazolam might be required to effectuate the intended result of the 10 mg Plan B dosage. Beuke's experts testified that this risk presents the possibility that the midazolam will not work as well as it might in an individual who is not on phenobarbital, so that the midazolam would not render Beuke unconscious within the relatively short time period previously testified to in this litigation. At the same time, the anti-seizure drugs could, in French's words, "rev up" Beuke's liver, with the end result being that Beuke could be awake to experience the side effects of hydromorphone, the other Plan B drug. These side effects could include any, all, or none of a litany of possible results, including euphoria, nausea, hallucinations, delirium, disinhibited speech, and vomiting. This Court has previously received testimony on the possibility that vomiting could result in aspiration, resulting in a notably unpleasant effect on an inmate. In other words, uncontradicted testimony indicated that as a result of his prescribed medications, the "window" of consciousness for Beuke could remain open longer, thereby potentially permitting him to experience side effects ranging from the essentially inconsequential to the notably disturbing.

The Court credits such testimony. But the possibility if not probability of a prolonged window of consciousness extending into a period of possible variable side effects preceding

4

likely death is not dispositive of the injunctive relief issue. What ultimately proves conclusive of that issue, however, is the speculation on which Beuke's arguments precariously hinges.[2]

Via declaration and in-court testimony, Heath asserted that Beuke's resistance to midazolam is "highly likely to be substantial," but Heath also notably qualified that opinion by stating that the specific degree of tolerance that Beuke would exhibit is simply not known. Asserting a likelihood that midazolam would have a reduced effect on Beuke, Heath testified that he could not quantify the likely reduced effect. Heath testified that the cross-reaction of the sedative drugs itself would not be painful, with the result being instead a reduced sedative effect opening the window to hydromorphone side effects. He specifically declined to equate the possible resulting intoxication or confusion with pain. Moreover, Heath responded to the question of whether there was a substantial certainty of nausea and vomiting only by explaining that doctors routinely issue orders to prevent or mitigate these effects when such drugs are employed in the clinical context.[3]

---

[2] This Court notes that the Sixth Circuit has characterized as "a threshold problem" challenges to Plan B made without a record giving the appellate court "reason to think that the execution team will have to resort to this contingency." *Cooey*, 589 F.3d at 229. Because the court of appeals stated this issue and then proceeded to address the merits of the Plan B issues before that court, this Court will not treat the appellate characterization as intended to foreclose a merits-based argument without a plaintiff having first made a showing of the sort discussed.

[3] In sum, Heath's testimony on the likelihood of potential side effects echoed prior testimony he gave in this litigation, which the Sixth Circuit previously dismissed as follows:

> At the recent hearing, Dr. Heath was unable to quantify the likelihood of any of these side effects occurring if the State turned to the intramuscular injection method. At most, he was able to say that "some" prisoners could have an individualized adverse reaction to the drugs. Tr. at 63. He also pointed out that, because patients in the clinical context are administered much lower doses of the drugs, the likelihood and intensity of the side effects is uncertain. Dr. Dershwitz, on the other hand, gave a definite expert opinion, explaining, "[I]t is my belief beyond

French similarly testified that he could not give a definitive answer as to how tolerant a person would be to midazolam under these circumstances. He in fact specifically offered no opinion as to when Beuke would become unconscious under Plan B, offering only that Beuke might be an exception to the typical two-to-four minute period from administration of midazolam to unconsciousness that most of the general population would be expected to experience. French also testified that it was not possible to precisely predict the side effects that Beuke would experience, and he explained that individual variability meant that Beuke would not necessarily experience increased likely side effects by increasing the dosage level of hydromorphone. In other words, the potential subsequent administration of multiple hydromorphone dosages contemplated by Plan B would not necessarily or invariably increase the side effects an inmate would experience. French admitted on cross that he could not predict with substantial probability that Beuke would experience side effects. He specifically stated that he was not testifying that there is an increased probability of nausea and vomiting as the dosage levels of hydromorphone increased.

The problem for Beuke with the foregoing testimony is that his own experts point not only to a conclusion of a likely greater susceptibility to a prolonged period of consciousness in

> a reasonable degree of medical certainty, if [intramuscular injection] is implemented ... it is very unlikely that the inmate will suffer any pain." Tr. at 219-20. The expert opinion to a reasonable degree of medical certainty offered by Dr. Dershwitz contrasts sharply with the speculation by Dr. Heath: "[S]ome prisoners who are exposed [to this intramuscular injection]" may have adverse reactions that result in a "distasteful" procedure. Tr. at 35. As we have emphasized repeatedly, the Constitution does not require perfection; it does require Biros to show more to convince us that he faces a substantial likelihood of pain and suffering.

*Cooey*, 589 F.3d at 231.

which he might experience side effects, but also the conclusion that any estimation of what side effects are likely to occur and the severity of those side effects is wholly speculative. As this Court as previously noted in this litigation, however, "[s]peculation is not evidence," which means that Beuke "has failed . . . to make a sufficient showing warranting a stay." (Doc. # 731, at 4-5.) This Court cannot conclude on the basis of the conjecture presented here that Plan B presents a *sufficient* risk of *sufficient* harm to Beuke. *See Cooey*, 589 F.3d at 222 ("In addressing challenges to execution methods, the Supreme Court has determined that the Eighth Amendment does not require a state to employ a painless execution method, but rather one free from "needless suffering" and a "demonstrated risk of severe pain." (quoting *Baze v. Rees*, 128 S.Ct. 1520, 1531, 1537 (2008))).

In recently denying a stay of execution for Darryl Durr, the last inmate to make a particularized-circumstances argument based on an alleged allergy, the Court explained:

> [C]ognizant of the law involved, this Court has long examined each stay request for the requisite facts supporting injunctive relief and the Sixth Circuit has repeatedly required such facts at the time the request is made. This proves problematic for Durr. . . . . There is nothing in the record before this Court, however, that demonstrates that whatever circumstances he presents constitute any irregular issues suggesting a *likely* problematic execution that would *likely* prove unconstitutional. Time and time again in his briefing Durr phrases generalized concerns of what *may* or *might* happen, targeting hypothetical crises, but he fails to provide specificity and probability–as well as evidence supporting his conjecture. It is not enough, as Durr does, to raise unsupported questions as to the protocol's sufficiency in relation to a general allergy. Durr must also provide a likelihood that he will prevail on the answers. This he has not done.

(Doc. # 731, at 5.) This rationale equally applies to Beuke's drug-interaction attack on Plan B. At the hearing, Beuke's counsel characterized the implementation of Plan B as experimentation. This is a correct if inherently unsettling choice of a label. Counsel's implication was that no one

7

really knows whether or how Plan B would work on Beuke, but that proposition defeats the conclusion that Beuke's counsel asks this Court to draw.

The law governing this litigation places a burden on a plaintiff to establish an unacceptable risk; it does not require a state to pursue a risk-free course of conduct. Thus, experimentation, however arguably untoward that term may be, is nonetheless permissible in the absence of evidence demonstrating an unacceptable risk rising to the level of a constitutional violation. As the Sixth Circuit has held, "the Constitution does not allow the federal courts to act as a best-practices board empowered to demand that states adopt the least risky execution protocol possible." *Cooey*, 589 F.3d at 220-21. Rather, attempted development of a protocol in an attempt to reach increasingly humane methods of execution is encouraged. *Id.* at 233 ("states should not be discouraged from attempting to improve their protocols"). The constitutional check on baseless experimentation is when such activity presents intolerable risks. *See id.* Beuke's argument that no one really knows what will happen therefore consumes itself. It is precisely because no witness could say that Plan B will or is likely to prove actually problematic (or perhaps most accurately, problematic *enough*) that this Court cannot conclude that the protocol violates the Constitution.

This failure of evidence means that Beuke has not demonstrated a likelihood of success on the merits. Although presenting a stronger case than Darryl Durr, Beuke has similarly ultimately failed to present any sufficiently distinguishing arguments, facts, or law warranting a different result here than in those instances in which this Court and the Sixth Circuit have denied injunctive relief to stay a scheduled execution. This Court simply cannot conclude on the record before it that Plan B "ignores a '*sure* or *very likely*' risk of serious pain 'and needless suffering,'

8

. . . which 'creates a demonstrated risk of severe pain' that is 'substantial when compared to the known and available alternatives.' " *Cooey*, 589 F.3d at 220 (quoting *Baze*, 128 S.Ct. at 1531, 1537).

The Sixth Circuit has explained that in regard to the issue of whether injunctive relief should stay an execution date, "the absence of any meaningful chance of success on the merits suffices to resolve this matter." *Workman*, 486 F.3d at 911. Because this Court has concluded that the first factor weighs against injunctive relief, the Court need not and does not discuss the remaining factors.

### III. Conclusion

The Court **DENIES** both Beuke's motion for injunctive relief and his contingent oral request to stay his execution pending appeal of this decision. (Doc. # 752.)

**IT IS SO ORDERED.**

/s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE