## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**RICHARD COOEY, et al.,**

        **Plaintiffs,**

                                       **Case No. 2:04-cv-1156**

     **v.**                                **JUDGE GREGORY L. FROST**

                                       **Magistrate Judge Mark R. Abel**

**JOHN KASICH, et al.,**

        **Defendants.**

**BRETT HARTMAN,**

        **Plaintiff,**

                                         **Case No. 2:09-cv-242**

     **v.**                                **JUDGE GREGORY L. FROST**

                                       **Magistrate Judge E.A. Preston Deavers**

**JOHN KASICH, et al.,**

        **Defendants.**

**ROMELL BROOM,**

        **Plaintiff,**

                                         **Case No. 2:09-cv-823**

     **v.**                                **JUDGE GREGORY L. FROST**

                                       **Magistrate Judge Mark R. Abel**

**JOHN KASICH, et al.,**

        **Defendants.**

**LAWRENCE REYNOLDS,**

        **Plaintiff,**

                                         **Case No. 2:10-cv-27**

     **v.**                                **JUDGE GREGORY L. FROST**

                                       **Magistrate Judge Mark R. Abel**

**JOHN KASICH, et al.,**

        **Defendants.**

## OPINION AND ORDER

It is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not.  This is nonsense.

This matter is before the Court for consideration of Plaintiff Kenneth Smith's motion for a temporary restraining order and a preliminary injunction (ECF No. 908), Defendants' memorandum in opposition (ECF No. 920), Plaintiff's reply memorandum (ECF No. 923), Defendants' incorporated motion for summary judgment (ECF No. 919), Plaintiff's incorporated summary judgment memorandum in opposition (ECF No. 925), and Plaintiff's supplemental memorandum related to the June 29, 2011 hearing (ECF No. 944).[1]  The issue presented by this briefing is relatively simple: has Plaintiff demonstrated that he is likely to succeed in establishing that the Ohio has an unconstitutional execution policy so that he deserves a stay of execution that will afford him the chance to prove his case?  Because Plaintiff has demonstrated a substantial likelihood of succeeding on his Equal Protection claim, this Court finds the motion for injunctive relief well taken.  Thus, it is **ORDERED**, **ADJUDGED**, and **DECREED** that the State of Ohio, and any person acting on its behalf, is hereby **STAYED** from implementing an order for the execution of Kenneth Smith issued by any court of the State of Ohio until further Order from this Court.

---

[1]  For ease of reference, the Court shall refer to any filing by its docket number in Case No. 2:04-cv-1156.  The references in this Opinion and Order also apply to each corresponding document filed in each consolidated case.  Additionally, all pinpoint references to documents filed on the electronic docket shall be to the original page numbers of the documents involved, not to the page numbers assigned by the electronic filing system.

## I.  Background[2]

The captioned consolidated cases are 42 U.S.C. § 1983 civil rights actions that challenge

multiple facets of the lethal injection protocol used by the State of Ohio.  Plaintiff Kenneth

Smith is an inmate on Ohio's death row who is set to be executed on July 19, 2011.  On May 10,

2011, Plaintiff filed a motion for leave to file an amended complaint (ECF No. 907) and a

motion for a temporary restraining order and preliminary injunction to stay his execution (ECF

No. 908).  Pursuant to S. D. Ohio Civ. R. 65.1(a), the Court therefore held an informal

preliminary conference with the parties on May 11, 2011, at which the Court set a hearing date.

(ECF No. 911.)  This Court subsequently granted Plaintiff's unopposed motion for leave to file

his second amended complaint.  (ECF No. 912.)  In that pleading, Plaintiff asserts Eighth

Amendment and Fourteenth Amendment challenges to Ohio's lethal injection practices via §

1983.  (ECF No. 913.)

On June 29, 2011, the Court held a hearing on Plaintiff's motion for injunctive relief.

Both sides presented testimony, which the Court summarizes below.  By order of this Court and

by continuing agreement of the parties, all references to Ohio's execution team members are

again by generic identifiers established by the parties and employed to address anonymity and

safety concerns.

### A. Stipulations

Prior to the commencement of the hearing on June 29, 2011, the parties submitted a

_____

[2]  The findings of fact related to this Opinion and Order are not conclusive given that
"findings of fact and conclusions of law made by a district court in granting a preliminary
injunction are not binding at a trial on the merits."  *United States v. Edward Rose & Sons*, 384
F.3d. 258, 261 (6th Cir. 2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390 395
(1981)).

series of stipulations.  The stipulations, which were admitted into evidence at the hearing as Joint

Exhibit 1, are as follows:

> The parties agree and stipulate to the following.

1.     The modifications for Plaintiff Kenneth Smith's scheduled execution include:

   a.     that the head of the "lethal injection bed" will be modified to include a 60-degree wedge-shaped cushion, (*see* Attachment 1), so that Smith's upper body will be elevated;

   b.     that a soft cuff will be used to restrain Smith's arm where primary IV access is obtained, because the wedge-shaped cushion on the modified "lethal injection bed" prevents the ususal arm restraint;

   c.     that Smith will have the wedge-shaped cushion available to him for the bed in the holding cell in the Death House prior to his execution and while he is located at Southern Ohio Correctional Facility ("SOCF");

   d.     that Smith will have available to him, for his optional use, a second wedge-shaped cushion, (*see* Attachment 2), or a mattress pad with a built in pillow, (*see* Attachment 3), that elevates him at a smaller angle, both of which have already been procured by and are available at SOCF;

   e.     that SOCF will provide an operational, portable suctioning machine to Smith, and said machine will be available at hand to Smith while at SOCF, including while in his holding cell in the Death House and in the execution chamber during the execution;

   f.     that Smith's trachea-esophageal prosthesis will be replaced sometime within seven days before his scheduled execution, and this is being done to accommodate Smith's request, which he made upon representation that such action will help prevent leakage or other issues;

   g.     that a microphone will be held near Smith's head throughout the execution process in order for him to access counsel if necessary by speaking into the microphone; and

   h.     that during the process of establishing IV access Smith will be permitted to have one hand free to enable him to talk and regulate his

4

breathing through his stoma.

2.     Counsel for Kenneth Smith, Attorney Carol Wright, has inspected the wedge-shaped cushion, (*see* Attachment 1), the second wedge, (*see* Attachment 2), and the mattress pad with a built-in pillow, (*see* Attachment 3), finding each and every one suitable.

3.     Since the execution of John Fautenberry on July 14, 2009, the medical team personnel involved in establishing peripheral IV access has consisted of TM # 9, TM # 17, and TM # 21, or some combination thereof.

4.     It is currently planned that TM # 9, TM # 17, and TM # 21, or some combination thereof, will comprise the medical team personnel to establish[] peripheral IV access during the scheduled execution of Kenneth Smith on July 19, 2011.

5.     During the execution of Kenneth Biros on December 8, 2009, approximately 30 minutes transpired from the initial attempt to the actual establishing of peripheral IV access.

6.     TM # 9's participation has been and almost certainly will continue to be limited to establishing peripheral IV access in the condemned prisoner.

7.     Before the execution of Vernon Smith, TM # 17 was hospitalized as a result of a vehicle accident.  Consequently, TM # 17 was not present the day before or the day of Vernon Smith's execution.

8.     TM # 21 and TM # 9 were in the equipment room during the administration of the lethal drugs to Vernon Smith.

9.     When TM # 21 exited the equipment room to enter the execution chamber after administration of the lethal drugs to Vernon Smith, TM # 9 remained in the equipment room.

10.    TM # 9 never entered the execution chamber during Vernon Smith's execution.

11.    In addition to Carol Reeder, two persons signed the document entitled "Order for Execution Medications" related to Vernon Smith's execution.

12.    Former SOCF Warden Edwin Voorhies does not meet the qualifications set forth in the current policy to be considered a member of the medical team.

13.    Charles G. Miller does not meet the qualifications set forth in the current

policy to be considered a member of the medical team.

14. TM # 10 does not meet the qualifications set forth in the current policy to be considered a member of the medical team.

15. TM # 10 does not have an individual DEA Registration Number or an Ohio license number equivalent.

16. A EA Individual Registration Number authorizes the individual registrant to receive, order, possess, and distribute controlled substances.

17. Dr. Carmelita Bautista is not and never has been a member of the execution team.

18. Dr. Bautista has never participated in any execution rehearsal sessions for any inmates.

19. There is no institutional pharmacy or pharmacist physically located at SOCF.

20. TM # 10 signed the Order for Execution Medications document before the Spisak execution.

21. Nancy D. Behn is an account clerk at SOCF.

22. Nancy D. Behn does not meet the qualifications set forth in the current policy to be considered a member of the medical team.

23. Nancy D. Behn does not have an individual DEA Registration Number or an Ohio license number equivalent.

24. ODRC officials obtained sodium thiopental from corrections officials in Indiana.

25. ODRC officials obtained sodium thiopental from corrections officials in Kentucky.

26. TM # 10 obtained sodium thiopental from Southern Ohio Medical Center in May, 2010, and September, 2010.

27. Warden Morgan does not meet the qualifications set forth in the current policy to be considered a member of the medical team.

28. Warden Morgan does not have an individual DEA Registration Number or an Ohio license number equivalent.

6

29.      Former Warden Kerns does not meet the qualifications set forth in the current policy to be considered a member of the medical team.

30.      Former Warden Kerns does not have an individual DEA Registration Number or an Ohio license number equivalent.

31.      TM # 9, as a phlebotomist, is not qualified under Ohio law to administer intravenous and intramuscular injections.

(J. Ex. 1.)

### B. Team Member # 10

Following preliminary remarks concerning discovery and opening statements by counsel, Plaintiff called Team Member 3 10, who testified behind a screen that shielded his identity. Team Member #10, who is now the leader of the execution team, has served on the team for every execution that Ohio has conducted since resuming executions in 1999.

Plaintiff proceeded to ask Team Member # 10 about several stipulations that the parties submitted to the Court just before the hearing commenced. Examining a copy of those stipulations, Team Member # 10 confirmed that he does not meet the qualifications in the current written protocol to be considered a member of the medical team on the execution team; that he does not have an individual DEA Registration Number or an Ohio license number equivalent; that he signed the "Order for Execution Medications" document prior to the execution of inmate Spisak; that he obtained sodium thiopental from the Southern Ohio Medical Center ("SOMC") in May 2010 and September 2010; and that Team Member # 9, as a phlebotomist, is not qualified under Ohio law to administer intravenous and intramuscular injections. Team Member # 10 also agreed that he often speaks with the condemned inmate before the inmate is executed, both while the inmate waits in the holding cell and when the inmate lies in the execution chamber, and that, as the team leader, he remains in the execution chamber along with the warden, while inmates

are executed.

Team Member # 10 testified that he is not qualified under Ohio law to administer intravenous or intramuscular injections. Referencing the most recent version of the written execution protocol–DRC Policy Number 01-COM-11, effective April 11, 2011–Team Member # 10 agreed that Section VI.B.7.b of the written protocol states that the person who receives the execution medications at the institution on the day of an execution, documents the receipt, and delivers them to the Death House must be qualified to administer medications.[3] Team Member # 10 testified that it is usually the Health Care Administrator ("HCA"), Registered Nurse Rosie Clagg, who takes possession of the execution medications on the day of an execution, but that recently, another registered nurse, Carol Reeder, has performed that job.

Turning to Section VI.B.7.c of the written protocol, Team Member # 10 testified about the procedures and requirements for the preparation of the execution medications and the documentation of the same. Team Member # 10 agreed that under the written protocol, documentation of the transfer of the execution medications to the Death House requires the signatures of three people qualified under Ohio law to administer intravenous and intramuscular injections: the person who delivers the medications to the Death House, and two additional

---

[3] Section VI.B.7.b provides in its entirety:

On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs pentobarbital, midazolam, and hydromorphone from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The person qualified under Ohio law to administer medications shall deliver the drugs to the Death House.

people qualified to administer medications.[4]

Team Member # 10 proceeded to testify about the section of the written protocol governing the preparation of the execution medications: Section VI.B.7.d  That section, Team Member # 10 confirmed, requires not only that the person who prepares the execution medications be qualified under Ohio law to administer intravenous and intramuscular injections, but also that a second person qualified under Ohio law to administer intravenous and intramuscular injections independently verify the mixtures and doses.[5]  Team Member # 10 testified that it was his understanding that the same section requires three signatures, on the same form as that documenting the transfer, although Team Member # 10 was not able to testify with certainty as to his understanding of which three people could sign the form.  When Plaintiff

---

[4]  Section VI.B.7.c provides in its entirety:

The person qualified under Ohio law to administer medications shall, in the presence of a second medically qualified person, give possession of the drugs to a person qualified to prepare intravenous and intramuscular injections.  This transfer shall be documented by a receipt signed by these three parties.  The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of the drugs and the command center shall log the time of delivery, the quantity, name, and tup of drugs delivered.

[5]  Section VI.B.7.d provides in its entirety:

The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous and intramuscular injections.  The preparation of the drugs shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs.  Both medical professionals shall document and sign a written verification of the preparation and dosage of the drugs, which may be noted on the medication receipt referred to in paragraph c. above.  When the drugs are prepared, the command center shall be notified and the time of the preparation recorded.  The command center shall also record what drugs were prepared, the quantity, name, and dosage of the prepared drugs.

asked whether, despite the fact that Team Member # 10 was not qualified to perform any of the tasks set forth above, Team Member # 10 had in fact signed the receipt, Team Member # 10 answered, "correct."  When asked whether he had signed the receipt documenting completion of those tasks for the May 17 execution of Daniel Bedford, Team Member # 10 answered, "correct."  Team Member # 10 then explained that he is present with the HCA and two "qualified" team members when the execution medications arrive at the Death House and that once they are all inside the control room or equipment room, he secures the door from the inside. Team Member # 10 testified that, once the HCA and other two team members inspect all of the medications and materials, prepare the injections, and verify the preparations, Team Member # 10 signs the document described in Section VI.B.7.d to verify that all of the tasks were performed.  Team Member # 10 testified that there was no separate form that he or anyone else signed documenting the mixing of the drugs and the preparation of the injections.  When asked whether the omission of a separate form documenting the preparation of the drugs constituted a deviation from Section VI.B.7.d of the written protocol, Team Member # 10 answered that "it could be . . . correct."

Team Member # 10 then confirmed that he had signed the document described in Section VI.B.7.d for the Daniel Bedford execution on May 17, 2011, and the Kenneth Biros execution on December 8, 2009.  Team Member # 10 proceeded to testify that he believed he had signed that document for every execution over the past four years.  Team Member # 10 attempted to explain that, in his mind, he signed those documents not because he was one of the required signatories described in Section VI.B.7.d, but for purposes of accountability.  When asked whether his signing of those documents in lieu of one of the three signatories described constituted

deviations from the written protocol, Team Member # 10 answered, "correct."

Plaintiff next questioned Team Member # 10 about the execution of Vernon Smith. Team Member # 10 confirmed that Team Member # 17, a medical team member qualified under Ohio law to administer intravenous and intramuscular injections, was not present for the execution of Vernon Smith. Team Member # 10 testified that he was one of two signatories on the form described in Section VI.B.7.d documenting the receipt and mixing of the drugs at the Death House. When Plaintiff asked whether the written protocol required two signatories to be qualified under Ohio law to administer medications and whether anything less constituted a deviation from the written protocol, Team Member # 10 answered, "yes." After testifying that he signed not in place of someone qualified under Ohio law to administer medications but only for purposes of accountability, Team Member # 10 agreed that it would be a deviation from the written protocol to have only one signature of someone so qualified, as was the case with the Vernon Smith execution. To that point, Team Member # 10 confirmed that for the Vernon Smith execution, Team Member # 21 was the only person present who was qualified under Ohio law to administer medications. When Plaintiff asked whether, in light of the fact that the written protocol requires the presence of at least two people qualified under Ohio law to administer medications, it was a deviation from the protocol that only one was present during the Vernon Smith execution, Team Member # 10 answered, "correct."

Team Member # 10 then confirmed that under the written protocol as it existed for the Vernon Smith execution, with an effective date of November 30, 2009, he was present in the death chamber and could see who entered the death chamber to verify the visibility of the two IV lines, one in each of Vernon Smith's arms. Specifically, Section VI.B.8.a of the November 30,

2009 protocol required the warden, two medical team members, and the team leader to verify in the death chamber the visibility of the IV lines.  Team Member # 10 confirmed that Team Member # 17 was not present that day and that Team Member # 9 never entered the death chamber for the Vernon Smith execution.  When asked whether it constituted a deviation from the then-effective protocol to have fewer than two medical team members verify in the death chamber the visibility of the IV lines, Team Member # 10 answered, "correct."  Team Member # 10 then confirmed that no one substituted for Team Member # 17 for the Vernon Smith execution.

Team Member # 10 testified that Section VI.B.1.d of the current version of the written protocol, with an effective date of April 11, 2011, requires the team leader, prior to the commencement of the initial training or rehearsal session, to verify and document the inclusion of the requisite number of persons qualified under Ohio law to administer medications and those team members' certifications.[6]  When Plaintiff asked whether that section of the written protocol required verification *and* documentation of the qualifications, Team Member # 10 answered, "correct."  Team Member # 10 confirmed that no such documents were generated at the time that he testified in 2008 but that he now keeps copies of all of the medical team members' certifications and checks them before each execution.  Team Member # 10 confirmed that he

---

[6]  Section VI.B.1.d provides in its entirety:

Prior to commencement of the initial training session, the Warden or team leader shall verify and document that the Execution Team includes persons who are currently qualified under Ohio law to administer and prepare drugs for intravenous and intramuscular injections, and that the persons have at least one year experience as a certified medical assistant, phlebotomist, EMT, paramedic or military corpsman.  Medical team members shall provide evidence of certification status at least once per year and upon any change in status.

verifies the medical team members' certifications but does nothing to document that verification. When Plaintiff asked whether the omission of documentation of the verification process constituted a deviation from the written protocol, Team Member # 10 answered, "correct."

Plaintiff then questioned Team Member # 10 about his role in the acquisitions in March 2010 and September 2010 of sodium thiopental from SOMC. Team Member # 10 confirmed that he authored an email, dated March 26, 2010, to Edwin Voorhies and Warden Donald Morgan acknowledging his awareness that the institution possessed enough sodium thiopental only for the executions scheduled for March and April of that year, inquiring whether there existed any policy governing from where they could acquire the drug, and indicating that he knew the pharmacist at SOMC and was willing to initiate contact with that pharmacist for the purpose of trying to acquire more sodium thiopental. Team Member # 10 testified that he offered his assistance in this regard of his own volition, not because anyone prompted him or because he felt "pressure" to acquire more sodium thiopental. Team Member # 10 confirmed that, after receiving approval from Morgan, Team Member # 10 initiated contact with the pharmacist two or three times, with the contacts culminating in Team Member # 10 on May 10, 2010, taking possession of sodium thiopental at SOMC and transporting it back to the Southern Ohio Correctional Facility ("SOCF"). Team Member # 10 testified that although he assumed that he would be involved in the acquisition, he also assumed that the transfer of sodium thiopental would be not to him "personally," but pharmacy to pharmacy, and that the DRC legal authorities or other authorities "higher up" had approved the transaction. Team Member # 10 confirmed that a receipt for 500 mg of sodium thiopental, dated May 10, 2011 (Pl.'s Ex. 46), contained both a DEA number and a "TD" number. When Plaintiff pointed out that SOCF did

13

not have its own DEA number at the time, Team Member # 10 testified that he was not aware of that fact and that he assumed that the numbers belonged to the DRC central office.  (Team Member # 10 later confirmed on redirect examination that SOCF received its own DEA number on March 9, 2011.)  Team Member # 10 then testified that on the day of the transaction, he drove to SOMC, signed for and took possession of the thiopental from an assistant pharmacist, and called Morgan when Team Member # 10 was en route back to SOCF.  Team Member # 10 testified that he had no involvement in generating a purchase order for the sodium thiopental and that he assumed DRC had been responsible for a formal purchase order.  Regarding the provision in Section VI.B.7 referencing the acquisition of the required execution drugs from the institution's pharmacy, Team Member # 10 confirmed that SOCF does not have pharmacy on site.  When asked whether Team Member # 10's actions leading to and including the acquisition of sodium thiopental on May 10, 2010, constituted deviations from the written protocol, Team Member # 10 answered that he did not know.

Team Member # 10 confirmed that his regular job duties at the institution do not include the ordering, receiving, or transporting of medications.  Team Member # 10 denied that, prior to the execution of Michael Beuke scheduled for May 13, 2010, Team Member # 10 felt "pressure" to locate sodium thiopental.  Team Member # 10 confirmed that he picked up sodium thiopental from SOMC in the manner described above twice: once in May 2010 for the Beuke execution and again in September 2010 for the October 6, 2010 Michael Benge execution.  Team Member # 10 denied repeatedly that he had had any role in ordering or approving funds for the sodium thiopental on behalf of DRC.  Team Member # 10 could not explain why a bill for the purchase of sodium thiopental (Pl.'s Ex. 51) had a notation directing the bill to Team Member # 10's

14

attention.  Team Member # 10 also testified as to his awareness that various DRC officials, such as former DRC director Ernie Moore and SOCF Warden Morgan, had been making telephone calls to locate and acquire more thiopental, including to a warden in Kentucky named Phil Parker and to a medical facility in Chillicothe called Adena.  Team Member # 10 confirmed his understanding that Adena was not willing to sell the drug directly to SOCF, but was willing to sell it to SOMC for the purpose of SOMC then selling it to SOCF, which culminated in Team Member # 10's September 2010 acquisition of the drug from SOMC.  Team Member # 10 testified that he had no involvement in acquiring sodium thiopental other than the May 2010 and September 2010 acquisitions from SOMC.

Plaintiff's counsel proceeded to question Team Member # 10 about a file that Team Member # 10 recently had begun maintaining and that he had disclosed to Defendants just days before testifying.  Defendants in turn disclosed the file to Plaintiff the day before the hearing. Team Member # 10 testified that around January 2011, he began keeping a file documenting training and rehearsal sessions for executions.  The file, Team Member # 10 explained, contains such materials as applications for membership on the execution team, team members' certifications, and sign-in sheets for the training/rehearsal sessions.  Team Member # 10 proceeded to recount the various occasions on which he excused certain team members from attending a rehearsal for reasons such as job-related conflicts, inclement weather, and health issues.  Team Member # 10 testified that he had never experienced a team member simply failing to appear for a rehearsal session.  Plaintiff proceeded to ask Team Member # 10 about a particular rehearsal session preceding the Frank Spisak execution for which neither Team Member # 17 nor Team Member # 21–the only team members qualified under Ohio law to

15

administer intravenous and intramuscular injections–were present.  In response to Plaintiff's question as to how the team could conduct a rehearsal without the presence of the requisite number of medical team members and without any member qualified to actually administer the execution drugs, Team Member # 10 testified that the execution team ran through a "play by play" of the execution for the benefit of the team members who were there and that Team Member # 9–a medical team member not qualified to administer medications–performed some dual roles only for the purpose of keeping the rehearsal going.  Team Member # 10 denied that he was in possession of any other documents or materials required by this Court's discovery order to be disclosed.

Plaintiff next asked a series of questions about Plaintiff's Exhibit 189–a collection of "Order for Execution Medications" forms for executions ranging from April 2007 to October 2010.  The top half of the forms at issue consists of an order for the release of execution medications, signed by the SOCF warden, while the bottom half of the form documents receipt of the execution medications authorized to be released, with one signature line to document receipt of the execution medications at the institution from the pharmacy that released them and three signature lines to document the delivery of those drugs to the Death House.  With respect to the latter set of signature lines, Team Member # 10 confirmed that he was one of the three signatories, along with HCA Nurse Clagg or another registered nurse, on many of the forms submitted as Plaintiff's Exhibit 189.

Plaintiff then asked Team Member # 10 questions about the procurement of execution medications for the May 2, 2006 execution of Joseph Clark.  The questions, testimony, and accompanying exhibits–Plaintiff's Exhibits 34 and 35, the execution time line and a controlled

substance accountability record, respectively–suggest that four units, or two grams, of sodium thiopental[7] were received at the institution on May 1, 2006 at 2:00 p.m.–the day before Clark's scheduled execution.  Team Member # 10 testified that he was not aware of and could not explain why that drug was delivered a day early.  Team Member # 10 further testified that on the morning of the execution at approximately 10:45 a.m., (while the execution team was endeavoring to reestablish IV lines following the failure due to infiltration of the single line through which they had begun to administer the two(2) grams of sodium thiopental), a former HCA exited the Death House to obtain more sodium thiopental–but only two (2) units, or one (1) gram.

On cross-examination by Defendants, Team Member # 10 confirmed that none of Defendants' counsel had instructed him not to tell the truth.  Regarding the fact that several forms purporting to document the receipt and preparation of the execution medications contained the signatures of only Team Member # 10 and one medical team member qualified under Ohio law to administer intravenous and intramuscular medications, Team Member # 10 testified that it was his understanding of the written protocol that so long as two qualified medical team members were *present*–one to prepare the drugs and the other to independently verify the preparation and dosages–it was not necessary for both of the medical team members to actually sign the form.  Team Member # 10 clarified that he never intentionally violated the requirements of the written protocol in this regard and never intentionally acted as a person qualified under Ohio law to administer intravenous and intramuscular injections.  Team Member # 10 testified

---

[7] By way of reminder, Ohio's execution protocol in effect at the time called for the administration of two grams of sodium thiopental, followed by the administration of pancuronium bromide and potassium chloride.

generally that during the preparation of the execution medications in the equipment room of the Death House, always present were Team Member # 10, a registered nurse (usually HCA Nurse Clagg), and two medical team members.

Team Member # 10 also testified that he now keeps copies of the medical team members' licenses and verifies those licenses before each execution. Regarding the requirement set forth in Section IV.B.1.d that the warden or team leader verify *and* document the certification status, qualification, and experience of the designated medical team members, Team Member # 10 testified that he believed that the steps he takes before each execution of reviewing the licenses and maintaining copies of them satisfied the requirements in Section IV.B.1.d.

Team Member # 10 next testified on cross-examination about the procedures for performing vein assessments on an inmate who arrives at SOCF for execution. Team Member # 10 testified that the inmate's veins are first assessed for viability at intake, when the inmate arrives at SOCF the morning before his scheduled execution. Team Member # 10 testified that a second vein assessment is performed at 8:30 p.m. the evening prior to the scheduled execution and that the third and final vein assessment is performed the morning of the scheduled execution, immediately after visitations have ended. Team Member # 10 testified that he has been on the execution team for every execution since 1999, and that to the best of his knowledge, the vein assessment procedure described above has been followed for each execution.

During redirect examination, however, Plaintiff called upon Team Member # 10 to revisit deposition testimony that he had provided in October 2009 concerning the failed attempt to execute Romell Broom. Team Member # 10 suggested during that testimony that no vein assessment was performed on Broom on the morning of his scheduled execution. Team Member

18

# 10 testified that if he had testified as such, and if it were true, he could not offer an explanation

for why that morning vein assessment would not have been performed.  When confronted during

his 2009 deposition testimony with the fact that the time line for the Broom execution did not

reflect that a morning vein assessment had been performed, Team Member # 10 then testified in

his deposition that if it was not reflected on the time line then it must not have happened.

Although agreeing that vein assessments were critical, Team Member # 10 allowed in the instant

hearing that perhaps the omission of the vein assessment from the time line did not mean that the

vein assessment did not occur.  Team Member # 10 speculated that documentation in the time

line of the vein assessments was required only where someone suspected a possible problem.

Team Member # 10 nonetheless agreed that all of the vein assessments–problematic or

not–should have been documented; Team Member # 10 insisted that that "was our practice."

Team Member # 10 also explained on redirect examination that the morning of the failed Romell

Broom execution was hectic and that any omissions in documentation were inadvertent.  Team

Member # 10 conceded that without the documentation, there existed no way to ensure that an

event–such as a morning vein assessment–did occur.

Team Member # 10 testified that he, as well as every member of the execution team, has

a full-time job within DRC apart from their duties as members of the execution team.  Team

Member # 10 testified that all execution team members are volunteers.  Team Member # 10

testified that because the team performs one rehearsal per week for four weeks prior to a

scheduled execution, and Ohio has commenced carrying out executions at a rate of nearly one

every four to six weeks, the execution team has been training almost weekly for the past two

years.  Team Member # 10 confirmed that execution team members have occasionally been

excused from rehearsals, due to scheduled vacation or for medical reasons.  Team Member # 10 also testified that the members of the execution team not designated or qualified as medical team members are considered security team members.  Because most of the security team members are active corrections officers, performance of their daily job duties is considered the equivalent of training daily for their duties as security members of the execution team.  Team Member # 10 testified that security team members never perform the tasks assigned to medical team members and that he, as team leader, will ensure that is always the case.

With respect to the receipt and preparation of the execution drugs, as well as the actual administration of the execution drugs, Team Member # 10 testified that Team Members # 17 and Team Member # 21 alternate not only between preparing the drugs and independently verifying the preparation, but also between administering the execution drugs and monitoring the administration of the execution drugs.  Team Member # 10 testified that Team Member # 9 has been present during the preparation of the execution drugs and in the equipment room during the carrying out of the execution on the occasions when Team Member # 17 was not.  Team Member # 10 clarified, however, that neither Team Member # 9 nor the HCA registered nurse have ever prepared the execution drugs or ever administered the execution drugs.  Team Member # 10 reiterated that during the Vernon Smith execution in January 2010 and during the Michael Beuke execution in May 2010, when Team Member # 17 was not present due to a car accident and a necessary doctor's appointment, respectively, Team Member # 9 was present for the receipt and preparation of the execution drugs, as well as in the equipment room with Team Member # 21 while Team Member # 21 was administering the execution drugs.

On redirect examination, Team Member # 10 agreed that according to the written

execution protocol, the only persons who are authorized to do anything with the execution drugs

are those authorized under Ohio law to administer intravenous and intramuscular injections.

Team Member # 10 insisted that aside from the two executions for which Team Member # 17

was absent, there have been no other executions during which any of the three medical team

members was not present.  Team Member # 10 also confirmed that no one "substituted" for

Team Member # 17 during the two executions for which he was absent.

Concerning the periods during which there was a nationwide shortage of sodium

thiopental, Team Member # 10 confirmed on cross examination that he was aware of the

shortage, but emphasized that no one from DRC had ever directed him to attempt to acquire any

sodium thiopental and that any efforts he made in that regard were of his own volition in an

effort to solve a known problem.  Team Member # 10 testified that on the two occasions that he

acquired sodium thiopental from the pharmacy at SOMC, he had done so not for his personal use

but with the authorization by Morgan.

### C.  Donald Morgan

Plaintiff next called Donald Morgan, who testified that he has been the warden of SOCF

for the past year and a half and serves as such to date.  Morgan testified that prior to becoming

the warden at SOCF, he was the deputy warden there.  Morgan confirmed that he was a former

execution team member.

Concerning the nationwide shortage of sodium thiopental, Morgan confirmed that

beginning in April 2010, Team Member # 10 was involved, acting as Morgan's designee, in

obtaining some packages of sodium thiopental.  Morgan testified that he became aware from

discussions that DRC was exploring the possibility of obtaining sodium thiopental from local

21

sources, the possibility of importing the drug from overseas, and the option of using doses that went through a re-issuance process after expiring.  Morgan testified that then-Director Ernie Moore vetoed the latter two options.  Morgan testified that in September 2010, he had contacted other states, pharmacies, and correctional facilities in an effort to locate more sodium thiopental.  Regarding the reluctance of a medical facility in Chillicothe named Adena to sell the drug directly to SOCF for use in an execution, Morgan confirmed that it was he who suggested a number of options, including the option that was employed: Adena sold the drug to SOMC, which in turn sold it to SOCF.  Concerning the acquisition of sodium thiopental from SOMC, Morgan testified that Denise Dean of the DRC Central Office was aware of the transaction but never had direct contact or involvement with Team Member # 10.  When Plaintiff asked whether Dean ever expressly authorized the transaction that occurred, Morgan testified that it was his view that her awareness of the transaction was one and the same as her authorization of it.

With respect to the fact that SOCF obtained its own DEA license in March, 2011, authorizing it to receive and otherwise handle Schedule II controlled substances, Morgan testified that Dean thought SOCF should obtain such a license because of Ohio's recent switch from the use of sodium thiopental to pentobarbital.  Morgan explained that pentobarbital is a Schedule II controlled substance.  When Plaintiff asked whether hydromorphone, which has been procured as part of Ohio's written execution protocol since November 30, 2009, was also a Schedule II controlled substance, Morgan answered that he did not know.  Morgan testified that when it is time to request execution medications, he sometimes directs the request to his institution's HCA and sometimes directs it to Dean.  Morgan testified that he did not know whether any DEA forms were generated with the purchase orders for the execution medications.

Morgan testified that it was his understanding that, prior to SOCF obtaining its own DEA license, the DEA license possessed by DRC's central pharmacy provided sufficient authority for SOCF to acquire execution medications.

Morgan confirmed that he was the warden of SOCF during the Michael Beuke execution in May 2010.  When questioned about the fact that the execution took place without the presence of one of the two required medical team members authorized under Ohio law to administer intravenous and intramuscular injections, Morgan testified that he had been aware of the fact, that they had not had in depth discussions about it because they had done the same thing in January 2010 (for the Vernon Smith execution), and that he thought they were in compliance with the written protocol.  To that point, Morgan referenced the section within the written protocol that, in his view, allows him to make whatever adjustments are necessary to carry out an execution.[8]  Morgan testified that he thought that the team members that were on hand for the Beuke and Vernon Smith executions were sufficient.  Relying on his authority to make adjustments, Morgan testified that the absence of one of the two required medical team members authorized to administer medications did not constitute a deviation from the written protocol. When Plaintiff asked whether the fact that Team Member # 9 was not qualified to administer medications, leaving only Team Member # 21 as the sole person with the requisite authorization,

---

[8]  Section VI.B.4.o of the current written protocol, with an effective date of April 11, 2011, provides in its entirety:

> The Warden shall consider the needs of the condemned inmate, visitors and family members, the Execution Team, prison staff and others, and may make alterations and adjustments to this or other policies as necessary to ensure that the completion of the execution is carried out in a humane, dignified, and professional manner.

amounted to a deviation from the written protocol, Morgan answered that because of the warden's authority to make alterations, it did not amount to a deviation.  Morgan testified that he believed that the alterations he made in allowing for the executions of Beuke and Vernon Smith to proceed without the presence of one of the two required medical team members authorized to administer medications, but with the presence of Team Member # 9, were calculated to complete the executions in a humane manner.  He characterized the alterations as "slight."  When asked what, in his view, constituted "non-negotiable" aspects of the written protocol–without which an execution could *not* proceed–Morgan answered "the drugs."  Beyond that, Morgan explained, he could not offer what he would regard as non-negotiable.  Morgan further explained that when problems arise, he discusses them and deals with them.  When asked what he would do if both Team Members # 17 and Team Member # 21 were unavailable on the day of an execution, Morgan answered that he would be open to the possibility of postponing the execution, especially because he does not know whether he would be able to locate someone on the day of an execution qualified to perform the tasks that Team Members # 17 and Team Member # 21 are required and authorized to perform.  Morgan confirmed that he would never ask a team member who was not qualified as a medical team member to perform medical team member tasks.

Morgan testified that, as the warden, he is to be next to the inmate in the death chamber during the execution.  In response to questioning whether, following the December 2009 execution of Kenneth Biros, the execution team has ever encountered any trouble carrying out executions, Morgan answered that he was aware of no problems.

Defendants began their cross examination by establishing that Morgan had been a corrections officer for eighteen years, was highly decorated with awards and honors, and

represents the first corrections officer to hold every institutional position within the corrections system. Morgan proceeded to testify that in his view, the written protocol (or policy) is a guideline. Morgan explained that every execution cannot be perfect and that flexibility is essential. Morgan reiterated that the fundamental consideration informing every execution is that it be carried out humanely. Morgan testified that if a critical occurrence arose, he would consult with his team before making any alterations. When asked about the alteration from the written protocol's requirement of the presence of two medical team members qualified to administer medications, Morgan insisted that was done in furtherance of carrying out humane executions. Morgan testified that he saw no need to halt an execution under that scenario.

The cross examination next turned to the issue of acquiring, storing, and administering execution drugs. Morgan testified that SOCF has a pharmacy license that allows it to store drugs. Morgan also testified that DRC's central pharmacy is the licensed pharmacy for SOCF. Morgan testified that his process for paying for execution drugs is to get billed and then to approve the funds to pay that bill. Morgan also testified that he believed that the central pharmacy's authority provided him with the authority to search for and obtain execution drugs. Morgan testified that all of SOCF's acquisitions of execution drugs involved a licensed pharmacist during the process.

Morgan next testified that he understood Team Member # 9's qualifications and duties during an execution. Morgan insisted that Team Member # 9 has never been asked to administer the execution drugs and never would be asked to do anything for which Team Member # 9 was not qualified. When asked whether Team Member # 9 was functioning outside qualifications by observing from the equipment room the administration of drugs (that she was not qualified to

administer), Morgan answered that Team Member # 9 was qualified to observe the inmate's

veins and the flow of drugs and that that was what she did.  Team Member # 9's presence in the

equipment room during the execution was not as a substitution for a medical team member

qualified to administer medications.  On redirect examination, Morgan confirmed that in his

view, Ohio may go forward with an execution with the presence of only one medical team

member qualified under Ohio law to administer medications.  Finally, Morgan confirmed that he

became the warden of SOCF in April 2010, but that he has been involved in executions in Ohio

since 1999.

### D.  Richard Theodore

Defendants called as their first witness Richard Theodore.  Up until the day before the

instant hearing, Theodore was employed by DRC as a pharmacy supervisor at the Oakwood

facility in Lima, Ohio.  Theodore testified that he was somewhat familiar with SOCF and

confirmed that SOCF does not have its own pharmacy at the institution and has not since 2007.

Theodore explained that the Ohio Department of Mental Health contracts as a pharmacy for

SOCF.

Regarding the relevant regulatory authority governing SOCF's acquisition of execution

medications, Theodore referenced Defendant's Exhibit A: a 1994 letter from the Ohio Board of

Pharmacy to SOCF concerning the documentation necessary to carry out executions.  Theodore

testified that he believed that the SOCF wardens have relied on that documentation as authority

to obtain the execution drugs.

Theodore proceeded to testify that he was requested by DRC to contact the Ohio Board

of Pharmacy last year concerning any requirements or procedures for obtaining sodium

thiopental from out of state.  Theodore testified that the board members wanted an invoice to document the origin and transfer of any sodium thiopental.  Theodore confirmed that he contacted someone in the State of Kentucky and arranged for Kentucky to transport three grams of thiopental to Theodore himself at the Oakwood facility.  Theodore testified that an invoice was prepared and that he signed for the receipt.  Theodore testified that he also arranged to acquire five grams of sodium thiopental from the State of Indiana, but that on that occasion, he personally picked up the package from Indiana, transported it to Oakwood, and then prepared an invoice to transfer it to SOCF.  Pursuant to the same 1994 Board of Pharmacy letter, Theodore also obtained a copy of the death warrant.  Defendants' Exhibit B documented Theodore's transfer of the sodium thiopental from Oakwood to SOCF, Defendants' Exhibit C documented the transfer of sodium thiopental from Indiana to Ohio, and Defendants' Exhibit D documented the transfer of sodium thiopental from Kentucky to Ohio.  Theodore testified that he believed that the transactions he described where in full compliance with the Ohio Board of Pharmacy.

Theodore proceeded to testify about his contacts with the DEA and Ohio's Board of Pharmacy concerning Ohio's January 2011 switch from sodium thiopental, which is a Schedule III controlled substance, to pentobarbital, which is a Schedule II controlled substance.  Theodore explained that he contacted these regulatory agencies for the purpose of determining what, if any, additional documentation was necessary following the switch in order for Ohio and SOCF to be in compliance in the acquisition of pentobarbital and in carrying out executions using that drug.  Theodore confirmed that hydromorphone is a Schedule II controlled substance.  Theodore testified that he was aware both that hydromorphone was a component of Ohio's "back-up" execution plan and that it to date had never been used.  Theodore proceeded to testify that after

27

learning from the DEA officials within the State of Ohio that any communication concerning

Ohio's acquisition and use of pentobarbital would have to come from DEA officials in

Washington, D.C., Theodore had no further contact with any DEA officials.  As for the Ohio

Board of Pharmacy, Theodore testified that it referred him to the same 1994 letter and stated that

although the letter mentioned a Schedule III controlled substance, the letter nonetheless

constituted authority for the acquisition and use of a Schedule II controlled substance such as

pentobarbital.  Theodore testified that the Board also informed him to inquire of the pharmacy

supplying the pentobarbital regarding any concerns it might have or additional documentation it

might require.  Theodore testified that he believed that the Board of Pharmacy's 1994 letter gives

the SOCF warden the authority to procure drugs for executions.

On cross examination, Theodore confirmed that all of his contacts with regulatory

agencies described above were conducted over the phone and were not documented.  Theodore

testified that, to his knowledge, no further inquiries occurred to the national DEA officials

following or as a result of Theodore's contact with Ohio DEA officials.

Theodore also testified that SOCF had been in possession since 2007 of a "contingency

stock license" concerning its authority to possess and dispense medications.  Regarding the fact

that the Board of Pharmacy letters referred to SOCF's pharmacy and that SOCF had not had a

pharmacy on site since 2007, Theodore explained that pharmacy services at corrections

institutions change, are sometimes in house, are sometimes provided for regionally, and are

sometimes provided for centrally.  Theodore testified that the pharmacy tasked with providing

services to an institution essentially qualifies as the institution's pharmacy as if it were on site.

Theodore testified that the Ohio Board of Pharmacy informed him that even with the change in

status of SOCF's pharmacy services, the original letter still provided sufficient authority for the procurement of execution drugs.  Theodore confirmed that he obtained that information through conversation, not documentation.

Theodore also testified on cross examination that the reason that he took possession of the sodium thiopental packages from Kentucky and Indiana respectively at Oakwood, rather than having those packages transported directly to SOCF, was because DRC had requested that he arrange for those acquisitions, he felt it necessary to be "hands on" in the acquisitions.  Theodore testified that the shipments could have been sent directly to SOCF.  When Plaintiff asked about instances when SOCF procured sodium thiopental from other medical facilities within the state, Theodore testified that he believed that SOCF's contingency stock license authorizes it to undertake such a transaction.  Theodore also testified that in his view, if DRC's central pharmacy had knowledge of a medication transaction, that medication was essentially central pharmacy's property no matter who acquired the medication or how it was acquired.

Theodore testified that he has never been involved in the procurement of hydromorphone for Ohio's "back-up plan."  Theodore testified, albeit without certainty, that he would expect a "DEA 222" form be prepared for every purchase of pentobarbital.

On redirect examination by Defendants, Theodore testified that he believed that Ohio is in full compliance with relevant regulations governing the procurement and use of execution drugs.  On re-cross examination, Theodore testified that the reason that he did not follow up with national DEA officials after Ohio DEA officials informed him that any communication regarding Ohio's use of pentobarbital would have to come from national DEA officials was because he did not have authorization to do so.  Theodore explained that he passed on to DRC officials the

information that Ohio DEA officials had related to him. Theodore also explained that Ohio DEA officials never suggested to him that he should contact national DEA officials.

### E. Edwin Voorhies

Former Noble Correctional Institution and SOCF warden and current DRC Deputy Director/South Regional Director Edwin Voorhies was the final witness to testify. He explained that as SOCF warden, he had presided over ten executions and that in his new role, he continues to attend each execution that occurs. Voorhies testified that he is present in the equipment room during the execution with various other supervisors and medical team members, as well as legal counsel.

Early in his testimony, Voorhies testified that Ohio's written protocol does not set out mandated regulations but instead provides general guidelines, a theme he returned to more than once. He explained that the department employs general guidelines in other situations, such as in hostage scenarios. Voorhies testified that he had been involved in every modification of the written protocol and identified as the two most significant modifications a provision inserting additional steps into the execution process (for example, pausing during the three-drug protocol executions to determine an inmate's level of consciousness) and the provision that switched Ohio from the three-drug protocol to its current one-drug protocol.

Questioning turned to the written protocol provision calling for the involvement of persons who are qualified under Ohio law to administer drugs intravenously and intramuscularly. When questioned about the role the second medical team member who is qualified to administer drugs plays in the execution, Voorhies testified that this individual provides a redundancy, a second set of eyes, and watches for signs of infiltration while the medical team member who

actually administers the execution drug watches the syringe and the IV line.  Voorhies explained

that the second medical team member also serves as an available individual who could

administer the execution drugs if the first medical team member assigned to administer the drugs

is unavailable.  If this second person is not available for an execution, Voorhies testified, it was

still okay to proceed with an execution if there is a medical team member who can serve as a

second set of eyes watching for infiltration.  Therefore, Voorhies opined, it was fine that Ohio

conducted the execution of Vernon Smith without the presence of Team Member # 17 because

Team Member # 9 fulfilled the role of observer.  Voorhies also explained that the nurse present

during an execution is qualified to administer drugs, although she is not part of the actual

execution team.

Voorhies then testified concerning the preparation of the execution drugs.  He stated that

two people sign a document indicating that they witnessed the preparation.  Voorhies admitted

that Team Member # 10 signing the form violates a literal interpretation of the written protocol,

but not its spirit.  Voorhies noted that Team Member # 10 does not prepare the drugs.  He

testified that he knows Team Member # 10 takes great care to monitor the preparation process

each time.  Voorhies stated that he personally takes responsibility for Team Member # 10

signing the forms because Voorhies is the one who "drilled home the issue" of accountability for

the drugs.  Voorhies rejected the proposition that the lack of sufficient signatures presented a risk

of an improper execution because he knows who is present when the drugs are prepared.  He

stated that he had personally witnessed the process on four successive occasions to ensure his

satisfaction and testified that he was "so satisfied, I'm willing to assume responsibility for it."

When questioned in regard to the Clark execution, Voorhies testified that he was aware

that the IV line had failed during that execution.  He denied that the fact that the execution team

had obtained an extra gram os sodium thiopental during the course of the execution meant that

Clark received an insufficient dose of the drug.  He attempted to explain that the most plausible

explanation for the apparent issue was that the medical team member administering the drug

might have had one syringe left from the primary dose and that the medical team member might

have needed only the additional one gram to administer a full dose.

Questioning then turned to the procedures Ohio has employed to obtain sodium

thiopental for executions.  Voorhies pointed to Defendants' Exhibit A as giving a warden

knowledge of his authority to obtain the execution drug.  He explained the procurement process

and its paperwork and then turned to the fact that Ohio had considered and rejected various

alternatives for obtaining additional drugs.  One such avenue was using imported drugs due to

the concern that the drugs would lack FDA approval.  He also testified that Ohio had also

rejected the option of compounding drugs or using expired drugs that had been given an

extended expiration date.  Voorhies testified that Ohio had explored obtaining sodium thiopental

from other states with capital punishment.  He indicated that he was unaware that any such state

could not transfer the drugs to Ohio due to legal concerns, and he explained that states had been

reluctant to be known publically as a state that provided Ohio with the drugs.  Voorhies

conceded that, as a public official, he considers public opinion in every decision.  He noted that

at any given moment, he could lose his job if he makes a poor decision.  Voorhies also testified

that Ohio pursued obtaining the necessary drug from pharmacies.

Voorhies testified that he is satisfied with how Ohio has obtained execution drugs.  He

stated that the most important aspect of the execution procedure and the policy guidelines is to

promote a humane execution.

Voorhies also testified in regard to the failed Broom execution. When questioned about the doctor brought in during the IV access problems, Voorhies testified that this was based on his advice. A warden can bring in a doctor as a responsible act during an execution, he explained, and he noted that he would do it again even with the benefit of hindsight. Voorhies emphasized that he sought to obtain the doctor's advice. Later in his testimony, questioning returned to this issue, and Voorhies again emphasized that the doctor had been involved as an advisor. He initially denied that she was actively involved in the execution proceedings, but upon additional questioning, Voorhies recognized that she had attempted to start an IV He explained that he would rather that the doctor has not done this and stated that she did so of her own volition. Voorhies testified that her involvement was not inconsistent with the execution protocol.

Other questioning addressed various suggested deviations from that protocol. Plaintiff's counsel inquired as to an apparent discrepancy between a summary judgment affidavit that Voorhies had submitted in which Voorhies addressed the completeness and reliability of execution timelines. His hearing testimony indicated that not everything that occurs during the execution process is recorded on the timeline. Pressed to answer whether vein assessment is a significant even during the execution process, Voorhies eventually admitted that it was. Counsel suggested that Voorhies' testimony regarding the timelines had shifted from deposition testimony that Voorhies had given earlier in this litigation. When questioned regarding his October 2010 deposition testimony in which Voorhies stated that vein assessment would be in a timeline, Voorhies stated that its absence pointed to a quality control issue and stated that he would take additional, unidentified measures to address the issue.

33

Similarly, Voorhies was questioned about issues surrounding SOCF's drug inventory records, documented in Controlled Substance Accountability Record sheets.  Counsel walked Voorhies through various entries on these sheets that counsel proposed as suggesting that during the Clark execution, it was mathematically impossible for Ohio to have injected Clark with a sufficient drug dosage based on the amount fo the drugs delivered to the execution.  There were also entries suggesting that the drugs had been delivered to the execution one or even two days prior to executions.  In later testimony on this topic, Voorhies stated that the Clark drug records could just be errors.  He testified that he has never observed evidence of the administration of an improper dosage.  Voorhies did agree, however, that sixty-two errors in the drug inventory records were a lot of errors.

In other testimony, Voorhies stated in response to a question as to whether reducing the level of protection and eliminating redundancy set forth in the protocol was necessary to ensure a humane execution.  He answered that he does not believe that redundancies were eliminated.  The written protocol is a set of guidelines, he testified.  Voorhies also stated in response to a question from the bench that there had been no deviations since Ohio went to the one-drug protocol.

## II.  Analysis

### A. Standard involved

In considering whether injunctive relief staying Plaintiff's execution is warranted, this Court must consider (1) whether Plaintiff has demonstrated a strong likelihood of success on the merits; (2) whether Plaintiff will suffer irreparable injury in the absence of equitable relief; (3) whether a stay would cause substantial harm to others; and (4) whether the public interest is best

34

served by granting a stay.  *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  As the Sixth Circuit has explained, " '[t]hese factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together.' "  *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

### B. Likelihood of success

Plaintiff asserts in his fourth claim a 42 U.S.C. § 1983 violation.[9]  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, in order to prevail on a § 1983 claim, Plaintiff must show that, while acting under color of state law, Defendants deprived or will deprive him of a right secured by the Federal Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003).  Plaintiff's Second Amended Complaint asserts that Defendants' "informal and formal written execution policies, including the policy as written and administered, violate[] [his] rights to equal protection under the law as guaranteed by the Fourteenth Amendment." (ECF No. 913 ¶ 315.)  The equal protection theory upon which Plaintiff proceeded at the June 29, 2011 hearing is that Defendants' policy and pattern of deviations from the written execution protocol treat each condemned inmate differently, burdening his fundamental rights and

---

[9]  Plaintiff has narrowed the grounds on which he currently seeks injunctive relief to the core deviations portion of this specific claim.

constituting disparate treatment that is not rationally related in any way to a legitimate state interest.  The threshold question is therefore whether Plaintiff is correct that Defendants routinely deviate from mandated or core provisions set forth in the written protocol.

The brief answer is yes.  Throughout the course of this litigation, Ohio time and again has used its written protocol as both a sword and a shield.  Defendants have attacked various inmates' claims of dangerous state practices by pointing to the written protocol as evidence of official policy and procedure that provide salvaging order and predictability.  At the same time, Defendants have cloaked themselves in the various permutations of the written protocol, which they have periodically updated to formalize the customs and practices that propped up an often teetering protocol, all in an effort to shield Ohio's lethal injection practices from invalidation under the Constitution.  But after literally over half a decade of litigating the issues that way, it now appears that the state officials involved have decided either to change their minds or to come clean on what the actual beliefs and practices are and not what they have previously told this Court to be true.

The evidence now suggests that Ohio has an overarching execution policy and a notably subordinate written execution protocol.  Similar to other courts entertaining challenges to lethal injection protocols under § 1983, this Court previously followed the parties' lead in "us[ing] the term 'protocol' to encompass not only the quantities, preparation, injection, and the actual drugs administered during the execution process, but also all policies, procedures, and staff qualification requirements."  *Walker v. Epps*, 587 F. Supp. 2d 763, 766 n.3 (N.D. Miss. 2008).  Continued use of the blanket term protocol now fails to capture the division that Defendants' new approach to the written protocol presents.

36

Previously, Voorhies testified that the written protocol carries the force of administrative law. The SOCF warden is required to follow the protocol, Voorhies testified in 2009, and former DRC Director and former SOCF warden Terry J. Collins, his then-supervisor, agreed. Now Morgan, the latest SOCF warden, tells this Court that the written protocol is merely a set of guidelines, and from the vantage point of his promotion, Voorhies conveniently agrees. The man who once testified that the written protocol carries the force of law now offers that the written protocol does not set out mandated regulations. The controlling set of mandates constituting the written protocol that often shielded Ohio's practices from constitutional infirmity and provided the state with a sword to puncture inmates' claims is thus revealed to be an advisory compilation of guidelines subject to being ignored.

This sea change in the characterization and treatment of the written protocol is significant.[10] Although everything in the written protocol is important, not everything in that

_____

[10] The significance of the policy change potentially reaches beyond the Equal Protection claim at issue today and to an Eighth Amendment claim of the sort both this Court and the Sixth Circuit have considered multiple times in this litigation (and which Plaintiff asks this Court not to opine upon at this time). The Court has explicitly recognized the possible effect of such changed circumstances previously, noting in its April 21, 2009 Opinion and Order that

> [a] new warden who elects to abandon the custom and practice that has grown around the written protocol would risk enabling an inmate to assert a new challenge directed to what would be the new (old) protocol and would arguably undercut today's conclusions as to an inmate's likelihood of success on the merits of a § 1983 claim of the sort advanced here.

*Cooey v. Strickland*, 610 F. Supp. 2d 853, 932 (S.D. Ohio 2009). Morgan may be that warden and Ohio's newfound stance that even the core written protocol mandates are subject to abandonment may be the mechanism by which Plaintiffs reopen viable Eighth Amendment claims. As yet, however, no party has moved to amend their pleading or to supplement the briefing on the pending motions for summary judgment utilizing evidence arising from the June 29, 2011 proceedings. This Court offers no opinion as to the viability of such motions or any possible effect of the new evidence on the Eighth Amendment claims.

protocol is of equal importance for purposes of scrutiny in light of the Constitution.  For example, a deviation from the written policy in regard to visitation with an inmate by family members who had arrived outside the time period for visitation set forth in the protocol is one thing (and a benefit to an inmate that does not disturb constitutional rights).  Letting into the execution chamber a non-execution team member who attempts to start an IV is quite another.  So is foregoing mandated vein assessments, as well as failing to honor the mandate of documenting the execution drug preparation.  And so is eliminating mandated redundancies that have previously contributed to the defeat of constitutional challenges to Ohio's practices, such as having two medical team members present to provide oversight redundancy in the administration of executions drugs.

The latest evidence presents at least these four deviations from the core components of the written protocol.  Such core deviations *as a matter of policy* were once considered improbable.  Previously in this litigation, Defendants' evidence suggested that such core deviations were outside Defendants' approach to the written protocol, as this Court credited in its April 21, 2009 Opinion and Order:

> [T]here is no evidentiary basis for concluding that those parts of the written protocol related to the preparation for administering and the actual administration of drugs would be disregarded.  Collins, for example, testified that a warden asked him for permission to deviate from the written execution policy regarding when an inmate's visitors would be allowed access to the condemned.  Collins granted the warden permission to deviate from the written protocol and the warden did so, permitting late-arriving individuals time with an inmate despite their having arrived at SOCF technically too late for visitation.  This is a laudable deviation viewed from the standpoint of simple humanity.  It also suggests that despite testimony that the written protocol stands as the law, deviation at the election of the state actors involved in the system is possible.
>
> The next obvious question is how far this deviation extends.  Could, for example, the warden request and the director approve deviation from the written

38

> policy of using sodium thiopental?  Such an irrational deviation is unlikely but
> theoretically possible if the scope of the ability to depart from the written policies
> and procedures is truly unlimited.  This illustrative deviation would naturally be
> problematic from a constitutional standpoint, but there is no basis on this record for
> concluding by inference or otherwise that such deviations from the core execution
> procedures is likely or even possible.  Moreover, concluding that deviation from the
> core execution procedures is likely would require an impermissible drawing of an
> unwarranted inference upon an inference: first, that deviation from *any* provision of
> the written protocol is possible, and second, that the actors involved would or are
> likely to deviate from the substantive core procedures.  Accordingly, absent evidence
> to the contrary, this Court cannot conclude that the remote, theoretical *possibility* of
> deviation from the core procedures presents a *likely* substantial risk of substantive
> harm.

*Cooey (Biros) v. Strickland*, 610 F. Supp. 2d 853, 928 (S.D. Ohio 2009).  What was once a

theoretical concern relegated to the unlikely or impossible has become (or has finally been

revealed to be) reality.

Ohio's execution policy now embraces a nearly unlimited capacity for deviation from the

core or most critical execution procedures.  No inference is required to reach this conclusion,

much less the stacking of inference upon inference. Rather, as set forth below, simply paying

attention to the hearing testimony mandates this conclusion.  These core deviations are not mere

cosmetic variations from an optional or even aspirational set of guidelines.  Rather, the

deviations are substantive departures from some of the most fundamental tenets of Ohio's

execution policy.  These tenets or core components embody concerns that cannot be disregarded

and are described below.

Ohio fails to document the preparation of the execution drugs, leading to the untenable

possibility that the state has failed to use the correct drug dosages.  Section VI.B.7.d of the

written protocol now provides:

> The drugs shall be prepared for injection by a person qualified under Ohio law to
> administer and prepare drugs for intravenous and intramuscular injections.  The

39

> preparation of the drugs shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs.  Both medical professionals shall document and sign a written verification of the preparation and dosage of the drugs, which may be noted on the medication receipt referred to in paragraph c. above.  When the drugs are prepared, the command center shall be notified and the time of the preparation recorded.  The command center shall also record what drugs were prepared, the quantity, name, and dosage of the prepared drugs.

Voorhies testified that he understood "that two people witness the preparation of the drugs *and sign to that effect*."  (June 29, 2011 Hr'g Tr. at 277 (emphasis added).)  There is often incomplete documentation of the delivery of the execution drugs to the equipment room.  Review of these documents indicates that they expressly serve only as receipts documenting the delivery.  There is thus *no* signed written verification documenting the preparation of the drugs despite the written protocol mandate.  This is more than just sloppy recordkeeping such as Morgan's paperwork showing that Team Member # 17 attended an execution that he did not attend.  The lack of mandated drug preparation documentation serves to render of great concern the open issue of whether Ohio started the Clark execution with an insufficient administration of a key execution drug.  Records and testimony introduced at the June 29, 2011 hearing suggest that this might well be the case.

Voorhies attempted to explain away the inventory record issues as perhaps flawed recordkeeping or "administrative errors."  (June 29, 2011 Hr'g Tr. at 321.)  Without a doubt, he recognized the obvious problem such records issues presented:

> Q. Mr. Voorhies, would you agree that 62 clerical errors in critical drug inventory records is a lot of errors?
>
> A.  Yes, I would agree.

(June 29, 2011 Hr'g Tr. at 325.)  This Court is not wholly convinced, however, that Voorhies

recognizes the larger issue.  If Ohio had followed the practice of creating documentation of the actual preparation of the drugs, this Court would have a record signed by multiple people that the correct amount of drugs were properly prepared, rendering the inventory issue of far less concern.  Even if the documentation aspect was subsequently added to the written protocol, there is no evidence that Ohio is now complying with this practice.  The core deviation removes a safeguard from the execution process, which can in no way provide a more humane, dignified, and professional execution.  Transparency applied across all inmates can aid these laudable concerns while displaying governmental satisfaction of constitutional concerns.

Ohio also fails to follow formalized procedures designed to ensure adequate preparation for the administration of drugs by IV, rendering possible that the state will proceed without sufficient assessment of the inmate and that the state might attempt an execution by Plan A when it should proceed directly to Plan B.  Section VI.B.4.b of the written protocol provides for multiple vein assessments, including a pre-9:00 a.m. assessment on the morning of the execution. As the June 29, 2011 testimony indicated, however, the execution timelines previously held out to this Court by Defendants as reliably recording every significant step in the execution process are now characterized by Defendants as pretty accurate but flawed.  When something is missing from a timeline, such as the written protocol-required morning vein assessment of Broom preceding Ohio's failed execution attempt, Defendants ask this Court to take their word for it that the mandated assessment happened.  Voorhies characterizes the missing information as "a quality control issue on our timeline" and offers that "there, clearly, is room for improvement in terms of quality of our timeline."  (June 29, 2011 Hr'g Tr. at 296, 297-98.)  These significant understatements are correct.  Periodically failing to adhere to a safeguard designed to capture

41

compliance with a necessary medical step defeats the point of the safeguard by opening the door to the medical step being overlooked and thus left undone.

Ohio fails to adhere to the systemic redundancies designed to minimize if not eliminate the possibility of human error. This targets not only the redundancy safeguard constituting qualified personnel involved in the mixing of the drugs as discussed above. It also encompasses redundancy in qualifications and observation during the actual administration of execution drugs. For example, Section VI.B.8.b of the written protocol provides that in addition to the team member who administers the drugs being in the equipment room performing that task, "[o]ne additional person who is qualified to administer intravenous and intramuscular injections shall be present in the control room to observe the administration."

During the executions of Vernon Smith and Michael Beuke, however, there was only one qualifying medical team member present, Team Member # 21. Team Member # 17 was absent from both executions, which left Team Member # 9 the only other medical team member present with Team Member # 21 in the equipment room.

Morgan testified in regard to this deviation and the Beuke execution as follows:

Q. Okay. So, do you find it significant that that particular execution was conducted without one of the two individuals who are the only ones authorized under the policy to do anything with the execution drugs?

A. I was aware that we was [*sic*] one medical team member short for that execution.

Q. Okay. So you were aware of that when you authorized the execution to go forward?

A. Yes.

Q. Were there any discussions with anybody about that decision?

A. Not anything in depth.

42

(June 29, 2011 Hr'g Tr. at 195.)  When then questioned about the basis for the deviation from the

written protocol, Morgan testified:

> A.  We had previously conducted an execution January that same year with no difficulties.  And the policy that we operate under, essentially, I felt that we were still within the policy.  So, therefore, we proceeded.

> Q.  Okay.  When you say, essentially, you thought you were within that policy --

> A.  Uh-huh.

> Q.  -- what do you mean by that?

> A.  There is a section within the policy – I believe it's on page 6 of the policy – that says the warden has the ability to make adjustments or alterations to the policy to ensure that the execution is carried out in a humane manner.

> Q.  Okay.

> A.  I think that's what I mean when I say we were still operating within the policy.

(June 29, 2011 Hr'g Tr. at 195-96.)

Plaintiff's counsel continued to inquire about Morgan's perspective that Ohio was

operating within the written protocol even when ignoring part of that protocol.  This inquiry

elicited a telling response from Morgan on how he perceives both his function and the

functioning of the written protocol:

> Q.  And this paragraph [Section VI.B.4.o] says that the warden can make alterations and adjustments to this policy, quote, as necessary to ensure that the completion of the execution is carried out in a humane, dignified and professional manner.  Did I read that correctly?

> A.  Correct.

> Q.  So, is it your testimony that not using the required number of individuals makes is more likely that the execution is going to be humane, dignified, and in a professional manner?

43

A. Well, I believe that, the team members that we had assigned, I was still within the policy by having one medical team member that administered the drugs and then another team member assigned to evaluate the process. And I believe that team member was still operating within the scope of their training and certification.

(June 29, 2011 Hr'g Tr. at 197.) Morgan clarified that the second team member "assigned to evaluate the process" was Team Member # 9.

Previously in this litigation, however, Team Member # 9 testified that she does not have any training in administering drugs and that she only has sufficient training to gain access to a vein which would allow someone else to administer the drugs. Team Member # 9 therefore *cannot* substitute for Team Member # 17 as a medical team member qualified to administer drugs and thus capable of serving as a check or built-in redundancy on Team Member # 21's administration of the execution drugs. Team Member # 9 can watch for infiltration but cannot evaluate Team Member # 21. Because not all medical team members are fungible, Ohio has conducted two executions in contravention of a written protocol protection.

Morgan subsequently did not offer Team Member # 9 as a redundancy-check on the drug administration and curiously asserted that although he had altered the written protocol demands, he was still operating within the written protocol:

A. I think that the alterations that was [*sic*] made that gives the managing officer or the warden the ability to alter the policy due to unforeseen circumstances and being able to provide team members that has [*sic*] the appropriate training to carry out the process is still, yes, within the scope of the policy.

Q. Okay. So, it's your position that those executions do not represent a deviation or any deviations of any number from the actual policy? Is that your testimony?

A. Correct.

(June 29, 2011 Hr'g Tr. at 198.) Rejecting concerns over Team Member # 9 not being qualified to perform the same written protocol function of Team Member # 17, Morgan explained his

expansive view of his authority and the limited role Ohio assigns to the written protocol as

follows:

> Q.  Okay.  So, you're saying that you read this paragraph to give you kind of carte
> blanche to make any alterations that you think you want to do?
>
> A.  I think it just gives me the authority to make alterations or make changes within
> the policy *to ensure that the execution is carried out*.  I don't think it gives me, you
> know, a blank sheet of paper to write my own policy.  I just think that we're given
> a task to carry it out.  And as the managing officer, it gives me the ability to make
> necessary changes that's within reason to get the task taken care of.
>
> Q.  Okay.  So, you don't attach any significance to that language that requires that
> changes must be ones that are necessary to ensure that the execution is humane,
> dignified, and professional?  Is that what I hear you saying?
>
> A.  Well, I believe any alterations that I made during that execution, I still had a
> medically trained team member that was administering the drugs.  So, I was well
> within policy there.  And then I had a second team member that was overseeing the
> I.V. lines and the insertion of the I.V. lines, which is within their scope of their duty.
> So, I don't even believe that I made that big of an alteration to the policy.

(June 29, 2011 Hr'g Tr. at 198-99 (emphasis added).)  Morgan thus recognizes the literal task he

has been assigned and does what he needs to do to complete that task without never once even

paying lip service to the constitutional restraints put upon him and the mandated written protocol

protections those restraints inform.  His subsequent characterization of his casting aside of the

redundant check on the administration of the execution drugs as a "slight alteration" evinces a

willful or shockingly clueless blind spot as to why the written protocol matters.[11]  (June 29, 2011

_____

[11]  This Court previously and expressly relied upon the built-in systemic redundancy
check on drug administration in rejecting another inmate's attempts to obtain or continue a stay
of execution, reasoning as follows:

> Ohio has a system of redundancies in place in which no actor is left alone
> without observation.  One medical team member mixes the drugs while watched by
> at least one additional state actor.  Two medical team members are present in the
> holding cell while establishing heparin locks.  The warden and the team leader
> together check for sufficient inmate unconsciousness and IV infiltration in the death

Hr'g Tr. at 199.)  The job is not done well when it is simply completed; it is done well when it is

completed properly, which is to say *in accordance with the law*.

Especially troubling is Morgan's perspective on the role the administration redundancy

check plays in the administration of drugs.  He testified as follows:

> Q.  Now, you were asked a number of questions about the policy's requirement that two persons who are qualified to administer drugs – you were asked a number of questions about that requirement.  Do you recall those questions?
>
> A.  Yes.
>
> Q.  Now, in your view, would it be fair to say that, of course, one of the reasons or purposes for those provisions would be to ensure that the execution was done competently from a professional standpoint?  Fair to say?
>
> A.  Correct.
>
> Q.  But is it also fair to say that one of the reasons for such a requirement would be to ensure that, in the event that one of those persons was unavailable, that, nevertheless, an execution could go forward because a second person would have the adequate experience to perform the administration task?  Is that fair to say?
>
> A.  Yes.
>
> Q.  Keeping that in mind, if we look to the execution of Inmate Vernon Smith, were

---

chamber.  One medical team member pushes the drugs while another medical team member is present in the equipment room, in addition to the narrator and other individuals.  In short, there are specific safeguards in addition to the general observations of team members by one another and by the warden that protect against a team member underperforming in a manner that creates a likely risk of serious harm.  These protections guard against one unchecked individual deviating from permissible procedures as a result of medical issues.  And although the protections may not be foolproof, none could be; there is always the risk of human error whether caused by inadvertence, misfeasance, or medical issues.  What is important is that the risk is acceptably mitigated here so as to not rise to a constitutionally impermissible level.

*Cooey v. Strickland*, 610 F. Supp. 2d 853, 929 (S.D. Ohio 2009) (vacating preliminary injunction staying the execution of Kenneth Biros).  *See also Cooey v. Strickland*, No. 2:04-cv-1156, 2009 WL 4842393, at *90 (S.D. Ohio Dec. 7, 2009) (denying Biros a temporary restraining order).

you satisfied that the person who was available to administer those drugs was sufficiently qualified and could do the job that he was tasked to do?

A. Yes.

(June 29, 2011 Hr'g Tr. at 215-16.)  This is interesting testimony, considering that, like Team Member # 9, Morgan is simply *not qualified in any sense* to evaluate whether the person administering the drugs did so properly at *any* execution.  Satisfaction with credentials does not invariably lead to proper job performance, and in the Vernon Smith or Beuke executions, there were no redundancies to ensure proper administration.  Morgan and Voorhies assert that they indeed recognize that the redundancy of two potential drug administrators provides a competency check, yet they throw this function out when it is a hindrance to the immediate completion of an execution.  They inherently credit the reward of a job done over the risk of a task performed poorly for one inmate while providing the safety check for another inmate, purportedly all in the name of guaranteeing humane executions.  The practice does not match the stated goal.

Ohio also fails to exercise control over who participates in an execution.  During the failed Broom execution, Voorhies concluded that a non-execution team member, Dr. Carmelita Bautista, be enlisted to assist with the failing execution.  His June 29, 2011 testimony characterized the purpose of this recruitment as permissible under the policy to obtain advice "on if and how to proceed" with the execution in light of the substantial IV issues that were occurring.  (June 29, 2011 Hr'g Tr. at 289.)  Prior testimony in this litigation reveals that the doctor proceeded to attempt to start an IV in Broom herself, that she failed to do so, that she may or may not have hit bone in her attempts, and that she eventually fled the execution chamber and now expresses concern about her enlistment and actions.

47

When questioned about his recruitment of Bautista, Voorhies testified that "even with the benefit of hindsight, [he] believe[s] [he] would do it again." (June 29, 2011 Hr'g Tr. at 290.) After initially testifying that Bautista did not participate in the attempted execution, Voorhies then admitted that she attempted to establish IV access, noting that she did so "[o]f her own volition." (June 29, 2011 Hr'g Tr. at 312.) Even more curious, Voorhies testified that "[i]f he had his druthers, [he] wishe[es] she wouldn't have [participated]." (June 29, 2011 Hr'g Tr. at 312.) But he asserted that recruiting her for advice was consistent with Ohio's execution policy.

This testimony presents the underlying issue of this core deviation: recruiting a non-execution team member to advise in an execution might be prudent under select circumstances, but failing to exercise any oversight over that non-execution team member's activities in the execution house is inexcusable. While professing to assume responsibility, Voorhies engages in post hoc rationalization to explain away a failure by himself and others to at best exercise adequate supervision and command control of the execution process and at worst to engage in sound decisionmaking while under pressure. The problematic nature of ad hoc recruiting coupled with overly permissive freedom of individuals who are not part of the execution team was apparently not similarly lost on at least one team member. In its December 7, 2009 Opinion and Order, this Court noted that team member's reaction to Bautista's presence as follows:

> Perhaps the most apt comment on this notable departure from the protocol, however well intentioned it may have been, comes from the testimony of Team Member # 9, who stated, "I look up and she's present [in the holding cell]. And I'm like, *dear God, what is she doing here*?" That is a question that requires an answer.

*Cooey v. Strickland*, No. 2:04-cv-1156, 2009 WL 4842393, at *98 (S.D. Ohio Dec. 7, 2009) (emphasis added). This Court now has an unequivocal answer to that question: Bautista was there because *anyone* can be involved at the direction of the decisionmakers, who will *not*

48

necessarily then exercise reasonable control over the actions of such non-execution team members.

The foregoing four core deviations are embarrassing to the State of Ohio, regardless of whether Defendants admit or even recognize that embarrassment.[12]  Moreover, the evidence points to the larger issue that there is almost no limit to what other core written protocol provisions Ohio can selectively abandon during an execution.

When asked what were the "non-negotiables" without which it would be impossible to carry out an execution, Morgan identified only the execution drugs.  (June 29, 2011 Hr'g Tr. at 201.)  When pressed, he was unable to name any other written protocol component that would if absent preclude pressing forward with an execution, although he did allow that if the only two medical team members qualified to administer the execution drugs were both absent from an execution, it "could" stop that execution.  (June 29, 2011 Hr'g Tr. at 204.)  Morgan described such a hypothetical scenario as "a gray area" and noted that he did not know whether he "would be able to obtain trained individuals that would be willing to assist" in that execution so as to allow for its completion.  (June 29, 2011 Hr'g Tr. at 204.)

Voorhies' testimony echoes Morgan's "guidelines" approach:

Q.  Sir, in your view, does the written directive prescribe mandatory regulatory requirements for the Department to follow in conducting executions?

---

[12]  There are various other deviations or issues that Plaintiff presents, such as whether Defendants deviate from the written policy as to when they shall remove the execution drugs from the SOCF pharmacy or safe and whether the nurse who delivers the drugs can also concurrently serve as one of the two other mandated medically qualified persons to observe that delivery.  There is also an open issue as to whether Ohio has illegally procured execution drugs in the past and whether this possible impropriety remains relevant in light of a forthcoming anticipated shortage of pentobarbital.  Given that the four core deviations discussed herein prove dispositive of Plaintiff's motion for injunctive relief, the Court need not and does not discuss Plaintiff's additional allegations of core and perhaps non-core deviations.

A. No, sir.  We don't write policies to be rigid, mandatory procedures.  Moreover, we describe them as general guidelines to govern how we address whatever issue it is that policy is designed to address.

(June 29, 2011 Hr'g Tr. at 272.)  This latest testimony stands in stark contrast to prior testimony by Voorhies.  In summarizing Voorhies' March 24, 2009 testimony during another hearing in this litigation, the Court previously noted:

> Voorhies testified about the process of implementing changes to the written version of the protocol.  He explained that any proposed changes would be discussed and then proposed to the director.  If the director was in agreement, the changes would be written into the protocol and then ultimately signed by the director.  *At that point, Voorhies testified, the written protocol becomes administrative law pursuant to Ohio statute.*  Voorhies agreed that anything that is not specifically written in the protocol does not have to be followed.

*Cooey*, 610 F. Supp. 2d at 866 (emphasis added).)  The Court also summarized additional prior testimony by Voorhies as follows:

> Voorhies also testified on redirect examination that it was his understanding that *the SOCF warden tasked with supervising executions was required to follow Ohio's written protocol*.  Voorhies agreed that the warden would not be required to "follow" anything that was not expressly written in the protocol.  Voorhies testified that it was his understanding that Ohio law provided "wide latitude" to the SOCF warden (with respect to the matter of taking whatever steps might be necessary but not spelled out in the written protocol).  Voorhies stated that he believed that the decision as to what was or was not included in the written protocol stemmed from "measured consideration" as opposed to a concern about whether inserting new written provisions had the effect of re-starting a statute of limitations on legal challenges to the execution protocol.

*Id.* at 866-67 (emphasis added).  Former DRC Director and former SOCF warden Collins similarly provided previous testimony in this litigation that the warden must implement the written policy to carry out the law of Ohio.  Collins also testified that the warden does not have to implement what is not in the written policy.

The new "mere guidelines" testimony is troubling because it confirms what was

previously a suspected disregard for the core components of the written protocol by Defendants. The task of conducting an execution trumps the mission of exercising governmental power within the confines of the Constitution.  Moreover, the testimony of Morgan and Voorhies regarding the "guideline" nature of the written protocol reveals a troubling illogic to their asserted basis for the decisionmakers' discretion.  Both men pointed to the written protocol provision affording a warden necessary discretion to guarantee a more humane execution, Section VI.B.4.o, and both men professed that humane executions are the goal.  This Court has no reason to believe that these men do not in fact wish to achieve that goal.  But wishes are poor substitutes for subversive action that undercuts the stated goal.  Neither man could explain how the core deviations they have permitted and even at times encouraged serve a more humane execution.

There is a disconnect between the written protocol source from which Morgan and Voorhies attempt to draw the unbridled deviation authority and the deviations in which both men engaged.  Section VI.B.4.o permits a warden to make alterations and adjustments to policies only "as necessary to ensure that the completion of the execution is carried out in a humane, dignified, and professional manner."  Logic and certainly experience teach that fewer protections do not encourage, much less are *necessary* for, a more humane execution, and in fact fewer protections risk subverting that goal.  Broom would no doubt agree with that proposition, and Clark would likely as well if he were alive.  This Court does, and any intellectually honest and dispassionate observer must as well.  Periodically dispensing with safeguards is not a policy aiming for consistent and promising results.

The demonstrated subjective application of the written protocol (which points to a larger

issue of overarching unequal application of even greater magnitude) thus manifests itself in failures that undercut faith in the system, tarnish those select numerous team members involved in the execution process who seek to act professionally and competently (often despite the supervision they must follow), and are a blight upon now three executive branch administrations spread over seven years. It need not be so. The core components of the written protocol as set forth in the latest incarnation of the execution protocol are adequate even if capable of further refinement. It is only Ohio's implementation of these core components that is often grossly and inexplicably inadequate.

This does not necessarily mean that Plaintiff or any other capital inmate can make a federal case out of it. The extant question is thus whether the documented pattern of core deviations and the expressed underlying rationale of subjective adherence are not merely offensive in the why-cannot-government-work sense, but whether they are offensive in the constitutional sense. Defendants' policy and practice of permissible core deviations or failures only matter in a court of law if they run afoul of the Constitution, which necessitates examination of two distinct theories of constitutional jurisprudence.

Plaintiff argues that Defendants' pattern and practice of core deviations treat inmates disparately in a manner that burdens fundamental rights. The Sixth Circuit has explained that

> "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. The Supreme Court has stated that this language 'embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (quoting *Vacco*, 521 U.S. at 799, 117 S.Ct. 2293). To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Id.; see also TriHealth, Inc.,* 430 F.3d at

788.

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006). When the disparate treatment burdens a fundamental right, strict scrutiny applies. *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). This means that Defendants' core deviations are permissible only if they are narrowly tailored to a compelling governmental interest. *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

Here, Plaintiff points to his fundamental right to be free from cruel and unusual punishment. Defendants attempt to transform Plaintiff's Fourteenth Amendment claim into a pure Eight Amendment claim. But the former claim sufficiently targets that the sweeping core deviations at least burden Plaintiff's fundamental right by negating some of the precise procedural safeguards that this Court and the Sixth Circuit heralded in prior discussions of Eighth Amendment claims in this same litigation. Defendants offer no compelling reason for selectively introducing risk into some executions but not others.

Alternatively and perhaps even more effectively, Plaintiff argues that he constitutes a "class of one" and that the pattern and practice of core deviations are impermissible because they lack any rational basis. The Sixth Circuit has explained the class of one approach:

> When a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis. *Radvansky*, 395 F.3d at 312. Under rational basis scrutiny, government action amounts to a constitutional violation only if it "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005). A "plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 711; *see also TriHealth, Inc.,* 430 F.3d at 788 (citing *Warren*, 411 F.3d at 710).

53

>Under rational basis review, the defendant "has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.' " *Id.* at 790 (quoting *Fed. Comm. Comm'n v. Beach Comm., Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).  The burden falls squarely to the plaintiff, who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law.  *Id.*

*Club Italia Soccer & Sports Org., Inc.*, 470 F.3d at 298.  Plaintiff has produced sufficient evidence to persuade this Court that he has a strong likelihood of prevailing on his class of one claim.

Plaintiff has demonstrated that the only rationale for core deviations that eliminate safeguards and introduce greater uncertainty into the execution process is to simply complete the executions at all or nearly all costs.  Mere pursuit of administrative convenience that risks flawed executions is not a legitimate state interest.  *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966).  Completing executions in a constitutional manner is a legitimate state interest.  Completing them in a manner that ensures their humane nature is as well.  There can be protocol deviations that will further both of these and other valuable, legitimate interests.  But core deviations that introduce uncertainty and eliminate safeguards meet neither of these state interests nor any other combination of legitimate interests of which this Court can conceive.

This is therefore not a case in which the Court is only confronted with merely " 'the fact that other means are better suited to the achievement of governmental ends,' " a scenario under which Plaintiff would fail.  *Johnson v. Bredesen*, 624 F.3d 742, 748 (6th Cir. 2010) (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 77 (2001)).  This is a scenario in which there is no rationality behind the means employed to reach any legitimate state interest.

Defendants do not have to offer any justification for their core deviations, but they do.

54

Their proffered justification for the core deviations is to ensure more humane executions. As noted, the goal of humane executions is embodied in Section VI.B.4.o, the written protocol section to which Morgan and Voorhies point as an enabling mechanism for the authority to deviate at will. Both men have also consistently testified that humane executions are their foremost concern. The Court does not question their best intentions, nor does it question the integrity of any member of the execution team. The members are charged with an inherently difficult and unpleasant task of immense responsibility, and those who have testified have often impressed this Court with their intentions.

This is not to say that the core deviations and underlying policy of failing to adhere to the most fundamental or core written protocol practices rationally relates to the asserted goal of humane executions. Whatever intentions the governmental actors hold, core deviations that bypass protections cannot and do not logically further the goal of humane executions. Sometimes the core deviations do not adversely affect that goal in demonstrable action, and sometimes they can puncture the goal. In both cases, there is no connection between goal and practice. The explanation or asserted goal does not align with the policy of permissible core deviations and the periodic implementation of that policy. Under rational basis scrutiny, Defendants' core deviations are revealed to be irrational. They are arbitrary and capricious. They are unconstitutional.

What the foregoing analyses teach is that Plaintiff is likely to prevail on his Equal Protection claim. Such a conclusion is mandated under the evidence presented when viewed in light of the rights the execution process implicates and the haphazard application of that process in which Ohio engages. A death warrant cannot trump the Constitution. That latter document is

55

not an inconvenience to be worked around or ignored.  It is the most fundamental expression of the principles, rights, and obligations that define this country, and no governmental actor should ever disregard its dictates and prescriptions in this or any other context to fulfill any sense of perceived duty.  It is wholly lawful to execute capital inmates.  It is wholly unlawful to even attempt to do so in a manner that violates the Constitution.

Defendants' steadfast refusal to recognize core deviations as problematic subverts the purpose of the written protocol and defies the point of the protections that the Fourteenth Amendment provides to all citizens.  Defendants mistake semantics for propriety and in doing so conflate situational dedication to a governmental function with their overarching duty to follow the law.  They posit that because their own written protocol is merely a set of guidelines subject to context-dependent variable implementation, any departure is not a deviation but actually continued application of the protocol.  This approach misreads the protocol and ignores equal protection.  A deviation is a deviation, and to claim otherwise is either delusional or disingenuous.  Ohio can and should easily do better.

To characterize the core deviations as inconsequential in the constitutional sense would be to ignore the reality of what is going on.  Ohio pays lip service to standards it then often ignores without valid reasons, sometimes with no physical ramifications and sometimes with what have been described as messy if not botched executions.  Neither term is sufficient to capture the importance of what is involved here.  "Messy" is child's terminology that undermines the gravitas of state-sanctioned killing.  "Botched" sounds perhaps comical and falls far short of what is necessary to describe the risky scenario Ohio's execution process presents.  "Failure" and "constitutionally impermissible" are more fitting.

56

Moreover, just because the core deviations may not result in a substantial risk of severe pain does not mean that they do not matter.  There is an Eighth Amendment inquiry that the Sixth Circuit has largely resolved (albeit relying in part on what is now known to be a false premise of adherence to the written protocol).  And there is a Fourteenth Amendment issue that relies not on such physical impact, but instead targets whether the state government is living up to its constitutional obligations in how it ends the life of citizens.

The core deviation issue has long concerned the Court and should not surprise Defendants.  Previously, the Court noted:

> This is not to say that a plaintiff can never prevail under the plurality standard.  Additional evidence could be produced at the subsequent July 2010 trial on the merits, or *a plaintiff might successfully present an argument based on Ohio's departures from its protocol*.  But such speculation targets another day under changed circumstances, and today, under present conditions, Biros is not likely to succeed on the merits proceeding under the plurality's standard.

*Cooey*, 2009 WL 4842393, at *91 (noting deviations issue in discussing *Baze v. Rees*, 553 U.S. 35 (2008), issues (emphasis added)).  In that same 2009 Opinion and Order, the Court later stated:

> This Court has grave concerns about the combination of the pattern of deviation exhibited by many of the state actors involved in the execution team, the amount of discretion that exists under Ohio's protocol, and the lingering doubts regarding competency or the ability to perform that surround execution attempts. The lack of confidence arising from these cumulative concerns could point to an unacceptable risk that violates the Constitution if the argument and evidence were presented.

*Id.* at *98.  And still later in that decision, the Court stated:

> Other deposition testimony points to similarly odd departures that together evince a troubling pattern of disregarding the very protocol that is supposed to control and provide safeguards for the execution process.  The obvious question

becomes how far this deviation extends. Substantive protocol deviations, however potentially beneficial or well intentioned, nonetheless evince disregard for the sanctity of adherence to the procedures purportedly designed to satisfy the Constitution. Previously, this Court noted that concluding that deviation from the core execution procedures likely would require an impermissible drawing of an unwarranted inference upon an inference: first, that deviation from *any* provision of the written protocol is possible, and second, that the actors involved would or are likely to deviate from the substantive core procedures. Accordingly, absent evidence to the contrary, this Court could not conclude that the remote, theoretical *possibility* of deviation from the core procedures presents a *likely* substantial risk of substantive harm. The Broom proceedings speak to this issue.

*Too much discretion coupled with too little management regard for the protocol could suggest little regard for the Constitution.* The testimony of Team Member # 11 and Team Member # 21 indicates that team members failed to discuss and plan for anticipated problems with accessing veins, including problems that were identified, at a minimum, by the nurse who had examined Broom upon his arrival at SOCF the morning before the execution. Team Member # 21 failed to attend a May 2009 training session required under paragraph Section VI(B)(1) of the protocol, as testified to by the team leader. Team Member # 10 also alluded to the possibility, based on the spacing of some summer executions, that not every execution was in fact preceded by a sufficient number of prior rehearsals as required in the written protocol. There was also an apparent failure to do a vein assessment on Broom the morning of the execution attempt.

*Such incidents concern this Court and suggest a general sense of bureaucratic ennui rendering it the policy of the State of Ohio that it adheres to its execution protocol, except when it does not.* Collins testified more than once that medical team members were frustrated and concerned during the Broom incident and that they were intent upon continuing to try to obtain vein access because of their fear of being berated or ridiculed in the press and of being hailed into court for more testimony.

The Constitution is not an inconvenience to be circumvented. Its protections animate our society of laws and give Ohio the lawful authority it must wield to put a citizen to death. *That the deviations perhaps reflect a sense of disdain for constitutional requirements by those who manage the execution warrants if not demands exploration.*

*Id.* at *99 (emphasis added). Today, Plaintiff has squarely presented the core deviations issue to

this Court in a manner that affords more direct discussion.

That discussion leads to the inevitable proposition that the Constitution teaches that the

end does not justify any and all means.  There is no doubt that Ohio can lawfully execute those inmates condemned to capital punishment.  But there is equally no reasonable debate over whether the Constitution confines the means of implementing that end.  It does.  The perplexing if not often shocking departures from the core components of the execution process that are set forth in the written protocol not only offend the Constitution based on irrationality but also disturb fundamental rights that the law bestows on every individual under the Constitution, regardless of the depraved nature of his or her crimes.

The first injunctive factor weighs heavily in Plaintiff's favor.

### C. Irreparable injury, substantial harm to others, and the public interest

Given the weight the Court assigns to the first factor discussion presented above, this Court need not and shall not address the remaining factors in much detail.  The Court notes that the irreparable injury a constitutional violation presents is clear and favors a stay.  *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (explaining that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated" and "a successful showing on the first factor mandates a successful showing on the second factor-whether the plaintiff will suffer irreparable harm").  This Court is not persuaded that issuance of injunctive relief will cause substantial harm to the State or others by comparison.  The Court also recognizes that the public interest only is served by enforcing constitutional rights and by the prompt and accurate resolution of disputes concerning those constitutional rights.  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) (" '[I]t is always in the public interest to prevent violation of a party's constitutional rights.' " (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1079

(6th Cir. 1994))).  By comparison, the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights.  Finally, this Court declines to require a security bond for obvious reasons.  *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (explaining that whether to require a bond is within the discretion of the court).

### III. Conclusion

As in similar Opinions and Orders, the Court does not conclusively hold today that Ohio's method of execution practices are constitutional or unconstitutional.  Today's decision merely recognizes that based on all of the record evidence, Plaintiff has met his burden of persuading this Court that he is substantially likely to prove unconstitutionality and prevail in this litigation.  Because Plaintiff is therefore entitled to injunctive relief, the Court **GRANTS** his motion for a temporary restraining order and a preliminary injunction.  (ECF No. 908.)  It is thus **ORDERED**, **ADJUDGED**, and **DECREED** that the State of Ohio, and any person acting on its behalf, is hereby **STAYED** from implementing an order for the execution of Kenneth Smith issued by any court of the State of Ohio until further Order from this Court.

**IT IS SO ORDERED.**

   /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE