# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**RICHARD COOEY, et al.,**

    **Plaintiffs,**

        **v.**

**JOHN KASICH, et al.,**

    **Defendants.**

**Case No. 2:04-cv-1156**
**JUDGE GREGORY L. FROST**
**Magistrate Judge Mark R. Abel**

**BRETT HARTMAN,**

    **Plaintiff,**

        **v.**

**JOHN KASICH, et al.,**

    **Defendants.**

**Case No. 2:09-cv-242**
**JUDGE GREGORY L. FROST**
**Magistrate Judge E.A. Preston Deavers**

**ROMELL BROOM,**

    **Plaintiff,**

        **v.**

**JOHN KASICH, et al.,**

    **Defendants.**

**Case No. 2:09-cv-823**
**JUDGE GREGORY L. FROST**
**Magistrate Judge Mark R. Abel**

**LAWRENCE REYNOLDS,**

    **Plaintiff,**

        **v.**

**JOHN KASICH, et al.,**

    **Defendants.**

**Case No. 2:10-cv-27**
**JUDGE GREGORY L. FROST**
**Magistrate Judge Mark R. Abel**

<u>**OPINION AND ORDER**</u>

This litigation has too often supported the inherent truth of the adage that those who cannot learn from history are doomed to repeat it. With some caution, the Court today reaches the conclusion that the State of Ohio has apparently learned the lessons of its prior embarrassments and corrected its course in order to pursue court-ordered implementation of its latest written execution protocol.

The captioned cases are before the Court for consideration of Plaintiff Reginald Brooks' motion for a temporary restraining order and a preliminary injunction (ECF No. 1022) and Defendants' memorandum in opposition (ECF No. 1042).[1] Similar to those filings related to inmates who previously sought to stay scheduled execution dates, the issue presented by the briefing *sub judice* is relatively simple: has Plaintiff demonstrated that he is likely to succeed in establishing that the Ohio has an unconstitutional execution policy so that he deserves a stay of execution that will afford him the chance to prove his case? Because Plaintiff has failed to demonstrate a substantial likelihood of succeeding on his Equal Protection claim, this Court finds the motion for injunctive relief not well taken.

---

[1] For ease of reference, the Court shall refer to any filing by its docket number in Case No. 2:04-cv-1156. The references in this Opinion and Order also apply to each corresponding document filed in each consolidated case. Additionally, all pinpoint references to documents filed on the electronic docket shall be to the original page numbers of the documents involved, not to the page numbers assigned by the electronic filing system.

# I. Background[2]

The captioned consolidated cases are 42 U.S.C. § 1983 civil rights actions that challenge multiple facets of the execution protocol used by the State of Ohio. Plaintiff Reginald Brooks is an inmate on Ohio's death row who is set to be executed on November 15, 2011. On September 29, 2011, Plaintiff filed a motion for leave to file an amended complaint (ECF No. 1021) and his motion for a temporary restraining order and preliminary injunction to stay his execution (ECF No. 1022). Pursuant to S. D. Ohio Civ. R. 65.1(a), the Court therefore held an informal preliminary conference with the parties on that same day, at which the Court set a briefing schedule on intervention and scheduled a hearing date if the injunctive relief issue became ripe. (ECF No. 1023.) This Court subsequently granted Plaintiff's opposed motion to intervene and permitted the filing of his complaint. (ECF No. 1038.) In that pleading, Plaintiff asserts Eighth Amendment and Fourteenth Amendment challenges to Ohio's execution practices via § 1983. (ECF No. 1039.)

From October 31, 2011 through November 2, 2011, the Court held a hearing on Plaintiff's motion for injunctive relief. Both sides presented testimony and submitted written closing statements to supplement their briefing. The Court took the issue of injunctive relief under advisement.

---

[2] The findings of fact related to this Opinion and Order are not conclusive given that "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." *United States v. Edward Rose & Sons*, 384 F.3d. 258, 261 (6th Cir. 2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390 395 (1981)).

## II.  Analysis

### A. Standard involved

In considering whether injunctive relief staying Plaintiff's execution is warranted, this Court must consider (1) whether Plaintiff has demonstrated a strong likelihood of success on the merits; (2) whether Plaintiff will suffer irreparable injury in the absence of equitable relief; (3) whether a stay would cause substantial harm to others; and (4) whether the public interest is best served by granting a stay.  *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  As the Sixth Circuit has explained, " '[t]hese factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together.' "  *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

### B. Likelihood of success[3]

On July 8, 2011, this Court issued a decision in which the Court set forth at length numerous deviations by state actors from the state execution protocol then in effect, including core deviations that subverted the key constitutional principles that control the execution process.  This Court found that

> [t]he perplexing if not often shocking departures from the core components of the execution process that are set forth in the written protocol not only offend the Constitution based on irrationality but also disturb fundamental rights that the law bestows on every individual under the Constitution, regardless of the depraved nature of his or her crimes.

---

[3]  By order of this Court and by continuing agreement of the parties, all references to Ohio's execution team members are again by generic identifiers established by the parties and employed to address anonymity and safety concerns.

(ECF No. 947, at 59.)  Consequently, this Court enjoined Ohio and any person acting on its

behalf from implementing an order for the execution of Plaintiff Kenneth Smith until further

Order from this Court.

Defendants did not appeal the Smith decision and instead set about revising Ohio's

execution protocol.  This resulted in the current iteration of the state's execution protocol, which

became effective on September 18, 2011.  In the interim period between the Smith decision and

today, no scheduled execution proceeded.  Defendant Kasich granted Plaintiff Brett Hartman a

reprieve (ECF No. 955), Plaintiff Billy Slagle a reprieve (ECF No. 982), and commuted former

plaintiff Joseph Murphy's sentence to life in prison without the possibility of parole (ECF No.

1006).

Bringing Defendants back before this Court, Plaintiff argues that little has changed–and

that the protocol and its implementation may have become even worse–since the Smith decision.

Defendants in contrast present themselves as, essentially, having found religion in the

vernacular, appropriately secular sense.  Invoking a new protocol and a convenient but

nonetheless credible newfound conversion (or at least return) to following their own rules and

the Constitution, Defendants attempt to hit the reset button on this litigation.  They assert that

they get the message, that they recognize the constitutional principles that apply to their actions,

and that they more than ever regard the new and improved protocol as binding and not advisory

or aspirational.  To support these contentions, they have presented testimony from key

decisionmakers who control the state execution process, some of whom have laudably reversed

course in their approach both to the protocol and the obligations the Constitution imposes.

Now, bereft of testimony revealing Ohio's execution protocol to be merely advisory

guidelines subject to being disregarded at whim, Plaintiff has essentially presented a two-track narrative most easily summarized as *do not believe Defendants* and *do not credit their meaningless protocol revisions*. These are perhaps not unreasonable positions given Defendants' history in this litigation, which is not to say that these are prevailing positions. Plaintiff's theory of the case is that having been burned in the Smith decision for truthfully if no doubt inadvertently characterizing their protocol as a compilation of ultimately meaningless guidelines, Defendants have figured out that paying lip service to what is important to this Court (*i.e.*, what is important to the Constitution) is the better strategy. Plaintiff also posits that what Ohio has presented as salvaging changes to the protocol are at best cosmetic glosses that do not resolve core problems and are at worst conflicting words that serve only to introduce additional and perhaps even greater problems than those recognized in the Smith decision.

Plaintiff's arguments fall under his fourth claim, which asserts an Equal Protection violation under 42 U.S.C. § 1983.[4] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, in order to prevail on a § 1983 claim, Plaintiff must show that, while acting under color of state law, Defendants deprived or will deprive him of a right secured by the Federal Constitution or laws of the United States. *See Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003). Plaintiff's Second Amended Complaint asserts that "Defendants' overarching

---

[4] Plaintiff has narrowed the grounds on which he currently seeks injunctive relief to the core deviations portion of this specific claim.

execution policy, including their wholly discretionary approach to their written execution protocol and their informal policies, violates [his] rights to equal protection under the law as guaranteed by the Fourteenth Amendment." (ECF No. 1039 ¶ 475.) He contends that the September 18, 2011 protocol is facially invalid because it codifies disparate treatment of similarly situated individuals without sufficient justification so as to be arbitrary, irrational, and capricious. Plaintiff also asserts that he is a class of one subject to treatment that burdens his fundamental rights in a manner that is not rationally related in any way to a legitimate state interest.

Both of these equal protection arguments are cognizable under § 1983. The Sixth Circuit has explained that

> "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. The Supreme Court has stated that this language 'embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly.' " *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (quoting *Vacco*, 521 U.S. at 799, 117 S.Ct. 2293). To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Id.; see also TriHealth, Inc.,* 430 F.3d at 788.

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006). When the disparate treatment burdens a fundamental right, strict scrutiny applies. *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). This means that any core deviations from the protocol are permissible only if they are narrowly tailored to a compelling governmental interest. *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

Plaintiff points to his fundamental right to be free from cruel and unusual punishment.

As they did with Smith's similar claim, Defendants attempt to transform Plaintiff's Fourteenth Amendment claim into a pure Eighth Amendment claim. But the former claim sufficiently targets that sweeping core deviations would at least burden Plaintiff's fundamental right by negating some of the precise procedural safeguards that this Court and the Sixth Circuit heralded in prior discussions of Eighth Amendment claims in this same litigation. For present purposes, it does not matter whether there is a qualifying risk of severe pain–a conclusion rejected by the only medical expert who testified–but only the creation of unequal treatment impacting the fundamental protection involved.

As noted, Plaintiff also argues that he constitutes a "class of one" and that a pattern and practice of core deviations exist that are impermissible because they lack any rational basis. The Sixth Circuit has explained the class of one approach:

> When a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis. *Radvansky*, 395 F.3d at 312. Under rational basis scrutiny, government action amounts to a constitutional violation only if it "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005). A "plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 711; *see also TriHealth, Inc.,* 430 F.3d at 788 (citing *Warren*, 411 F.3d at 710).
>
> Under rational basis review, the defendant "has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.' " *Id.* at 790 (quoting *Fed. Comm. Comm'n v. Beach Comm., Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). The burden falls squarely to the plaintiff, who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law. *Id.*

*Club Italia Soccer & Sports Org., Inc.*, 470 F.3d at 298. Similar to Smith, Plaintiff also asserts

that the only rationale for core deviations that eliminate safeguards and introduce greater uncertainty into the execution process is to merely complete the executions at all or nearly all costs.

In contrast to Smith, Plaintiff brings his arguments amid an analytic landscape that has changed significantly and to Defendants' benefit. Because the execution protocol and Defendants' approach to the protocol has by all appearances matured, Plaintiff now confronts an execution context in which Defendants have addressed the key concerns that provided the animus underlying the Smith decision.

In that prior Opinion and Order, this Court noted that "[t]he core components of the written protocol as set forth in the [then applicable] incarnation of the execution protocol are adequate even if capable of further refinement. It is only Ohio's implementation of these core components that is often grossly and inexplicably inadequate." (ECF No. 947, at 52.) Such flawed implementation manifested itself in what this Court described as four core deviations: (1) Ohio fails to document the preparation of the execution drugs, (2) Ohio fails to follow formalized procedures designed to ensure adequate preparation for the administration of drugs by IV, (3) Ohio fails to adhere to systemic redundancies that would minimize if not eliminate the possibility of human error, (4) Ohio fails to exercise control over who participates in an execution. The overarching issue underlying all of these problems was that Defendants perceived that they were free to ignore their own protocol due to convenience, pragmatism, or incompetence, which meant that Ohio would ignore the constitutional restraints on state actors' conduct.

Things have changed. It does not matter to this Court whether Ohio has acted motivated

by admirable intent or whether it has been begrudgingly dragged toward respectability. What matters is that as a result of state action, the written protocol is now binding, the possibility of variations from less core components has been curtailed and such variations now run to one decisionmaker, and the possibility of variations from the most essential or core components now lies outside the discretion of any decisionmaker because they are not possible. Moreover, Defendants have tightened procedures and have implemented checklists and safeguards extrinsic to the protocol that, effectively employed, will serve to reinforce the protocol requirements. Warden Donald Morgan correctly described the checklists as a checks and balances system that is not mentioned in the written protocol but assists in maintaining compliance with that protocol. Such practices that technically exist outside the written protocol constitute the same type of unwritten practices that in the past served to prop up inferior execution protocol versions. Ohio would be foolish to now abandon them, and the state's implementation of these practices warrants positive recognition.

The net effect of Ohio's revised practices and revised protocol is essentially twofold. First, there is a return to viewing the protocol and unwritten practices as linked. Like other courts entertaining challenges to lethal injection protocols under § 1983, this Court followed for much of this litigation the parties' lead in "us[ing] the term 'protocol' to encompass not only the quantities, preparation, injection, and the actual drugs administered during the execution process, but also all policies, procedures, and staff qualification requirements." *Walker v. Epps*, 587 F. Supp. 2d 763, 766 n.3 (N.D. Miss. 2008). In the Smith decision, this Court discontinued use of the blanket term "protocol" in such a manner because it failed to capture the division that Defendants' Smith-era approach presented. The Smith evidence previously suggested an

overarching execution policy and a notably subordinate written execution protocol. The contemporary evidence now supports that Defendants have returned to a protocol that embodies an expression of an overall concern for constitutional conduct. Moreover, the evidence indicates that unwritten policies and practices once again support the constitutionality of Ohio's execution practices, rendering the protocol more sound.

The second effect of Ohio's recent efforts is that Plaintiff has failed to meet his burden of proof. Plaintiff sought in his motion to assert the law of the case doctrine as a sword so that Defendants would bear the burden of rebutting a presumption of injunctive relief based on the Smith decision. This Court wholly rejected that proposition at the outset of the hearing. The burden remains on Plaintiff, especially in light of the fact that the relevant facts have changed since the Smith decision.

One such changed fact is that the written protocol is no longer a set of guidelines that can be set aside regardless of the constitutional effect of such action. This fact is perhaps best captured in the testimony of Regional Director Edwin Voorhies, who has changed his position once again, but this time to a position that favorably addresses constitutional concerns. Previously in this litigation, he testified that the written execution protocol carries the force of administrative law. The SOCF warden is required to follow the protocol, Voorhies testified in 2009, and former DRC Director and former SOCF warden Terry J. Collins, his then-supervisor, agreed. At the Smith hearing, Morgan, the latest SOCF warden, testified that the written protocol in effect at that time was merely a set of guidelines. Voorhies surprisingly agreed. This led the Court to conclude that Ohio's execution protocol was (and might have always been) an advisory compilation of guidelines subject to being ignored.

The Brooks hearing presented a different story. Ohio Department of Rehabilitation and Correction Director Gary Mohr's testimony in particular indicated a rejection of the pervasive bureaucratic ennui that this Court has long targeted as notably troubling. He described the Smith decision as difficult to read, which concerned this Court and its law clerks until Mohr explained that he did not mean there was inept writing presenting a confusing Opinion and Order. Rather, Mohr testified, what he meant was that the criticism leveled at Ohio was troubling or uncomfortable. He explained that the new protocol and approach was intended to embrace a policy of strict compliance. Mohr also clarified protocol language so that the protocol's use of "variation" and "deviation" were revealed to mean the same thing–departures from the written protocol–and he testified that only he could approve a "variation of a substantial nature," or as he defined it, a variation that would have an impact on the execution itself. Mohr described variations from requisite training as intolerable.

Morgan and Voorhies largely echoed Mohr. The new protocol strips the warden of much of his execution-related discretion in a sense, and Morgan evinced an understanding that he cannot delegate his execution duties to a team member. Like Mohr, Morgan testified that there is no difference in the written protocol between a variation and a deviation. Unlike Mohr, Morgan also testified that there is no difference between a substantial variation, or a variation of a substantial nature, and the terms "variation" or "deviation." In other words, Morgan understood the protocol to mean that a departure is a departure, and he explained that they all fall above his pay grade. Morgan testified that Mohr has made it clear that the protocol is to be faithfully, consistently, and strictly applied.

Voorhies now agrees. He testified that although Section II of the written protocol still

uses the term "guidelines," his approach is now quite different than the approach he expressed in the Smith hearing. He agreed that the protocol went from binding administrative law to advisory to binding again. Voorhies also testified that a deviation is the same as a variation under the protocol and that a team member cannot vary from the protocol.

The Court notes that Mohr testified that he understood the protocol to permit the warden to authorize protocol deviations. This is of course incorrect. It appears Mohr was crediting only Section V, the second unnumbered paragraph of which provides that "[a]ny variation of a substantial nature must be approved by the Director as described in this policy." Section VI(A)(6) expressly provides, however, that "[o]nly the Director may authorize a deviation from the procedures in this policy directive." Thus, one protocol provision leaves substantial variations only to the Director, and another provision leaves any variation or deviation to the Director. The end result is that *all* departures from the written protocol are up to the Director. The error on Mohr's part in recognizing the full scope of his responsibility does little for Plaintiff's cause for two reasons.

First, the only example non-substantial variation or deviation Mohr suggested (and the only one mentioned throughout the hearing) was when a warden would adjust inmate visitation. Mohr correctly recognized this as falling within the warden's purview, even if he failed to explain or recognize why it is within the warden's ability. Section VI(E)(7) specifically provides the warden with the discretion to increase visiting opportunities in the manner Mohr and others contemplated. Increasing visitation time or frequency is therefore actually not a deviation from the written protocol, but is instead a commendable part of that protocol. There can be no constitutional violation in giving an inmate more visitation and, more important for present

purposes, there is technically no written protocol departure when a warden does so.

Second, both Morgan and Voorhies testified that variations or deviations were left to the Director. Team Member # 10, the execution team leader, testified multiple times that he lacks the authority to authorize deviations. Even if Mohr thought that select subordinates could authorize protocol departures, the subordinates do not, and any possible departure would consequently flow upward to the only decisionmaker empowered under the protocol to authorize or deny the departure. The end result is the same: as the protocol contemplates, only the Director ultimately passes judgment on protocol departures. The Court also notes its suspicion that Mohr will no doubt recognize the mandate of Section VI(A)(6) following the filing of today's decision.

Given the foregoing, core deviations are once again outside Defendants' approach to the written protocol, rendering applicable again this Court's prior analysis from its April 21, 2009 Opinion and Order:

> [T]here is no evidentiary basis for concluding that those parts of the written protocol related to the preparation for administering and the actual administration of drugs would be disregarded. Collins, for example, testified that a warden asked him for permission to deviate from the written execution policy regarding when an inmate's visitors would be allowed access to the condemned. Collins granted the warden permission to deviate from the written protocol and the warden did so, permitting late-arriving individuals time with an inmate despite their having arrived at SOCF technically too late for visitation. This is a laudable deviation viewed from the standpoint of simple humanity. It also suggests that despite testimony that the written protocol stands as the law, deviation at the election of the state actors involved in the system is possible.
>
> The next obvious question is how far this deviation extends. Could, for example, the warden request and the director approve deviation from the written policy of using sodium thiopental? Such an irrational deviation is unlikely but theoretically possible if the scope of the ability to depart from the written policies and procedures is truly unlimited. This illustrative deviation would naturally be problematic from a constitutional standpoint, but there is no basis on this record for

14

concluding by inference or otherwise that such deviations from the core execution procedures [are] likely or even possible. Moreover, concluding that deviation from the core execution procedures is likely would require an impermissible drawing of an unwarranted inference upon an inference: first, that deviation from *any* provision of the written protocol is possible, and second, that the actors involved would or are likely to deviate from the substantive core procedures. Accordingly, absent evidence to the contrary, this Court cannot conclude that the remote, theoretical *possibility* of deviation from the core procedures presents a *likely* substantial risk of substantive harm.

*Cooey (Biros) v. Strickland*, 610 F. Supp. 2d 853, 928 (S.D. Ohio 2009).

Absent evidence that a policy and practice of permissible core deviations continues to exist, the conclusion of subjective adherence that proved so damaging to Defendants in Smith is absent here. This leaves Plaintiff with his assertion of a parade of horribles by which he seeks to ensnare Defendants in a web of unconstitutionality.

One component of Plaintiff's parade is his argument targeting shoddy or careless recordkeeping and drug handling. Testimony and other evidence pointed to the fact that unexpired drugs remain in the prison safe. Pharmacy manager Denise Dean explained that these drugs remained in the safe at least in part in case there was a need to prove that Ohio still had the expired drugs and had not used them in an execution. There is no evidence that Ohio has used expired drugs as part of an execution, and the Court accepts Mohr's testimony that Ohio will not use expired drugs even if the written protocol does not explicitly preclude such action.

This last portion of testimony is another unwritten practice or policy that serves to supplement the written protocol, and Ohio is now bound by the representation its agent has made to this Court. The same applies to Mohr's representation that Ohio will not use imported drugs. Granted, Mohr testified that there were no unwritten policies that were part of the execution policy, but this subjective assessment turns on perhaps a different use of terminology than that

applied by this Court. Mohr also testified that the use of expired drugs is "unconscionable" to him and would fly in the face of every policy behind the protocol. Numerous instances of state practices described herein qualify as such unwritten policies to this Court, some of which aid Defendants. Whether Mohr labels them unwritten policies is not important. What matters is that Ohio follows them and that they serve the interests of constitutionality, not detract from these interests.

In light of the fact that the issue of Ohio's past use of expired drugs has been laid to rest and the binding concession presented to this Court, it would make sense for Ohio to promptly destroy the expired drugs and wholly obviate the risk that human error in recordkeeping or action will render this drugs of future concern in this or similar litigation.

Moreover, the recordkeeping issues Plaintiff raises target either conduct under old protocols and more permissive execution policies or conduct related to rehearsal issues to which the protocol does not apply in the same way as during an execution. Neither the Constitution nor the protocol require a perfect or near perfect rehearsal. The protocol demands appropriately trained and qualified members and mandates rehearsals, but it does not micromanage the rehearsals. Voorhies correctly testified to this, explaining that the protocol does not define the full content of the rehearsal and that a deviation from the protocol in a rehearsal is not necessarily violating the protocol. A rehearsal is a working laboratory for training and improvement; it is not intended as a *gotcha* opportunity that strictly construed can serve only to impede valuable experimentation and learning that could serve to improve Ohio's execution practices. Prudence dictates and encourages making mistakes when they do not matter so as to increase the chance of avoiding mistakes when they do matter. Nothing in the protocol

establishes more than broad rehearsal content and absolutely nothing imposes the avoidance of any and all rehearsal errors that Plaintiff seeks to enforce.

This is not to say that rehearsals should be sloppy or that they cannot be improved. It would make sense for at least the team leader if not his chain-of-command superiors to review rehearsal results more than they do, perhaps, for example, by reviewing the practice timelines for inaccuracies so that any issue can be addressed and the actual execution timelines will present a greater degree of reliability than they currently do.

Nor does the protocol require strict attendance at all rehearsals by all team members. Plaintiff argues that absences are impermissible, but the testimony supports that select absences are approved. More communication regarding absences between the subordinate supervisors and Mohr would further the aims of the protocol process and better support the fourth core component set forth in Section V of the protocol. But Plaintiff overreaches when he argues that Ohio has abandoned oversight principles regarding attendance. The Constitution does not preclude vacation and it does not preclude a policy of minimal permissible absences for reasons that are wholly unconnected to any particular inmate. It does preclude ignored absences that would render an execution team member insufficiently trained or unqualified. There is no evidence establishing a likelihood of proving such results here.

The Court shares Plaintiff's concern over records that do not reflect Morgan as having removed drugs from the prison safe. This concern is not dispositive. Evidence explained the circumstances by which this occurred, with the person who should have removed the drugs thinking that the execution involved had been called off. Departures from procedure are always concerning, but they are not always of constitutional dimension and do not always support an

encompassing inference of greater disregard for the protocol, especially in the post-Smith protocol context. Additionally, Dean testified that she would be reporting to the prison on scheduled execution regardless of reports that an execution has been stayed by a court. Such unwritten prophylactic practices present a change in conduct that addresses the circumstances of which Plaintiff complains.

More favorable at first blush to Plaintiff is Ohio's handling of his pre-execution physical and mental evaluations. The new protocol calls for an assessment of an inmate within a specified number of days prior to his or her execution. Belatedly disclosed hearing evidence indicates that Ohio conducted such evaluations, even if at least one of the individuals examining Plaintiff did not know the reasons for the evaluation until after the fact and even he only fulfilled the requirements of the assessment essentially by luck. The physician who conducted the hands-on examination of Plaintiff testified that he performed the IV assessment of Plaintiff's veins as a matter of course because he routinely does so in many physical evaluations. Ohio thus fell into compliance with this protocol requirement. It would have made much more sense the doctor had been told beforehand that Ohio needed a pre-execution protocol for Plaintiff. Inexplicably, he was not, despite the fact that the doctor opined that as part of his duty to care for inmates, he believes that he could ethically perform such an assessment. Regardless, the requisite assessment was completed.

Plaintiff questions the sufficiency of the assessment. He argues that the protocol requires that the execution team be informed of his physical condition, including high blood pressure that testimony indicated could result in Plaintiff's demise at nearly any moment. Plaintiff perhaps places more demands than either the protocol or the Constitution compel. Full information

18

sharing would certainly make sense, even if not compelled by Ohio's rules or the Constitution. But in making the argument he does, Plaintiff overlooks a key fact: he is refusing to take his medication. Any risk related to his high blood pressure is in part self-inflicted, and Plaintiff has directed this Court to no authority supporting the proposition that a state violates equal protection when it fails to communicate every potential medical roadblock an inmate voluntarily creates to being healthy enough to execute. Other record evidence similarly supports the conclusion that Ohio conducted the requisite mental health evaluation, even if the conclusions reached did not necessarily agree with older conclusions reached prior to Plaintiff entering the system as a death-sentenced individual. It would make sense for the execution team to know as much detail as possible about an inmate's physical and mental condition. It does not violate the Constitution if they know less than everything.

While on the topic of medical activities, the Court also recognizes that Ohio has added additional team members to the execution team in an effort to now avoid having an insufficient number of medical team members at any execution. Mohr testified that there have been instances in which less than three medical team members were present at an execution and that this will not happen again. The September 18, 2011 protocol expressly provides, without a possibility of variation, that three medical team members shall be present at every execution and that two of the three be authorized to administer drugs under state law. This implementation of a binding systemic redundancy helps minimize the possibility of human error, a key concern in the Smith decision. This Court previously and expressly relied upon the built-in systemic redundancy check on drug administration that sufficient medical team members provide, explaining:

Ohio has a system of redundancies in place in which no actor is left alone without observation. One medical team member mixes the drugs while watched by at least one additional state actor. Two medical team members are present in the holding cell while establishing heparin locks. The warden and the team leader together check for sufficient inmate unconsciousness and IV infiltration in the death chamber. One medical team member pushes the drugs while another medical team member is present in the equipment room, in addition to the narrator and other individuals. In short, there are specific safeguards in addition to the general observations of team members by one another and by the warden that protect against a team member underperforming in a manner that creates a likely risk of serious harm. These protections guard against one unchecked individual deviating from permissible procedures as a result of medical issues. And although the protections may not be foolproof, none could be; there is always the risk of human error whether caused by inadvertence, misfeasance, or medical issues. What is important is that the risk is acceptably mitigated here so as to not rise to a constitutionally impermissible level.

*Cooey v. Strickland*, 610 F. Supp. 2d 853, 929 (S.D. Ohio 2009) (vacating preliminary injunction staying the execution of Kenneth Biros). *See also Cooey v. Strickland*, No. 2:04-cv-1156, 2009 WL 4842393, at *90 (S.D. Ohio Dec. 7, 2009) (denying Biros a temporary restraining order).

Additionally, although Section VI(A)(5)(d) of the protocol permits recruitment of an advising physician or medical personnel, it limits such an individual's role to providing consultation or advice. Such restriction negates letting into the execution chamber such an individual who could then attempt to start an IV or perform any form of procedure, addressing another key event in this litigation's history that continues to trouble this Court.

Plaintiff argues that the protocol is unconstitutional because of the methods by which Ohio has obtained execution drugs. This Court did not reach this issue in the Smith decision because the core deviations that the Court addressed in that analysis proved dispositive of Smith's motion for injunctive relief. On the record evidence now before the Court, there is no basis for concluding that Plaintiff is likely to prove that the new protocol and state practices violate the Constitution. Ohio has obtained a second DEA license to validate (if necessary) its

drug procurement and has obtained an Ohio Board of Pharmacy resolution that approves of the protocol drug procurement. The past practices upon which Plaintiff relies were done under an old protocol and without the benefit of the second license and the newest, arguably much more expansive resolution. With an implicit *we all know what went on here* wink and nudge, Plaintiff asks this Court to reject the Ohio Board of Pharmacy's action because Defendants allegedly told the separate state agency what they wanted and the Ohio Board of Pharmacy simply complied. There is no basis on this limited record to reach that conclusion or to hold that the resolution approves impropriety.

This leaves for discussion Plaintiff's reliance on how Ohio proceeded toward the planned execution of Slagle.[5] Plaintiff points to various errors and asserted mistakes that purportedly violate the September 18, 2011 protocol as evidence of Ohio's inability or unwillingness to adhere to the new protocol, no matter what Defendants say. But the Slagle evidence actually cuts against Plaintiff. For the sake of argument, the Court shall credit every asserted protocol violation that Plaintiff asserts occurred, such as Ohio having blown the mandated pre-execution

---

[5] Pointing to this Court's recognition in the Smith decision that other issues aside from the four core deviations exist, Plaintiff asserts in his motion that the September 18, 2011 protocol fails to remedy these issues. Plaintiff's conclusory argument fails to inform this Court of his specific contentions and thus fails to persuade. Similarly, Plaintiff's assertion in his written closing statement that injunctive relief is warranted because the protocol restricts his last words hardly arises from the hearing evidence or the motion briefing and is simply unpersuasive. Such an argument-by-kitchen sink approach mirrors at least one aspect of Plaintiff's motion in which he attempts to persuade by referencing without detail numerous filings, including "all hearing and deposition transcripts and other evidentiary materials previously filed on the docket for any of these consolidated cases." (ECF No. 1022, at 4.) Two comments are appropriate. First, the docket in Case No. 2:04-cv-1156 alone presents nearly one thousand fifty filings spread out over seven years. Second, given this first point and given that this Court is in the business of resolving disputes and not charged with fashioning arguments from nearly random asides, some might argue that informing the Court of the specific arguments asserted and providing supporting authority for the positions taken would be a more prudent litigation strategy.

vein assessment and medical evaluation, in addition to conducting an insufficient mental health evaluation (which Morgan conceded did not comply with the new protocol). This Court can then conclude only that the system worked. After consultation with key actors, including a ninety-minute meeting with Mohr, Defendant Kasich stepped in and gave Ohio more time to get it right–more time to hone the new protocol practices and more time to honor the Constitution's requirements. Rather than constituting systemic failure that damns the execution process, the events surrounding Slagle are a testament to Ohio's willingness to stop the march toward an execution and start over if and when necessary. Such action is to be commended, not derided.

Of little importance to any of the foregoing is the protocol addition of a special assistant. Various witnesses made much of this position and the quality assurance review she is to conduct in connection with each execution. Defendants offer the special assistant as evidence of their commitment to a constitutional process. Plaintiff in turn questions the qualifications and objectivity of the special assistant, who as yet has had no perceivable impact on Ohio's execution process. The Court notes the parties' dispute here merely for the sake of completeness and concludes that neither the testimony related to this position nor the testimony given by the special assistant informed the issues in any meaningful way.

The dispositive questions before this Court today have been whether Plaintiff is correct that Defendants routinely deviate from mandated or core provisions set forth in the written protocol and whether Plaintiff has sufficiently proved that the protocol fails to address sufficiently varied constitutional concerns. The answer to both questions is no. After the Smith rebuke, it appears that the state officials involved have finally recognized that subject adherence to the protocol and too much discretion to depart from core provisions or safeguards are neither

laudable nor constitutionally permissible approaches.  Thus, "the perplexing if not often shocking departures from the core components of the execution process that are set forth in the written protocol" appear to be relegated to the past, obviating the conclusion that Ohio's execution practices offend the Constitution based on irrationality and disturb fundamental rights that the law bestows on every individual regardless of the depraved nature of his or her crimes. (ECF No. 947, at 59.)

The first injunctive factor does not weigh in Plaintiff's favor.

### C. Irreparable injury, substantial harm to others, and the public interest

The Sixth Circuit has explained that in regard to the issue of whether injunctive relief should stay an execution date, "the absence of any meaningful chance of success on the merits suffices to resolve this matter." *Workman*, 486 F.3d at 911.  Because this Court has concluded that the first factor weighs against the issuance of injunctive relief, the Court need not and shall not address the remaining factors.

## III. Conclusion

As in prior injunctive relief decisions, the Court does not conclusively hold today that Ohio's method of execution practices are constitutional or unconstitutional.  Today's decision merely recognizes that based on all of the record evidence, Plaintiff has not met his burden of persuading this Court that he is substantially likely to prove unconstitutionality and prevail in this litigation.  This is not to say, however, that the Court is without concern over the successful implementation of and adherence to the September 18, 2011 protocol.

Ohio has time and again struggled with competence and consistency, and the Court remains wary.  There are competing inferences involved here.  Past bad behavior does not

invariably serve as a conclusive predictor of future poor conduct. At the same time, assertions of *Ohio has changed, just give the state one more chance* are not wholly effective at purging past sins. The Court is cognizant of the significant measures that Ohio has implemented to improve its protocol and the practices surrounding that protocol. The Court also recognizes the commitment of the individual state actors involved to lawfully, competently, and humanely discharge their execution-related duties. If the revised protocol aligned with the professionalism of the execution team and its supervisors meets with truly effective implementation, the lessons of the past will have produced a learned result that escapes the unconstitutional infirmities that have long plagued Ohio.

Based on the record evidence before this Court, there is no reason to conclude that Defendants will fail and that Plaintiff is likely to prevail on his § 1983 claims. Accordingly, the Court **DENIES** Plaintiff's motion for a temporary restraining order and a preliminary injunction. (ECF No. 1022.)

**IT IS SO ORDERED.**

    /s/  Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE